1    J. Michael Hennigan (SBN 59491)
     hennigan@mckoolsmithhennigan.com
2    Michael H. Swartz (SBN 163590)
     mswartz@mckoolsmithhennigan.com
3    MCKOOL SMITH HENNIGAN, P.C.
     865 South Figueroa Street, Suite 2900
4    Los Angeles, California 90017
     Telephone:   (213) 694-1200
5    Facsimile:   (213) 694-1234

6    Attorneys for Plaintiffs

7

8            **UNITED STATES DISTRICT COURT**

9            **CENTRAL DISTRICT OF CALIFORNIA**

<table>
<tr><td>

OAKTREE PRINCIPAL FUND V, LP.;<br>
OAKTREE PRINCIPAL FUND V<br>
(PARALLEL), L.P.; OAKTREE FF<br>
INVESTMENT FUND, L.P.; DG VALUE<br>
PARTNERS, L.P.; DG VALUE PARTNERS<br>
II MASTER FUND, L.P.; SPECIAL<br>
SITUATIONS, LLC; SPECIAL<br>
SITUATIONS X, LLC; BREVAN<br>
HOWARD CREDIT CALATYSTS<br>
MASTER FUND LIMITED; BREVAN<br>
HOWARD MASTER FUND LIMITED;<br>
VISIUM CREDIT MASTER FUND, LTD.;<br>
and VISIUM BALANCED MASTER<br>
FUND, LTD.<br><br>
           Plaintiffs,<br><br>
      v.<br><br>
WARBURG PINCUS LLC; WARBURG<br>
PINCUS PRIVATE EQUITY X, L.P.; FTI<br>
CONSULTING, INC.; and SEAN CARNEY,<br><br>
           Defendants.

</td><td>

Case No.   2:15-cv-8574<br><br>
Judge:<br><br>
**COMPLAINT FOR:**<br><br>
**VIOLATION OF THE<br>
FEDERAL SECURITIES<br>
LAWS;**<br><br>
**INTENTIONAL<br>
MISREPRESENTATION;**<br><br>
**CONCEALMENT;**<br><br>
**FRAUD BASED ON<br>
CONSPIRACY;**<br><br>
**NEGLIGENT<br>
MISREPRESENTATION**<br><br>
**JURY TRIAL DEMANDED**

</td></tr>
</table>

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

MCKOOL SMITH HENNIGAN, P.C.
LOS ANGELES, CA

1   Plaintiffs allege as follows:

2   **I.     THE PARTIES**

3       **A.     The Plaintiffs**

4       1.     Plaintiffs sue to recover losses they suffered on investments in

5   Rural/Metro Corporation ("Rural/Metro") 10.125% Senior Notes due 2019 ("Senior

6   Notes").  These losses were caused by Defendants' wrongful acts.

7       2.     Plaintiff Oaktree Principal Fund V, L.P. ("Oaktree Principal V") is a

8   Delaware limited partnership with its principal place of business in Los Angeles,

9   California.

10      3.     Plaintiff Oaktree Principal Fund V (Parallel), L.P. ("Oaktree Principal V

11  P") is a Delaware limited partnership with its principal place of business in

12  Los Angeles, California.

13      4.     Plaintiff Oaktree FF Investment Fund, L.P. ("Oaktree FF") is a Delaware

14  limited partnership with its principal place of business in Los Angeles.  Oaktree

15  Principal V, Oaktree Principal V P and Oaktree FF are collectively referred to as the

16  "Oaktree Plaintiffs."  The Oaktree Plaintiffs purchased the Senior Notes listed on

17  Exhibit A on the dates and for the prices listed.

18      5.     Plaintiffs DG Value Partners, L.P., a Delaware limited partnership, DG

19  Value Partners II Master Fund, L.P., a Cayman Islands limited partnership, Special

20  Situations, LLC, a Delaware limited liability company and Special Situations X, LLC,

21  a Delaware limited liability company, are collectively referred to as "DG."  DG

22  purchased the Senior Notes listed on Exhibit A on the dates and for the prices listed.

23      6.     Plaintiffs Brevan Howard Credit Catalysts Master Fund Limited and

24  Brevan Howard Master Fund Limited (collectively, "Brevan Howard") are each

25  companies duly organized and incorporated in the Cayman Islands.  Brevan Howard

26  purchased the Senior Notes listed on Exhibit A on the dates and for the prices listed.

27

28

McKOOL SMITH HENNIGAN, P.C.
LOS ANGELES, CA

7. Plaintiff Visium Credit Master Fund, Ltd. ("Visium Credit") is a Cayman Islands exempted company managed by Visium Asset Management, LP, a Delaware limited partnership with its principal place of business in New York.

8. Plaintiff Visium Balanced Master Fund, Ltd. ("Visium Balanced") is a Cayman Islands exempted company managed by Visium Asset Management, LP, a Delaware limited partnership with its principal place of business in New York. Visium Credit and Visium Balanced are collectively referred to as "Visium." Visium purchased the Senior Notes listed on Exhibit A on the dates and for the prices listed.

9. From May 2012 through August 1, 2013, Plaintiffs purchased Senior Notes at prices that were inflated as a result of misrepresentations and omissions by Defendants that are described below.

**A.    The Defendants**

10. Defendant Warburg Pincus LLC ("Warburg Pincus") is a New York limited liability company. Warburg Pincus is a global private equity firm that maintains only two offices in the United States, one in California and the other in New York. Warburg Pincus is registered to do business and does substantial and continuous business in California and in this District. Warburg Pincus has purposefully availed itself of the benefits of conducting business in California, including but not limited to, the operation of its office in California, the targeting of and sales to California investors of hundreds of millions of dollars of interests in Warburg Pincus funds and portfolio companies, and the investment by Warburg Pincus funds in California-based companies.

11. Defendant Warburg Pincus Private Equity X, L.P. is a Delaware limited partnership which does substantial and continuous business in California and in this District, and has purposefully availed itself of the benefits of conducting business in California, including but not limited to, the targeting of and sales to California investors of millions of dollars of interests in Warburg Pincus Private Equity X, L.P. Warburg Pincus Private Equity X, L.P. is an affiliate of Warburg Pincus, and acted

McKOOL SMITH HENNIGAN, P.C.
LOS ANGELES, CA

1  jointly with Warburg Pincus with respect to the matters alleged in this Complaint.

2  Warburg Pincus Private Equity X, L.P. is a Warburg Pincus private equity fund that

3  purchased Rural/Metro in 2011.  Warburg Pincus and Warburg Pincus Private

4  Equity X, L.P. are collectively referred to in this Complaint as "Warburg."

5      12.    Defendant Sean Carney is a managing director of Warburg Pincus and

6  was Chairman of the Board of Directors of Rural/Metro.  Carney transacts business in

7  California and in this District, including the targeting of and sales to California

8  investors of interests in Warburg Pincus funds and portfolio companies. At all times,

9  Carney was acting as an agent of and on behalf of Warburg.

10     13.    Defendant FTI Consulting, Inc. ("FTI") is a Maryland corporation that

11 maintains nine offices in California, the largest number of FTI offices in any one state.

12 FTI is registered to do business and does substantial and continuous business in

13 California and in this District.  FTI has purposefully availed itself of the benefits of

14 conducting business in California, including but not limited to, the operation of its

15 multiple offices in California, and the provision of business consulting, analytical and

16 valuation services for a wide variety of California businesses and investors.

17     14.    Defendants purposefully and intentionally directed their

18 misrepresentations and omissions at California and did so knowing that their

19 misrepresentations and omissions would cause harm in California.  Defendants were

20 aware that there were both existing note investors and potential new note investors in

21 California.  Warburg, Carney and Michael DiMino, the Chief Executive Officer and a

22 Director of Rural/Metro, directed the June 2011 private placement offering and the

23 February 2012 offering (both of which are discussed below) in substantial part to

24 California investors, many of whom became existing note investors by the time of

25 Defendants' misconduct that is discussed below.  Defendants were aware that any

26 existing note investor who wished to sell the Rural/Metro Senior Notes would be

27 required to forward all material information to any new investor, that

28 misrepresentations and omissions would therefore be directly or indirectly forwarded

MCKOOL SMITH HENNIGAN, P.C.
LOS ANGELES, CA

1  to new investors and that a large percentage of potential new investors were in

2  California. Indeed, the main purpose of Defendants' presentations regarding

3  Rural/Metro was to provide information to both existing and potential investors to

4  allow trading in Rural/Metro's Senior Notes and its bank loan. Defendants directed

5  their misrepresentations and omissions to all existing and potential note investors and

6  to the investing market. The Oaktree Plaintiffs received the misrepresentations and

7  omissions in California, and, in relying on the misrepresentations and omissions, felt

8  the brunt of the impact of the misrepresentations and omissions in California. The

9  other Plaintiffs suffered the same injuries and damages, including the purchase of

10  Senior Notes at artificially inflated prices, as a result of Defendants' common course

11  of conduct in making the misrepresentations and omissions to Plaintiffs.

12      15.    Each of the Defendants participated in the tortious actions alleged in this

13  Complaint, and is proximately responsible for the occurrences, harm and damages

14  alleged. Each of the Defendants is also a joint venturer, partner, co-conspirator,

15  principal, agent and aider and abettor of each of the other Defendants, and at all

16  relevant times was acting in the course and scope of said joint venture, partnership,

17  conspiracy and agency.

18  **II.    JURISDICTION AND VENUE**

19      16.    Plaintiffs' claims arise in part under Section 10(b) and 20(a) of the

20  Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and rule 10b-5 promulgated thereunder

21  by the Securities and Exchange Commission ("SEC"), 17 C.F.R. § 240.10b-5.

22      17.    This Court has jurisdiction over the subject matter of the action pursuant

23  to 28 U.S.C. §§ 1331 and 1367, as well as Section 27 of the Exchange Act, 15 U.S.C.

24  § 78aa.

25      18.    In connection with the acts alleged in the Complaint, Defendants directly

26  or indirectly used the mails and instrumentalities of interstate commerce, including the

27  mails, interstate telephone communications and facilities of the national securities

28  markets.

McKOOL SMITH HENNIGAN, P.C.
LOS ANGELES, CA

McKool Smith Hennigan, P.C.
Los Angeles, CA

1    19.    Defendants also have had substantial, continuous and systematic contacts

2   with California, including contacts with California in carrying out the unlawful acts

3   and conduct that are the subject of this Complaint.

4    20.    Venue is proper in this District pursuant to both Section 27 of the

5   Exchange Act and 28 U.S.C. § 1391(b) because Defendants transact business in this

6   District.  Additionally, acts constituting the violations alleged in this Complaint took

7   place in this District.  The misrepresentations and omissions which underlie the

8   Plaintiffs' claims were purposely directed to California, and were received by the

9   Oaktree Plaintiffs in California. The Oaktree Plaintiffs' decisions to purchase and their

10  purchases of the Senior Notes were made in this District, and their losses were

11  incurred in this District.

12  **II.    SUMMARY OF ACTION**

13    21.    During all periods relevant to this complaint, Rural/Metro was one of the

14  nation's largest providers of ambulance services, including emergency and non-

15  emergency medical transportation services.  Rural/Metro obtained its revenues

16  primarily from reimbursements by private insurance companies and government

17  funded healthcare programs such as Medicare and Medicaid.  Rural/Metro also

18  obtained revenues, to a lesser extent, through fees paid directly by uninsured patients.

19  Rural/Metro's customers included municipalities, fire districts, government agencies,

20  hospitals, nursing homes, specialty healthcare facilities and individual patients.

21  Rural/Metro served numerous communities in over 20 states, including California,

22  one of the primary sources of ambulance revenues for Rural/Metro.

23    22.    Warburg purchased Rural/Metro in June 2011.  Warburg publicly touted

24  its expertise in taking over and growing healthcare companies.

25    23.    After Warburg's purchase of Rural/Metro, however, Warburg and Carney

26  became aware of deeply troubling issues concerning Rural/Metro's financial

27  accounting systems, performance and operations.  Where Warburg's knowledge,

28

1  statements and omissions are discussed below, that knowledge, those statements and
2  those omissions were also Carney's.

3      24.    Warburg and Carney learned from DiMino and Rural/Metro's Chief
4  Financial Officer Jorge Perez that the ratio of cash collections to recorded revenues
5  had been steadily decreasing.  This ratio should not have been decreasing.  The
6  declining ratio indicated that the recorded revenues were incorrect and that the degree
7  of error was increasing.

8      25.    Warburg and Carney learned that Rural/Metro's revenue recognition
9  systems were antiquated, defective and unable to determine the company's revenues
10 reliably and accurately.  Warburg and Carney learned that Rural/Metro's systems
11 consistently produced inflated figures for revenues and earnings.

12     26.    Together, these problems exposed Rural/Metro to large write-offs of its
13 reported revenues and earnings and rendered the revenue and earnings numbers
14 reported to Rural/Metro's investors inaccurate and overstated.

15     27.    With Defendants' active participation and involvement, Rural/Metro held
16 quarterly calls to report on the company's financial performance to current and
17 prospective investors in Rural/Metro.  Rather than disclose to investors true and
18 correct information concerning Rural/Metro's true financial condition and the
19 antiquated, defective and unreliable nature of its revenue recognition systems,
20 Rural/Metro, DiMino and Defendants instead consistently presented a false picture of
21 financial health to investors and lenders in an effort to salvage one of Warburg's most
22 important healthcare investments.  From at least May 2012 through July 2013,
23 Warburg, Carney, Rural/Metro and DiMino, and in the latter part of the period, FTI,
24 made material misrepresentations and failed to disclose material facts to investors and
25 potential investors in the Senior Notes related to three key areas:

26     (a)    **Rural/Metro's Antiquated and Unreliable Revenue Recognition**
27            **System.**  Commencing no later than the May 2012 investor call, Warburg,
28            Carney, Rural/Metro and DiMino repeatedly made material misrepresentations

McKool Smith Hennigan, P.C.
Los Angeles, CA

6

concerning the financial performance of Rural/Metro by failing to disclose that Rural/Metro was unable to determine its revenues accurately and reliably and that Rural/Metro's reported results were therefore inflated (as they were later confirmed to be) and unreliable.

(b)     **Accounts Receivable Write-Offs Were Not One-Time Events.**  In particular, Rural/Metro's flawed revenue recognition system resulted in a $17.6 million accounts receivable write-off that was announced to investors during a September 2012 investor call.  This write-off was falsely described by Warburg, Carney, Rural/Metro and DiMino as a "one-time clean-up item."  They knew at the time of the call that the revenue recognition system had not been fixed, and that Rural/Metro would likely need additional write-offs in future quarters—meaning that additional write-offs that should have been recorded by the time of the September 2012 call would be recorded in later time periods.

(c)     **Rural/Metro's March 31, 2013 Last Twelve Months EBITDA Was at Least $6 million Less Than Represented.**  In January 2013, FTI was retained to assist in fixing Rural/Metro's revenue recognition system and in quantifying how much in additional write-offs was required.  Based on FTI's work, during the May 2013 investor call an additional $35 million accounts receivable write-off was disclosed.  FTI, Warburg, Carney and Rural/Metro falsely represented that Rural/Metro's Last Twelve Months adjusted EBITDA (Earnings Before Interest, Taxes, Depreciation and Amortization—a measure of cash flow) as of March 31, 2013 was $70 million, when they each knew it was $64 million or less.  It was critical that Rural/Metro's EBITDA be at least $70 million to cover its annual cash requirements so that it could continue to operate without a major restructuring.  Presenting a $64 million EBITDA figure would have revealed that Rural/Metro was going to need an urgent, major restructuring of its

1  obligations.  In fact, Rural/Metro's Last Twelve Months EBITDA as of

2  March 31, 2013 was far less than even $64 million.

3  28.     When the true nature and extent of Rural/Metro's financial distress and

4  overstated revenues were ultimately revealed to the market, the value of Plaintiffs'

5  Senior Notes plummeted as a result.  On August 4, 2013, Rural/Metro filed for

6  reorganization under Chapter 11 of the United States Bankruptcy Code.  Plaintiffs

7  seek recovery of losses incurred as a result of Defendants' wrongful acts.  Defendants'

8  wrongful misrepresentations and omissions proximately caused Plaintiffs' purchases

9  of the Senior Notes at artificially inflated prices and proximately caused Plaintiffs to

10  lose a large portion of their investment in Rural/Metro.

11  **III.   WARBURG'S JUNE 2011 ACQUISITION OF RURAL/METRO**

12       **A.     Acquisition of Rural/Metro and Issuance of the Senior Notes**

13  29.     In June 2011, affiliates of Warburg Pincus, including Warburg Pincus

14  Private Equity X, L.P., purchased all of Rural/Metro's stock, which had previously

15  been publicly traded, for approximately $760 million.  The purchase was funded in

16  part with approximately $218 million of Warburg funds, a private placement offering

17  of $200 million of Senior Notes, and proceeds of approximately $325 million from a

18  Credit Agreement dated June, 2011.

19  30.     Warburg was the Sponsor of the Senior Notes offering.  As Sponsor,

20  Warburg retained as its agents the investment banks who promoted the Senior Notes

21  offering, and Warburg led the drafting of the Senior Notes Offering Memorandum, the

22  related due diligence and the issuance of the Senior Notes to investors.  The Senior

23  Notes were not registered under the Securities Act of 1933, as amended, or any state

24  securities laws, and were therefore required to be offered and sold only to qualified

25  institutional buyers in accordance with Rule 144A under the Securities Act.

26  31.     In the Offering Memorandum, Warburg emphasized its health care

27  experience and touted itself as a "growth investor and an experienced partner to

28  management and teams seeking to build durable companies with sustainable value"

McKOOL SMITH HENNIGAN, P.C.
LOS ANGELES, CA

1   and as a business that invested more than "7.5 billion in healthcare companies." The

2   success of the Rural/Metro acquisition was important to Warburg's story of its

3   expertise in healthcare investments.

4        32.     After completing the purchase of Rural Metro, Warburg immediately

5   assumed control of Rural/Metro and maintained such control throughout the relevant

6   period. Warburg elected a new Board of Directors, including Warburg principals

7   Carney and Eric Liu. Warburg chose to have DiMino continue to serve on the new

8   Board of Directors and to act as Chief Executive Officer of Rural/Metro after

9   Warburg's purchase. Warburg had the power, and ultimately exercised the power, to

10  terminate him. Carney was appointed Chairman of the Board and was integrally

11  involved in all major decisions and events impacting Rural/Metro. Liu was appointed

12  to the Rural/Metro Audit Committee and was similarly integrally involved in major

13  matters at Rural/Metro. As a result of their roles with Rural/Metro, and while acting

14  on behalf of Warburg, Carney and Liu learned all material facts regarding

15  Rural/Metro's financial condition.

16       **B.     Warburg's Strategy of Growth Through Acquisition**

17       33.     Carney led the team at Warburg responsible for the purchase of

18  Rural/Metro, a team that also included Liu and Jacob Strauss. Warburg and Carney

19  anticipated that Rural/Metro, under their control, would experience significant growth

20  through acquisitions and that this could be accomplished through Rural/Metro's

21  existing management team.

22  **IV.   RURAL/METRO'S REVENUE RECOGNITION AND BILLING**

23         **SYSTEMS**

24       **A.     Rural/Metro's Revenue Recognition Methodology**

25       34.     During all periods relevant to this complaint, Rural/Metro provided

26  emergency response services primarily under exclusive contracts with counties,

27  municipalities, fire districts and other governmental agencies. These contracts

28  governed Rural/Metro's right to provide emergency ambulance services and, to some

McKool Smith Hennigan, P.C.
Los Angeles, CA

9

extent, its compensation for those services. These contracts typically required Rural/Metro to respond to all emergency calls in a designated area. Under such agreements, Rural/Metro was required to transport a patient regardless of the individual's ability to pay.

35.  Rural/Metro published a schedule of rates for the various services it offered. But the actual payment amounts it received for any transport depended significantly on applicable contractual arrangements with third party payers (such as insurance) or the amounts allowed by Medicare/Medicaid rules. Such differences (between Rural/ Metro's published rates and lower amounts set by contract or regulation) are sometimes referred to as "contractual allowances."

36.  Rural/Metro recognized revenues for its ambulance services when the services were provided. Rural/Metro's revenues were reported net of estimated contractual allowances for Medicare, Medicaid and other third party payer reimbursement limitations, and net of estimates for uncompensated care. Accurate assessment of the applicable contractual allowance was essential to an accurate net revenue calculation. Underestimated contractual allowances would produce overstated net revenue.

37.  Rural/Metro also needed to determine accurately its collections from charges it made to uninsured individuals. If it could not determine such collections accurately, Rural/Metro could not record the related revenues until the collections were made. Collections from uninsured individuals are notoriously less certain than collections from third-party payers. An accurate net revenue figure required that billed amounts be adjusted downward based on an informed and realistic estimate of the likelihood of actually collecting from uninsured individuals.

38.  In sum, Rural/Metro's actual cash receipts and properly recognized revenue for each transport varied based on the source of payment, and depended on whether patients were uninsured, held commercial insurance or had medical expenses

1    covered by Medicare or Medicaid.  The industry refers to this composition of parties

2    making payments as the "payer mix."

3        39.    In reporting its net revenues (*i.e.*, revenue per transports after taking into

4    account adjustments for contractual allowances and uncompensated care),

5    Rural/Metro used an average patient charge ("APC") for transports in each

6    geographical region in which Rural/Metro operated.

7        40.    While Rural/Metro's revenue recognition process used several inputs,

8    some of which were based on current data, a large component of Rural/Metro's net

9    revenue figure and the assessment of the collectability of Rural/Metro's accounts

10   receivable were based on a 13 month "look back" methodology which employed

11   collection rates that were over a year old.  Among other problems associated with

12   using such outdated collection data, the 13 month "look back" did not take into

13   account the changes in payer mix and payers' rates of reimbursement since that time,

14   thus impacting the amount of proper adjustments for contractual allowances and

15   uncompensated care.  Because Rural/Metro's reported net revenues did not reflect

16   recent payer mix changes and other changes to variables impacting collection rates,

17   the reported revenues were inaccurate and overstated.

18       41.    Periodically, Rural/Metro increased the levels of its published rates.

19   When it did so, it also increased the net revenue it recognized for transports to be paid

20   for by third party payers.  The accuracy of Rural/Metro's net revenue figures was

21   further compromised by its accounting treatment of the impact of such rate increases.

22   Rural/Metro's methodology assumed that it would collect a significant portion of the

23   rate increases when it was certain, and consistent with Rural/Metro's own experience,

24   that such a large portion would not be collectible.  Rural/Metro's unilateral changes to

25   its own rate structure could not alter its established contractual entitlements.

26   Rural/Metro could not properly record the amount of revenues that it projected from

27   its rate increases.

28

McKool Smith Hennigan, P.C.
Los Angeles, CA

11

42.   Revenue is a key item to investors in evaluating a company and its financial statements.  As Defendants knew, to be properly recorded as revenues a company's estimates of its future cash receipts must be reasonable and result in amounts that have a reasonable probability of being collected.  Defendants also knew that their revenue presentations were supposed to reflect the economics of the business.

43.   Moreover, whether an entity is able to make a reasonable and reliable determination of its revenues is a material fact to a reasonable investor.

44.   EBITDA, which is a measure of cash flow based on reported revenues, is also a critical and material factor considered by investors in making investment decisions.  All Plaintiffs considered EBITDA in assessing whether to acquire Rural/Metro's Senior Notes.

45.   Rural/Metro having EBITDA in amounts sufficient to meet its ongoing cash obligations was an essential component in Plaintiffs' investment decisions.

46.   Defendants knew the critical importance to investors of an accurate statement of Rural/Metro's revenues and EBITDA.  Warburg and Rural/Metro touted Rural/Metro's use of sophisticated revenue recognition methodologies that were supposedly capable of reasonably and properly estimating revenues.  Revenue recognition was among the matters identified in the Offering Memorandum as "critical to understanding" Rural/Metro's results of operations:

> **Revenue Recognition.**   A significant portion of our revenue is generated in the highly regulated and complex healthcare industry…*We use sophisticated financial models to estimate the provisioning for both contractual allowances and uncompensated care by looking at current service levels, payer mix known at the time of transport and incorporating historical trend information by service area.*   The evaluation of these data points, along with our interpretation of Medicare, Medicaid and various commercial

McKOOL SMITH HENNIGAN, P.C.
LOS ANGELES, CA

12

insurance provider rules and regulations, is highly complicated and subjective. If our interpretation or our analysis surrounding historical data is incorrect, revenue could be overstated or understated. For the year ended June , 2010, a 1% change in our estimate of revenue collectability would impact Rural/Metro Corporation by $9.5 million of net revenue.

47.     As described above and below, Rural/Metro's revenue recognition system was flawed and resulted in materially inaccurate reporting of the net revenue that Rural/Metro would reasonably expect to recover for its patient transports. Among other flaws, the system did not take into account current payer mix, service level mix (reimbursement rates differ depending on the level of ambulance service provided, *i.e.*, basic life support versus advanced life support) known at the time of transport, or historical trend by service area. The system also did not take into account the inability to pass through rate increases. The entire revenue recognition system was dated and unreliable. These material facts were known to Defendants. Defendants, however, misrepresented this information to Plaintiffs and did not disclose the true facts

**B.     Rural/Metro's Billing and Collection Systems**

48.     Defendants also knew that another critical aspect of Rural/Metro's operations and growth was its billing and collections capabilities. As represented in the Offering Memorandum:

> *Leading Billing and Collections Capability*: Our focus on improved billing and collections capabilities has allowed us to reduce DSOs and decrease uncompensated care, which in turn increases APC.

49.     The Offering Memorandum further stated:

> ***Our business depends on numerous complex information systems, and any failure to successfully maintain these***

McKool Smith Hennigan, P.C.
Los Angeles, CA

13
COMPLAINT

*systems or implement new systems could materially and adversely affect our operations.*

\* \* \*

We also use the development and implementation of sophisticated and specialized technology to differentiate our services from our competitors and improve our profitability. The failure to implement and maintain operational, financial and billing information systems successfully could have an adverse effect on our ability to obtain new business, retain existing business and maintain or increase our profit margins.

50.     In fact, as described below, Rural/Metro's billing systems were flawed and inadequate, a material fact known to Defendants. Defendants, however, misrepresented this information to Plaintiffs and did not disclose the true facts.

## V.     ACQUISITIONS OF PMT AND PACIFIC BOWERS

51.     Immediately after purchasing Rural/Metro, Warburg began implementing the planned growth-through-acquisition strategy. In September 2011, Rural/Metro entered into an agreement to purchase Pacific Ambulance, Inc. and Bowers Companies, Inc. ("Pacific Bowers"), a large provider of ambulance services in California for approximately $48 million. The purchase was financed with a $28 million draw under a $35 million unsecured bridge loan to Rural/Metro and a $20 million equity contribution from Warburg. The purchase was consummated in December 2011.

52.     In September 2011, Rural/Metro also entered into an agreement to purchase Professional Medical Transport, Inc. and affiliated entities ("PMT") for approximately $52 million. That purchase was consummated in February 2012.

COMPLAINT

McKOOL SMITH HENNIGAN, P.C.
LOS ANGELES, CA

McKool Smith Hennigan, P.C.
Los Angeles, CA

53.   While working on the potential acquisitions, Warburg and Carney learned that DiMino and the entire management team at Rural/Metro lacked the ability to analyze, negotiate and implement these acquisitions in a competent manner.

54.   The magnitude and complexity of the two acquisitions were unprecedented for Rural/Metro.  Red flags were raised concerning the financial condition of the potential acquisitions.  Nevertheless, Rural/Metro, Warburg, Carney and DiMino concluded the acquisitions without addressing concerns raised during the due diligence.  Rural/Metro, Warburg, Carney and DiMino also failed properly to plan for integrating and failed properly to integrate the acquired companies' operations into Rural/Metro's already antiquated and defective revenue recognition, billing and collections systems.

55.   Warburg, Carney and DiMino caused Rural/Metro to complete the acquisitions notwithstanding the known risks.  To complete the acquisitions, on February 3, 2012, Rural/Metro issued an additional $108 million of 10.125% Senior Notes due 2019.  The Senior Note proceeds repaid the draw on the bridge loan utilized for the Pacific Bowers purchase, funded the PMT purchase and paid down a portion of the revolving credit facility.  Once again, Warburg sponsored and led the February 2012 private placement offering.

56.   As Warburg, Carney and DiMino could all reasonably anticipate based on what they knew before the acquisitions, the acquisitions proved financially disastrous.  Revenues were far less than estimated for both PMT and Pacific Bowers, and faulty revenue recognition procedures made it impossible for Rural/Metro to determine those revenues accurately and reliably.

57.   While the February 2012 Offering Memorandum projected that Pacific Bowers would generate monthly EBITDA of $750,000 ($9 million annually), FTI determined and reported to Warburg and Carney in April 2013 that "the run rate established at the acquisition date for Pacific Bowers overstated revenue and EBITDA.  Based on adjusted revenue post-acquisition, the monthly revenue run-rate

was $2.7 million, and EBITDA was approximately break-even." The February 2012 Offering Memorandum projected that PMT would generate monthly EBITDA of $875,000. FTI Consulting determined and reported to Warburg and Carney in April 2013 that "the run rate established at the acquisition date for PMT overstated EBITDA. Based on adjusted revenue post-acquisition, the monthly revenue run-rate was $3.5 million, and EBITDA was $0.5 million."

## III. DEFENDANTS WERE AWARE OF RURAL/METRO'S FLAWED REVENUE RECOGNITION SYSTEM AND INABILITY TO DETERMINE REVENUES ACCURATELY AND RELIABLY

58. In February 2012, Rural/Metro's CFO Perez was provided a report that reflected a negative trend in the ratio of cash collections to recorded revenues. Rural/Metro was collecting a smaller and smaller percentage of its recorded revenues, strongly indicating that Rural/Metro's reported revenues and EBITDA were inflated and unreliable. Shortly thereafter, DiMino and Perez escalated the issue to Carney at a meeting in Arizona, shared the report, and understood that a problem existed and that it needed to be researched and investigated. Carney instructed Perez to "dig into" the problem and "find out" because the problem was "important" and "critical."

59. On March 7, 2012, Carney engaged in efforts to assist in resolving the revenue recognition issues. Specifically, he sent an email to Marty Rash, CEO of RegionalCare (another Warburg portfolio company), regarding the collections issue. Carney told Rash that Perez and DiMino would be calling him as Perez was trying to "measure the revenue-to-collections cycle better" and DiMino wanted to "identify a third party to help us identify/fix our processes . . . ."

60. To address the problems, in April 2012, Rural/Metro, with the knowledge of Warburg and Carney, retained Warburg's long-time advisor and consultant on Rural/Metro financial matters, the accounting firm Ernst & Young ("E&Y"), to analyze Rural/Metro's revenue recognition system and related issues.

61.     In April 2012, after meeting with DiMino and Perez, E&Y confirmed Warburg's and DiMino's already-existing understanding that Rural/Metro's revenue recognition methodology created a substantial risk of misstating revenues.  E&Y warned that Rural/Metro was "challenged in a couple of areas related to revenue cycle data and information," and that:

> the current approach for analyzing revenue performance information is particularly risky in an environment where payers are generally paying less for the same services than they have in the past.  Because of the lag factor in the monthly calculation … it is difficult to detect recent reductions in payment levels from the payers thereby increasing the risk on the reserve for contractual in accounts receivable.

62.     E&Y also noted that "Rural/Metro has been experiencing a decrease in collections over the past year" which led Rural/Metro's "executives to ask:  Is there a better way to value month end accounts receivable—ideally with more accurate and timely accounts receivable information?  Why are collections going down?"

63.     In May 2012, E&Y again confirmed to Rural/Metro, DiMino, Warburg and Carney (and they agreed) that there were serious problems with Rural/Metro's revenue recognition system.  E&Y confirmed to Rural/Metro, DiMino, Warburg and Carney (and they agreed) that the system utilized by Rural/Metro was:

> a **risky methodology** that is subject to a level of estimates and judgment that **is not appropriate for a company of the size and scale of Rural/Metro**.

Among the multiple deficiencies noted was the fact that Rural/Metro was not

> presently capturing and storing the net payment amount received from each payer for each service.   Without a

COMPLAINT

current and historical data base for maintaining this information, it will be nearly impossible to value the month end receivable or perform accurate profitability analysis by customer/location.

64.    Throughout the summer of 2012, E&Y continued to assess the flaws in the Rural/Metro revenue recognition system and to update Rural/Metro, Warburg, Carney and DiMino on the serious flaws and issues.  In September 2012, E&Y presented Warburg (and Carney) and Rural/Metro (and DiMino) a report stating that Rural/Metro's retrospective methodology for determining contractual allowances and net revenues was "antiquated and risky."  E&Y also confirmed serious problems in Rural/Metro's billing and collection systems that are described below.

65.    Despite their knowledge from at least May 2012 forward that Rural/Metro utilized an unreliable and flawed revenue recognition system, and that Rural/Metro could not and did not adequately determine revenues, Warburg, Carney, Rural/Metro and DiMino withheld this information from investors and potential investors, including Plaintiffs, and affirmatively misrepresented Rural/Metro's revenues and EBITDA.  If Plaintiffs had known the true facts, they would not have purchased the Senior Notes at all or at the prices they paid.

66.    It was not until after the Rural/Metro bankruptcy in August 2013 that Plaintiffs learned the true facts concerning Rural/Metro's revenue recognition system and its inability to determine its revenues and EBITDA accurately and reliably.

VI.    **RURAL/METRO QUARTERLY INVESTOR CALLS**

67.    After Warburg's acquisition of Rural/Metro and the issuance of the Senior Notes, Rural/Metro and Warburg held quarterly investor calls to discuss Rural/Metro's financial condition, operations and prospects.  Current and prospective investors in the Senior Notes were invited to participate.  In connection with these calls Rural/Metro current and prospective investors were given access to

McKool Smith Hennigan, P.C.
Los Angeles, CA

1   Rural/Metro's quarterly financial statements and a written PowerPoint presentation

2   discussing the quarter's supposed financial results.  Investors were able to access

3   those written materials on Rural/Metro's Intralink site with password information sent

4   to them by Rural/Metro via an email invitation to the call.  Prospective investors were

5   also able to obtain access to the call upon request to Rural/Metro, or to the

6   underwriters of the Senior Notes who made a market in the Senior Notes as part of the

7   services they provided to Warburg in connection with the offering of the Senior Notes.

8   During the road shows to promote the Senior Notes, Warburg committed that

9   Rural/Metro would provide quarterly conference calls for existing and prospective

10  investors.  On Warburg's behalf, the underwriters provided access to these calls to

11  prospective investors.

12      68.     As Defendants were aware, the investor calls and materials were an

13  important source of information to both current and prospective investors, including

14  Plaintiffs.  Investors were given the opportunity to ask questions and receive answers

15  during such calls concerning Rural/Metro's financial condition, operations and

16  prospects.

17      69.     Defendants presented false and misleading information to current and

18  prospective investors, including Plaintiffs, during the investor calls, in the quarterly

19  Discussion of Financial Results PowerPoint presentations, and in the quarterly

20  financial statements during the period 2012 through 2013, as described above and

21  below.  Defendants withheld or misrepresented material facts concerning

22  Rural/Metro's flawed revenue recognition system, its failure to properly book its

23  revenues and accounts receivable reserves, and the flaws in its billing and collection

24  systems.  Defendants also presented revenue and EBITDA numbers that they knew

25  were inflated, inaccurate, unreliable and without any reasonable basis.

26

27

28

McKool Smith Hennigan, P.C.
Los Angeles, CA

COMPLAINT

## VII.   MISREPRESENTATIONS MADE DURING THE MAY 2012 INVESTOR CALL

70.   Rural/Metro's 2012 fiscal year ran from July 1, 2011 through June, 2012. On or about May 15, 2012, Rural/Metro and Warburg held a quarterly investor call to discuss the Fiscal Year 2012 third quarter (January through March 2012) financial results.

71.   At the time of the May 2012 investor call, Warburg, Carney, Rural/Metro and DiMino knew that Rural/Metro had a significant revenue recognition problem and that E&Y had been retained to address the problems.

72.   None of the known revenue recognition problems were disclosed to current and prospective investors during the call.  Instead, DiMino spoke glowingly during the call regarding Rural/Metro's supposedly increased revenues and EBITDA for its fiscal third quarter:

> [O]ur financial performance is solid and trending in a
> positive direction.  We are confident that our proactive
> organic and strategic growth platform provides ample
> opportunities for continued long-term growth.

73.   This statement was materially misleading.  Rural/Metro's financial performance was not trending in a positive direction.  DiMino, Rural/Metro, Carney and Warburg knew, but did not disclose to investors, that the ratio of collections from Rural/Metro's base business compared to its booked revenues had been steadily decreasing, that Rural/Metro's revenue recognition system was risky and unreliable, that Rural/Metro was unable to determine its revenues in a reliable manner and that reported revenues were inflated.

74.   DiMino and Rural/Metro also deceptively focused investors' attention on increased transports, but failed to disclose that Rural/Metro did not have the ability reliably to determine revenues from those transports: "We are pleased to see

McKOOL SMITH HENNIGAN, P.C.
LOS ANGELES, CA

McKOOL SMITH HENNIGAN, P.C.
LOS ANGELES, CA

1  continued growth in transport volumes from continuing operations and expect this

2  trend to continue." Disclosure of the omitted information was necessary so that the

3  statements concerning increased transport volumes and other statements about

4  Rural/Metro's performance would not be materially misleading.

5      75.    Subsequent to the May 2012 investor call, and in reliance on the false

6  information provided to investors during the call, from May 15, 2012 through August

7  2012 Visium purchased approximately $16.6 million of Senior Notes at inflated

8  prices. If Visium had known the true facts, it would not have purchased the Senior

9  Notes either at all or at the prices it paid and would not have incurred the resulting

10 losses.

11 **IV.   FROM JUNE THROUGH SEPTEMBER 2012, DEFENDANTS**

12 **LEARNED OF FURTHER REVENUE AND RESERVE PROBLEMS**

13 **BUT FAILED TO DISCLOSE THESE PROBLEMS AND**

14 **MISREPRESENTED THE TRUE FACTS**

15 **A.    Defendant's Knowledge of Substantial Increase to Accounts**

16 **Receivable Reserves and Need for a System-Wide Overhaul**

17     76.    In or about June 2012, Warburg and Carney learned (and DiMino learned

18 or was already aware) that a large increase to accounts receivable reserves was

19 required, which would reduce historical and current EBITDA, as well as reported

20 revenues. As Warburg, Carney, DiMino and Rural/Metro were already aware, the

21 existing revenue recognition system was not reliably determining Rural/Metro's

22 revenues and was causing inflated reported revenues and EBITDA.

23     77.    Given the severe financial stress confronting Rural/Metro, Warburg went

24 into crisis mode, taking the lead in analyzing and considering possible methods to

25 address the revenue recognition issues. Warburg named these efforts the "Rural

26 Recovery Project Workplan." This extensive involvement in the day-to-day efforts to

27 resolve Rural/Metro's revenue recognition issues reflected Warburg's and Carney's

28 recognition that the Rural/Metro system was incapable of generating reliable revenue

data and had been producing inflated revenue numbers.  It included hiring of consultants to diagnose and quantify the revenue recognition issues:

a.   How large is the hole in the aggregate?

b.   How much [of the increase in reserves] is [applicable to] FY11 and prior years versus FY12[?]

c.   How much is worsening collection rate versus forecasting methodology?

d.   Covenant compliance headroom [before Rural/Metro would violate covenants with bank lenders].

78.   Warburg and Carney knew Rural/Metro needed to fix the revenue recognition and accounts receivable systems—two critical systems that the Defendants had failed to disclose were horribly in need of repair.

79.   Warburg and Carney were also aware that the management team at Rural/Metro did not have the experience or ability to resolve issues of the magnitude confronting Rural/Metro.  Accordingly, Warburg and Carney directed and actively participated in day-to-day efforts to address the revenue recognition problems and overstatements.

80.   Despite these efforts, Warburg, Carney, DiMino and Rural/Metro did not correct the revenue recognition problems and continued to be unable to determine revenues and EBITDA accurately and reliably.  These facts were not disclosed, and were misrepresented by Defendants, Rural/Metro and DiMino to investors and potential investors, including Plaintiffs.

**B.   Defendants' Knowledge of Rural/Metro's Billings and Collections Issues**

81.   Warburg and Carney also learned that there were serious flaws in Rural/Metro's billing and collection processes.  DiMino learned or was already aware of this issue.

82.   E&Y informed Warburg, Carney, DiMino and Rural/Metro that Rural/Metro "utilizes old software, the AS400, to gather billing information, bill and

McKOOL SMITH HENNIGAN, P.C.
LOS ANGELES, CA

1  collect receivables from all payer types.  At the time this software was modified for

2  use in healthcare, Rural/Metro was a considerably smaller company and healthcare

3  billing and collections were not nearly as complex as they are today."

4        83.    These facts were not disclosed and were misrepresented to investors and

5  potential investors, including Plaintiffs.

6  **C.    Defendants' Knowledge That Commercial Price Increases That**

7  **Could Not Stick Were Used Misleadingly to Boost Reported**

8  **Revenues**

9        84.    By no later than June 2012, Carney, Warburg and DiMino also learned

10  that, in an effort to boost revenues, Rural/Metro had started raising commercial prices

11  more frequently and had overestimated the amount of the price increases that would

12  be collectible.  Rural/Metro's ability to increase meaningfully the prices to be paid by

13  the various payers varied widely depending on the provisions of each payer's

14  commercial insurance policy terms.  Carney, Warburg and DiMino knew that

15  Rural/Metro assumed, with no reasonable basis, that a much larger amount of its

16  commercial price increases would be accepted and honored by payers than could have

17  been reasonably expected and that this resulted in an overstatement of revenues.

18        85.    These facts were not disclosed and were misrepresented to investors and

19  potential investors, including Plaintiffs.

20  **D.    Defendants' Knowledge that $17.6 Million Increase in Accounts**

21  **Receivable Reserves Was Insufficient**

22        86.    In September 2012, an adjustment of $17.6 million was recorded by

23  Rural/Metro and taken into account in its financial statements for the fiscal year

24  ending June 2012.  Warburg, Carney, DiMino and Rural/Metro knew, however, that

25  the $17.6 million correction was insufficient to correct the amount of receivables

26  indicated on Rural/Metro's financial statements.  They knew that additional increases

27  in accounts receivable reserves (and therefore reductions in EBITDA) would be

28

McKOOL SMITH HENNIGAN, P.C.
LOS ANGELES, CA

23

1   required, and that the reported revenue and EBITDA amounts were not accurate even

2   after the recorded $17.6 million adjustment.

3        87.     Delaying the adjustments to future quarters would soften the blow to

4   Rural/Metro's fourth quarter 2012 results and make Rural/Metro's 2012 financial

5   results appear more favorable than they actually were.

6        88.     In a September 2012 "Presentation to Warburg Pincus and Rural/Metro

7   Corporation" entitled "Net payment and reserve process assessment," E&Y reported

8   to Rural/Metro, Warburg, Carney and DiMino, among others, more details of the

9   deficiencies in the Rural/Metro revenue recognition system, thus further confirming

10  Rural/Metro's inability to calculate revenues in an accurate manner.  E&Y warned

11  that the Rural/Metro revenue recognition system was "antiquated and risky," based on

12  "old software," and was at odds with those of "[l]eading practice healthcare

13  organizations [which] closely monitor net payment levels for all payers."

14       89.     Defendants, DiMino and Rural/Metro did not disclose these critical and

15  material financial facts to existing and prospective investors.  Instead, Defendants,

16  DiMino and Rural/Metro misrepresented these facts to investors and potential

17  investors, including Plaintiffs.

18       **E.     Misrepresentations Made During September 2012 Investor Call**

19       90.     On September 26, 2012, shortly after the E&Y "Presentation to Warburg

20  Pincus and Rural/Metro" concerning the defects in Rural/Metro's revenue recognition

21  system, Rural/Metro and Warburg held a quarterly investor call to discuss the

22  financial results for the quarter ending June 2012 (fourth quarter Fiscal Year 2012).

23  Warburg, Carney, DiMino and Rural/Metro created and gave a financial presentation

24  during the call that was materially misleading.  Warburg and Carney actively

25  participated with DiMino in the preparation of both the financial presentation

26  provided to current and prospective investors entitled "Discussion of 4Q FY 2012

27  Financial Results," and the script of what was to be disclosed to current and

28  prospective investors during the investor call.  Warburg and Carney reviewed, revised

MCKOOL SMITH HENNIGAN, P.C.
LOS ANGELES, CA

COMPLAINT

1   and participated in the drafting of numerous versions of the script and financial

2   presentation, and provided extensive input on how to frame the difficult issues

3   confronting Rural/Metro with respect to its revenue recognition system.  Warburg and

4   Carney also provided final sign off on the script and financial presentation.  Warburg

5   and Carney were also intimately involved in preparing DiMino and Perez with respect

6   to what would be said to investors during the call, including drafting potential

7   questions from investors and assisting in developing answers.  Notwithstanding past

8   practice, at Carney's instruction, the financial presentation slides were not provided to

9   current and prospective investors in the Senior Notes prior to the investor call.  The

10  financial presentation slides were instead posted on the day of the call.  Carney

11  personally joined DiMino and Perez for the call and investor presentation. While

12  current and prospective investors were informed of the $17.6 million write-down, they

13  were falsely told by DiMino during the call, with the knowing participation, assistance

14  and final approval of Carney and Warburg, that the $17.6 million write down was a

15  "one-time clean-up item" that resulted from a change in payer mix, and that

16  Rural/Metro's revenue recognition issues had been successfully remedied:

> [W]ith our new enhanced methodologies we will be able to
> rapidly identify any further impact from external economic
> changes.... We also have a significant increase in average
> patient charge due to the impacted revenue cycle
> management process, as well as our---price increases that we
> will normally receive during the year. We have a high
> confidence in the reserve estimate for anticipated
> collections.

91.   Mischaracterization of the $17.6 million write-down as a one-time event
was intended by Warburg, Carney, DiMino and Rural/Metro to provide false
reassurance to investors that Rural/Metro had successfully resolved its revenue

McKool Smith Hennigan, P.C.
Los Angeles, CA

1    recognition problems.  In reviewing this write-down, Plaintiffs understood that it was

2    the common practice when companies announced earnings revisions to disclose all

3    problems and to move forward with clean numbers and Warburg, Carney, DiMino and

4    Rural/Metro were aware that investors had this understanding.

5         92.    Investors were also falsely assured in the written investor presentation

6    "Discussion of 4Q FY 2012 Financial Results" that "Increased Average Patient

7    Charge (APC) [was] due to improved revenue cycle management process" and that

8    Defendants had "High Confidence in Reserve Estimate for Anticipated Collections."

9    In fact, Warburg, Carney, DiMino and Rural/Metro knew that additional increases in

10   accounts receivable reserves would be required.

11        93.    The statements about the amount of revenues and EBITDA were

12   materially false and misleading.  Warburg, Carney, DiMino and Rural/Metro knew,

13   but did not disclose that, in fact, material additional write-downs in future quarters

14   would be required.

15        94.    Nor did Warburg, Carney, DiMino or Rural/Metro disclose that

16   Rural/Metro's revenue recognition system was seriously antiquated, risky and

17   incapable of reliably estimating revenues or EBITDA, and that the revenue

18   recognition system issues had not been resolved.  In fact, notwithstanding their

19   knowledge of the flaws in Rural/Metro's revenue recognition system, Rural/Metro

20   maintained the current antiquated and unreliable system of testing the adequacy of its

21   accounts receivable reserves.

22        95.    Investors were also told during the September 2012 call that the PMT and

23   Pacific Bowers acquisitions were contributing favorably to revenues and EBITDA:

24              As you can see on the slide, these [two] acquisitions are

25              doing quite nicely.  [O]n an annualized basis, transports are

26              192,000 combined, net revenue of $92 million and EBITDA

27              of $23 million which is--which both EBITDA and net

28              revenue are above the pro forma schedules that we provided.

McKOOL SMITH HENNIGAN, P.C.
LOS ANGELES, CA

1  In fact, DiMino, Rural/Metro, Warburg and Carney knew Rural/Metro also did not
2  have the ability to determine accurately and reliably the PMT and Pacific Bowers
3  revenues.   DiMino, Rural/Metro, Warburg and Carney knew that the presented
4  revenues were likely inflated (as they indeed were).

5      96.    Carney and Warburg were keenly aware of and participated in the plan to
6  make misrepresentations and misleading statements to investors of Rural/Metro
7  Senior Notes by misrepresenting the reliability of Rural/Metro's revenues and
8  EBITDA.  Carney and Warburg were closely involved over a period of months with
9  Rural/Metro and DiMino in identifying the problems with Rural/Metro's revenue
10 recognition system and in the retention of E&Y to analyze and advise Rural/Metro
11 and Warburg with respect to its antiquated revenue recognition system and the need to
12 replace it.  Carney and Warburg also took responsibility for participating in drafting
13 and finally approving the script and financial presentation for the September 2012
14 investor call that included the misrepresentations concerning Rural/Metro's financial
15 results.

16     97.    Subsequent to the September 2012 investor call, and in reliance on the
17 false information provided to investors during the call, during the month of October
18 2012 Visium purchased approximately $13.5 million of Senior Notes.  If Visium had
19 known the true facts, it would not have purchased the Senior Notes either at all or at
20 the prices it paid and would not have incurred the resulting losses.

21 **V.    FROM SEPTEMBER THROUGH NOVEMBER 2012, DEFENDANTS**
22 **LEARNED OF, BUT FAILED TO DISCLOSE AND**
23 **MISREPRESENTED, FURTHER REVENUE AND ACCOUNTS**
24 **RECEIVABLE RESERVES PROBLEMS**

25     98.    The financial problems at Rural/Metro continued to mount after the
26 September 2012 investor call, but DiMino, Rural/Metro, Warburg and Carney
27 continued falsely to portray Rural/Metro as on track to meet its financial goals.  In the
28 November 7, 2012 investor presentation call, during which results were reported for

McKool Smith Hennigan, P.C.
Los Angeles, CA

1   the quarter ending September 30, 2012 (first quarter of Fiscal Year 2013), DiMino
2   falsely reported:

> We have made significant strides in the first quarter to
> achieving our fiscal 2013 goals and believe that these results
> reflect our continued commitment to growth, expense
> management and our position as a strategic and progressive
> industry leader. We remain on track to perform the plan for
> 2013 and look forward to reporting second quarter results in
> February.

99. Warburg, Carney, Rural/Metro and DiMino were well aware that Rural/Metro was not on track to perform to plan.

100. As Warburg, Carney, Rural/Metro and DiMino anticipated, Rural/Metro had to record belatedly a further write-down of previously recorded revenues, specifically another write-down of $2.2 million during the first quarter ended September 2012.

101. Warburg , Carney, Rural/Metro and DiMino knew at the time of both the November 2012 and February 2013 investor presentations that the problems with Rural/Metro's revenue recognition system were not resolved, and that its inability to produce reliable revenue estimates continued. The offhand revelation of "$2.2 million worth of one-time cash items" in the November 2012 investor presentation call did not reveal the true situation, which was that a solution to the revenue recognition problems had not been identified or implemented. Warburg, Carney, Rural/Metro and DiMino knew that Rural/Metro remained incapable of accurately and reliably estimating its revenues.

102. Warburg, Carney, Rural/Metro and DiMino also did not disclose during the November 2012 investor call their knowledge that the collection rates at Pacific Bowers were far less than originally projected. While transports were close to the

McKool Smith Hennigan, P.C.
Los Angeles, CA

1    original pro forma estimates, the collection rate was substantially lower. Pro forma

2    collection rate was 29.4% and the estimated actual collection rate was approximately

3    23.9%. The impact of the change in collection rate was approximately $7 million.

4    Warburg, Carney, Rural/Metro and DiMino were aware that a high number of claims,

5    25% of transports or 3,800 claims, for the period February to September 2012, did not

6    meet the medical necessity standards for Medicare.

7         103.   Warburg, Carney, Rural/Metro and DiMino knew that further upward

8    adjustments to the accounts receivable reserves for Pacific Bowers were expected.

9    Warburg, Carney, Rural/Metro and DiMino intended to keep Rural/Metro from

10   making the necessary, and already deferred adjustments if taking the proper

11   adjustments would put Rural/Metro in danger of violating its financial covenants with

12   its lenders.

13        104.   Subsequent to the November 2012 investor call, and in reliance on the

14   false information provided to investors during the call, from November 2012 through

15   February 13, 2013 Visium purchased approximately $9 million of Senior Notes. If

16   Visium had known the true facts, it would not have purchased the Senior Notes either

17   at all or at the prices it paid and would not have incurred the resulting losses.

18   **VI.   FROM NOVEMBER 2012 THROUGH FEBRUARY 2013,**

19   **DEFENDANTS LEARNED OF, BUT FAILED TO DISCLOSE AND**

20   **MISREPRESENTED, WORSENING REVENUE AND ACCOUNTS**

21   **RECEIVABLE RESERVES PROBLEMS**

22        **A.    Defendants Learn of Deepening Revenue Problems in Early 2013**

23        105.   By early 2013, Warburg, Carney, Rural/Metro and DiMino knew that

24   Rural/Metro's revenue recognition problems had not been resolved and were

25   worsening. Warburg, Carney, Rural/Metro and DiMino learned of the need for an

26   additional $15 million accounts receivable reserves increase (and resulting revenue

27   reduction). Warburg, Carney, Rural/Metro and DiMino also knew accounts receivable

28   reserves adjustments had still not been properly quantified and accounted for, and that

McKOOL SMITH HENNIGAN, P.C.
LOS ANGELES, CA

1   revenues and receivables could still not be accurately and reliably calculated and were

2   therefore likely inflated (as they indeed were).

3       106.   Accordingly, Warburg caused Rural/Metro to retain FTI Consulting to

4   perform services related to revenue recognition problems, including measurement of

5   revenues and accounts receivable reserves and calculation of EBITDA for

6   presentation to investors.  FTI's assignment was extensive and targeted all the same

7   problems Warburg, Carney, Rural/Metro and DiMino knew had not been properly

8   analyzed, answered or resolved for almost a year.

9       107.   Warburg and Carney also knew that the Rural/Metro financial team was

10  not capable of resolving the revenue recognition problems or coming up with accurate

11  or reliable revenue or EBITDA numbers, and they were therefore in charge of

12  managing and formulating a resolution to Rural/Metro's financial issues.

13      108.   As FTI's work progressed, Warburg and Carney became aware that

14  Rural/Metro faced another significant accounts receivable write-down and would

15  likely not meet its Fiscal Year 2013 third quarter loan covenants.

16      **B.     Misrepresentations Made During the February 2013 Investor Call**

17      109.   None of the foregoing issues were disclosed to investors and potential

18  investors and instead they were misrepresented to investors and potential investors.

19  On or about February 14, 2013 Rural/Metro held an investor call to discuss results for

20  the quarter ending December 31, 2012 (Fiscal Year 2013 second quarter).  Warburg

21  participated in preparing the materials and presentation for the call.  Neither the need

22  for additional write-downs nor Rural/Metro's inability to quantify or resolve its

23  historical revenue recognition issues were disclosed during the February investor call.

24      110.   While DiMino disclosed that there had been a $4.5 million write-down

25  related to Pacific Bowers and a decrease in Rural/Metro's APC, he misleadingly

26  attributed it to the "impact of healthcare industry trends as we are familiar with"

27  including "a continued rise in the number of self-pay accounts," and "commercial

28  insurance . . . continuing to transition to high-deductible employer plans," and once

McKOOL SMITH HENNIGAN, P.C.
LOS ANGELES, CA

1  again characterized the write-off as a one-time event.  He failed to disclose the

2  inability of the Rural/Metro accounting system to produce accurate and reliable

3  revenue figures, and he made no mention of the revenue recognition system's issues.

4       111.   He also stated that the other driver of the APC decrease was related to

5  new business receivables:

> As you know, our full collection cycle can span 12 to 15
> months, and this presents a challenge for us when evaluating
> new businesses.  Now that we are closer to full collection
> cycles for the new entities, additional analytics can be
> applied.   In the case of Pacific-Bowers, we now are
> currently achieving the collection run rate we initially
> assumed.  This is due to the billing technology and process
> challenges that we are encountering in moving them from a
> paper to electronic patient care documentation system.
>
> On the positive side, the transport volume for the acquisition
> is in line with our expectations.  Therefore, we believe that
> as we continue to implement the billing process and
> technology solutions, performance expectations for these
> entities can be met.  Going forward, we remain optimistic
> about the upside drivers to revenue….

22      112.   This statement was false and misleading.  Warburg, Carney, Rural/Metro

23  and DiMino knew that additional write-downs with respect to Pacific Bowers were

24  expected.  Dimino's portrayal that the problems were related to moving the acquired

25  companies from a paper to an electronic system omitted the fact that they were not

26  properly billing for the transports and that the revenue recognition system had no

27  means of reliably estimating revenues.

McKool Smith Hennigan, P.C.
Los Angeles, CA

COMPLAINT

113.   Similarly, none of the dire issues facing Rural/Metro were disclosed in the discussion contained in the Financial Results PowerPoint presentation for the quarter ending December 31, 2012.  The only noted "Downside Trends" were:

Continuing economic pressure increases self-pay category of receivables

New business billing processes and collection cycle.

The following "Upside Trends" were falsely and misleadingly highlighted:

Stronger transport volume

Price increase (effective Jan. 2013 going forward)

Medicare fee schedule increase (effective Jan. 2013 going forward)

114.   Subsequent to the February 2013 investor call, and in reliance on the false information provided to investors during the call, (i) from February 14, 2013 through April 2013, Visium purchased approximately $5.6 million of Senior Notes, and (ii) from March 2013 through April 2013, Brevan Howard purchased approximately $23.1 million of Senior Notes.  If Visium and Brevan Howard had known the true facts, they would not have purchased the Senior Notes either at all or at the prices they paid and would not have incurred the resulting losses.

**VII.   FROM FEBRUARY THROUGH JULY 2013, DEFENDANTS LEARNED OF, BUT FAILED TO DISCLOSE AND MISREPRESENTED, SIGNIFICANT AND FURTHER REVENUE AND ACCOUNTS RECEIVABLE RESERVES PROBLEMS THAT ULTIMATELY LED TO RURAL/METRO'S BANKRUPTCY**

**A.   FTI Determines That Rural/Metro Needs to Write-Down Receivables by an Additional $35 Million**

115.   FTI, through its principal and health practice expert, Scott Bingham, undertook a comprehensive examination of Rural/Metro's revenues, accounts receivable reserves and revenue methodology.  Bingham is a senior managing director of FTI, and at all times, was acting as agent of and on behalf of FTI.  FTI was chosen for this assignment by Warburg and had performed extensive work for Warburg on

McKool Smith Hennigan, P.C.
Los Angeles, CA

COMPLAINT

other matters.  FTI, like Rural/Metro and Warburg, recognized that the methodology used by Rural/Metro to determine revenue and accounts receivable reserves was flawed and inaccurate and had produced inflated revenue and EBITDA numbers.  FTI noted the same key deficiencies in Rural/Metro's model that E&Y earlier identified, including that "Rural/Metro's monthly revenue estimation does not account for payor mix," "does not accurately account for revenue growth (both organic thru price changes and thru acquisition) resulting in a material separation between recorded gross-to-net collection rate and actual collection rates," and "Rural/Metro's review of accuracy for the revenue model is not robust, only adjusting revenue through review of A/R reserves."

116.   Initially, FTI conducted a comprehensive analysis of Rural/Metro's revenues through February 2013.  FTI subsequently updated this analysis to bring it current through March 2013.

117.   FTI determined that an additional **$35 million** needed to be added to the accounts receivable reserves as of the quarter ending March 31, 2013.  This write-down was necessary to undo the effect of overstatements of receivables and revenue for periods in the 2011, 2012 and 2013 fiscal years.  FTI so informed Carney, Warburg and Rural/Metro.  The need to make this write-down provided further confirmation that, as Warburg, Carney and Rural/Metro were already aware, Rural/Metro's financial presentations had been inaccurate for a long period of time.

**B.   Defendants Misrepresent Rural/Metro Revenues and EBITDA to Plaintiffs**

118.   On May 10, 2013, Carney (on behalf of Warburg) fired DiMino from Rural/Metro.  Shortly thereafter, Warburg appointed a new President and CEO of Rural/Metro who had previously been an Executive-in-Residence at Warburg Pincus LLC.

119.   In preparation for a May 15, 2013 investor call, addressing the period ending March 31, 2013, Warburg, including its employees Liu and Strauss, prepared

McKOOL SMITH HENNIGAN, P.C.
LOS ANGELES, CA

the presentation materials and did so with FTI's participation.  In particular, Warburg and FTI jointly developed the number that the presentation materials would say (and did say) was Rural/Metro's last twelve months EBITDA for the period ending March 31, 2013.

120.   As Warburg, Carney, Rural/Metro, FTI and Bingham knew, investors and potential investors in Senior Notes would rely on this presentation, and in particular the EBITDA number, in making investment decisions.  Plaintiffs did in fact so rely for all their subsequent purchases.

121.   Warburg (through Carney) and FTI (through Bingham) presented the key financial information during the call.  Carney started the investor call by announcing that he was a "partner at Warburg Pincus and also the Chairman of the Rural/Metro Board."

122.   At the presentation, Warburg and FTI discussed the amount of additional accounts receivable reserves required, the Rural/Metro revenues and EBITDA for the last twelve month ("LTM") period ending March 31, 2013.

123.   Carney, Warburg, Rural/Metro, Bingham and FTI knew that it was imperative that they represent to current and potential investors that the Last Twelve Months EBITDA number was at least $70 million.  If Rural/Metro did not have at least $70 million in EBITDA, investors would have known that Rural/Metro would be unable to meet its annual cash requirements and would be unable to continue as a viable business without going through a bankruptcy or some other form of major financial restructuring, which would dramatically reduce the value of the Senior Notes.  The written materials, as presented to investors and as prepared by Warburg, Rural/Metro and FTI, indicated a Last Twelve Months EBITDA number of $70.1 million.

124.   Indeed, during the investor call, the interim CFO confirmed: "[W]e're operating on a basic break even on cash.  So I think it was $70 million we showed you before, in the high 70s is what the run rate will be going for at a minimum and that's

McKool Smith Hennigan, P.C.
Los Angeles, CA

1   what we need to break even cash box." Thus, FTI, Warburg, Carney and Rural/Metro

2   were all aware that it was of critical importance to Rural/Metro's ability to continue as

3   a business and to maintain the support of the investors, and that it was critical to

4   Warburg's attempt to salvage its investment, that Rural/Metro have and report an

5   EBITDA number of at least $70 million.

6       125.   During the May 2013 presentation, Carney and Warburg, along with

7   FTI's Bingham, verified the revenue, accounts receivable reserves and EBITDA

8   numbers, and presented and confirmed the critical financial results in the presentation

9   to existing and potential investors. Mr. Carney stated:

10          FTI developed the $35 million change in AR reserve—and

11          we're confident that this properly quantifies and addresses

12          Rural/Metro's accounts receivable issue—and FTI has also

13          determined Rural/Metro's LTM EBITDA to be $70 million

14          based on cash collections.

15

16       126.   At Warburg's request, FTI and Bingham agreed that Bingham would

17   represent and confirm on the call that the LTM EBITDA number was $70 million.

18   The discussion of financial results that Bingham reviewed and that was presented and

19   made available to investors, including Plaintiffs, stated that "FTI has determined

20   Rural/Metro's LTM [last twelve months] EBITDA to be approx. $70 million."

21       127.   During the call, Bingham did what Warburg had asked him to do.

22   Bingham confirmed for investors the $70.1 million EBITDA number, stating: "Based

23   on our analysis and look back, we were able to determine that $19.2 million of that

24   [additional $35.2 million reserve] in fact related to periods prior to 12 months ended

25   03/31, which gets you to the run rate of approximately $70.1 million." FTI and

26   Warburg told the investors and potential investors that they were confident that the

27   adjusted revenue and EBITDA figures were accurate. They also told investors and

28   potential investors that they were "confident" that the $35 million adjustment was the

MCKOOL SMITH HENNIGAN, P.C.
LOS ANGELES, CA

full amount of needed additional accounts receivable reserves and that the entire amount of needed accounts receivable reserves for the last twelve months was taken into account in the $70 million EBITDA number that was presented.

128.   When asked by an investor "Are you guys able to say whether you [Warburg] would contribute additional equity if need be?" Carney, on behalf of Warburg and himself, falsely replied, "No reason to.  The company's in perfectly good liquidity position."  Warburg and Carney knew that, in fact, Rural/Metro was dangerously close to running short on liquidity.

129.   On or about May 30, 2013, the false financial data presented during the May 15, 2013 investor presentation, including the incorrect $70 million EBITDA number, was repeated and reconfirmed in supplemental financial materials prepared for and forwarded to investors by Rural/Metro, with the participation and final approval of Warburg, Carney and FTI.  Warburg, Carney and FTI actively participated in the preparation of the supplemental financial materials, including the drafting, review and revision of such financial materials.

130.   The statements made at the May 2013 investor presentation and reconfirmed on or about May 30, 2013, including the presentation about the Rural/Metro revenues and EBITDA number, were untrue and were materially inaccurate and misleading.  FTI and Bingham knew that the proper Rural/Metro EBITDA number for the twelve months ending March 31, 2013 was actually no more than $64 million.  Prior to the presentation, FTI and Bingham so informed Warburg and a draft of the presentation reflected the lower number.  However, Warburg and FTI altered the EBITDA number in the final presentation to indicate a higher and inaccurate level of EBITDA exceeding $70 million.  On May 15, 2013, Warburg and FTI presented the inaccurate $70.1 million EBITDA number to investors, including Plaintiffs.  FTI and Warburg knew, or should have known, that this number was overstated by at least $6 million.  FTI and Warburg had no reasonable grounds for presenting the inflated $70 million number as an accurate statement of Rural/Metro's

financial results or condition.  The financial analysis that FTI had prepared and that FTI had provided to Warburg indicated that Rural/Metro's actual Last Twelve Months EBITDA as of March 31, 2013 was less than $64 million.

131.   FTI also knew that the total accounts receivable reserves write-down attributable to the last twelve months ending March 31, 2013 was $27 million, which included a portion of the $17.6 million write-down taken in June 2012 and a portion of the additional $35.2 million that FTI determined needed to be recognized in the quarter ending March 31, 2013.  Based on this $27 million write-down, the original presentation drafts for the May 2013 investor presentation indicated a Last Twelve Months EBITDA of less than $64 million.  However, the presentation to the investors stated that the total amount of accounts receivable reserves attributable to the last twelve months was approximately $20.4 million, *i.e.*, $6.6 million *less* than the actual $ 27 million amount.  Through this use of an inaccurate write-down, FTI and Warburg presented a false Last Twelve Months EBITDA number of $70.1 million.  The presentation of a mere $20.4 million write-down was knowingly inaccurate and without any reasonable grounds.

132.   Both Warburg and FTI presented and verified the overstated $70.1 million EBITDA number at the May 2013 presentation.  The inaccurate EBITDA number and the inaccurate accounts receivable reserves write-down were presented by Warburg and FTI with the intent to induce reliance by actual and potential investors including Plaintiffs.

133.   Warburg, through various employees, directed and prepared the misstatements in order to pacify lenders and investors in an attempt to salvage its investment in Rural/Metro.

134.   If the EBITDA number had been accurately represented, Plaintiffs would not have invested or made further investments in the Senior Notes at the prices they paid.  Subsequent to the May 2013 investor call, and in reliance on the false information provided to investors during the call (i) in June 2013 Visium purchased

1    approximately $1.25 million of Senior Notes, (ii) from May 2013 through August

2    2013, Brevan Howard purchased approximately $11.2 million of Senior Notes,

3    (iii) from May 2013 through July 2013 the Oaktree Plaintiffs purchased approximately

4    $116 million of Senior Notes, and (iv) during July 2013 DG purchased approximately

5    $9.3 million of Senior Notes.  If Plaintiffs had known the true facts, they would not

6    have purchased the Senior Notes either at all or at the prices they paid and would not

7    have incurred the resulting losses.

8         **C.    Disclosure of the Misstated Revenues and EBITDA**

9         135.   In late June 2013, Rural/Metro and Warburg prepared a report stating that

10   the March 31, 2013 revenue and EBITDA numbers presented to investors had been

11   grossly overstated, and that the true EBITDA number as of March 31, 2013 was only

12   $55 million, rather than the previously reported $70 million.

13        136.   However, Rural/Metro and Warburg did not inform investors in the

14   Senior Notes of the misstatements until later, after further purchases by Plaintiffs.  In

15   late July 2013 Warburg and Rural/Metro finally disclosed to one (but not all) of the

16   Plaintiffs that the EBITDA number was, in fact, $50 to $60 million, rather than the

17   $70.1 million number (rising to $77.9 million on a pro forma basis) that had been

18   reported at the May 2013 investor call.  They also disclosed that Rural/Metro was

19   almost out of cash, a fact directly at odds with the May 2013 presentation.

20        137.   As acknowledged by Rural/Metro and Warburg, approximately

21   $6 million of the reduction in the new EBITDA number for the twelve months ending

22   March 31, 2013 corrected the failure of Warburg and FTI to take into account the full

23   amount of accounts receivable reserves they knew should have been taken into

24   account in calculating the March 31, 2013 EBITDA number previously provided to

25   investors.  This difference was critical and material.  A reduction of $6 million in the

26   EBITDA number would have demonstrated that Rural/Metro was unable to meet its

27   cash obligations, and Plaintiffs would not have made their subsequent investments in

28   the Senior Notes either at all or at the prices they paid.  The presented EBITDA

McKool Smith Hennigan, P.C.
Los Angeles, CA

38

1    number was, in fact, overstated by at least $15 million, as Defendants finally

2    acknowledged.  If Defendants had disclosed the truth and reduced the EBITDA

3    number, Plaintiffs would not have purchased the Senior Notes either at all or at the

4    prices they paid and would not have incurred the resulting losses.

5    **VIII.  PLAINTIFFS' INJURY**

6          138.   As a direct and proximate result of Defendants' material

7    misrepresentations and omissions alleged above, the Plaintiffs purchased their Senior

8    Notes at prices that were far in excess of what the Senior Notes were actually worth.

9    Underlying and connected with all of Rural/Metro's financial issues were its

10   dramatically over-reported revenues, its inability to accurately book its revenues and

11   determine its profitability and true cash flow, and its concomitant failure to properly

12   manage its operations and finances, the depths of which problems Defendants

13   misrepresented and concealed from existing and potential investors in the Senior

14   Notes.  The truth concerning Rural/Metro's financial issues were not fully revealed

15   until after Rural/Metro's bankruptcy, resulting in a significant drop in the price of the

16   Senior Notes.  If Plaintiffs had known the true facts, they would not have purchased

17   the Senior Notes either at all or at the prices they paid and would not have incurred

18   those losses.

19         139.   As a direct and proximate result of Defendants' material

20   misrepresentations, omissions and conduct as alleged above, Plaintiffs and each of

21   them have been damaged through their purchases of the Senior Notes at inflated

22   prices, entitling Plaintiffs to the relief sought in this Complaint.  The purchases and

23   damages were a direct result of the Defendants' misrepresentations, omissions and

24   wrongful conduct described above, and the damages would not otherwise have been

25   incurred.

26         140.   Pursuant to written agreements between the parties, all statutes of

27   limitations and similar rules regarding timely filing of a complaint were tolled from

28

McKool Smith Hennigan, P.C.
Los Angeles, CA

39
COMPLAINT

September 24, 2014 through August 31, 2015 with respect to Plaintiffs' claims against Warburg and Carney.

141.   Pursuant to written agreement between the parties, all statutes of limitations and similar rules regarding timely filing of a complaint were tolled from March 3, 2015 through August 31, 2015 with respect to Plaintiffs' claims against FTI.

## IX.   CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

### (Violations of Section 10(b) of The Exchange Act and SEC Rule 10b-5 by All Plaintiffs Against All Defendants)

142.   Plaintiffs repeat and reallege each and every allegation set forth earlier in this Complaint as if again fully set forth here.

143.   The Senior Notes were securities within the meaning of Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.

144.   Through the acts of misrepresentation, omission and concealment alleged herein the Defendants, and each of them, carried out a plan, scheme and course of conduct that was intended to and did (i) deceive existing and potential investors in the Senior Notes, including Plaintiffs, as alleged herein; and (ii) cause investors, including Plaintiffs, ignorant of the true facts to purchase Senior Notes when, if the true facts were known, they would not have purchased the Senior Notes either at all or at the prices they paid.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, individually and as a group, took the actions alleged in this Complaint.

145.   Defendants, individually and in concert, directly or indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and financial condition of Rural/Metro as specified in this Complaint.

146.   Defendants, while in possession of material adverse non-public information and in order to assure existing and potential investors in Senior Notes of

McKool Smith Hennigan, P.C.
Los Angeles, CA

1  Rural/Metro's value and performance (a) employed devices, schemes, and artifices to

2  defraud; (b) made untrue statements of material fact and/or omitted to state material

3  facts necessary to make the statements not misleading; and (c) engaged in acts,

4  practices, and a course of business that operated as a fraud and deceit upon the

5  purchasers, including Plaintiffs, of Senior Notes, all in violation of Section 10(b) of

6  the Exchange Act and SEC Rule 10b-5.

7       147.  The Defendants had actual knowledge of the misrepresentations and

8  omissions of material facts set forth herein, or acted with deliberately reckless

9  disregard for the truth in that they deliberately failed to ascertain and to disclose such

10  facts, even though such facts were readily available to them.  Defendants' material

11  misrepresentations and/or omissions were done knowingly or recklessly and for the

12  purpose and effect of concealing material facts concerning Rural/Metro's business,

13  operations and financial condition, including its dramatically over-reported revenues,

14  its inability to accurately book its revenues and determine its profitability and true

15  cash flow, and its concomitant failure to properly manage its operations and finances

16  from existing and prospective investors in order to continue the operations of

17  Rural/Metro for as long as possible to buy time to salvage Warburg's investment in

18  Rural/Metro and Warburg's reputation as an expert healthcare investor.

19       148.  Plaintiffs directly relied on the misrepresentations and deceptive and

20  misleading statements set forth in this Complaint, and were deceived by the omission

21  of material adverse information that was known to or recklessly disregarded by

22  Defendants, but not disclosed in the investor presentations or otherwise.  In evaluating

23  their decision to purchase Senior Notes, Plaintiffs pursued their own interests with

24  care and good faith and were ignorant of the misrepresentations and omissions alleged

25  in this Complaint or of the risks created by those misrepresentations and omissions.

26  Those misrepresentations and omissions concerned matters as to which Plaintiffs

27  could not, in the exercise of due diligence, have learned the true and accurate facts.

28

McKool Smith Hennigan, P.C.
Los Angeles, CA

149.   With respect to Plaintiffs' claims arising under Section 10(b) of the Exchange Act and SEC Rule 10b-5, Defendants' fraudulent omissions of material facts that were necessary to be disclosed in order for the investor presentations not to be materially deceptive and misleading, give rise to a presumption that Plaintiffs' relied on the accuracy and completeness of the disclosures made in the investor presentations and relied on the belief that Defendants had discharged their duty to disclose material facts.

150.   Moreover, the material misstatements and omissions made by Defendants deceived the Plaintiffs who purchased the Senior Notes and created, maintained and artificially inflated the market for the Senior Notes.  It was reasonably foreseeable to Defendants that the misstatements and omissions made in connection with the investor presentations or otherwise would be used in connection with the purchase or sale of the Senior Notes and would be relied upon by purchasers in making their investment decisions to purchase the Senior Notes.  Had Defendants disclosed the truth about the matters alleged in this Complaint to have been material misrepresentations or omissions, the Senior Notes would have been unmarketable or commanded a price far less than that at which they were purchased by Plaintiffs.  As a result, all Defendants are jointly and severally liable under Section 10(b) and Rule 10b-5 to purchasers of the Senior Notes.

151.   By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and SEC Rule 10b-5.

152.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs have suffered substantial damages in connection with their purchases of the Senior Notes.

**SECOND CLAIM FOR RELIEF**

**(Violation of Section 20(a) of the Exchange Act by All Plaintiffs against Warburg Pincus LLC, Warburg Pincus Private Equity X, L.P., and Sean Carney)**

153.   Plaintiffs repeat and reallege each and every allegation set forth earlier in this Complaint as if again fully set forth here.

154.   Warburg and Carney acted as controlling persons of Rural/Metro and DiMino within the meaning of Section 20(a) of the Exchange Act as alleged herein.

155.   By virtue of their high-level positions, their ownership and contractual rights and agency, participation in and awareness of Rural/Metro's operations and intimate knowledge of aspects of Rural/Metro's financial issues and dissemination of information to existing and potential investors in Senior Notes, Warburg and Carney had the power to influence and control and did influence and control, directly or indirectly, the decision making of Rural/Metro and DiMino, including the content and dissemination of the various statements and omissions in the investor presentations and otherwise which Plaintiffs contend are false and misleading.

156.   Warburg and Carney had direct and supervisory involvement in the day-to-day operations of Rural/Metro and, therefore, had and are presumed to have had the power to control or influence the content and dissemination of the various statements and omissions in the investor presentations or otherwise which give rise to the securities violations alleged in this Complaint, and Warburg and Carney exercised this power.

157.   Additionally, (a) Warburg exercised actual power and control over Rural/Metro and DiMino through Warburg's ultimate ownership and control of 100% of the common stock of Rural/Metro; (b) Carney was Chairman of the Board of Directors of Rural/Metro and was primarily responsible for Warburg's investment in Rural/Metro, including the monitoring and oversight of such investment, and by virtue of his responsibilities Carney was privy to and participated in the creation, development and reporting of Rural/Metro's financial condition during the investor

McKOOL SMITH HENNIGAN, P.C.
LOS ANGELES, CA

1  presentations; (c) Carney and Warburg enjoyed significant personal contact and

2  familiarity with other members of the Rural/Metro management team, internal reports

3  and other data and information about Rural/Metro's finances, operations and

4  antiquated and deficient revenue recognition system, (d) Carney and Warburg were

5  fully engaged in and directed the failed efforts to quantify Rural/Metro's revenue

6  recognition issues, and the retention and communication with the experts with whom

7  Warburg had preexisting relationships, including Ernst & Young and FTI, that were

8  hired to assist Rural/Metro and Warburg in resolving its financial issues; (e) Warburg

9  and Carney were provided with or had unlimited access to copies of the investor

10  scripts and investor presentations for the investor calls and to the information and

11  materials relating to the Senior Notes; (f) Warburg and Carney exercised ultimate

12  authority over the statements made during the quarterly investor calls and financial

13  presentations, and had the ability to prevent the issuance of the statements in the

14  investor presentations or cause the statements to be corrected; and (g) Carney and

15  Warburg made the decision to terminate and did terminate DiMino.

16      158.   By virtue of their positions as controlling persons, Warburg and Carney

17  are also liable pursuant to Section 20(a) of the Exchange Act for the acts of

18  Rural/Metro and DiMino set forth above.  As a direct and proximate result of each

19  such controlling person's wrongful conduct, Plaintiffs suffered substantial damages in

20  connection with their purchases of the Senior Notes.

**THIRD CLAIM FOR RELIEF**

**(For Intentional Misrepresentation by All Plaintiffs against All Defendants)**

23      159.   Plaintiffs repeat and reallege each and every allegation alleged earlier in

24  this Complaint as if fully set forth again here.

25      160.   Each Defendant knowingly made material false representations to

26  Plaintiffs.

27      161.   Each Defendant made the material misrepresentations, as set forth above,

28  knowing that such representations were false at the time they were made.

McKool Smith Hennigan, P.C.
Los Angeles, CA

1  Alternatively, Defendants made these misrepresentations recklessly and without

2  regard for their truth.

3       162.   Defendants made these misrepresentations with the intent that Plaintiffs

4  rely on them to consummate the purchase of the Senior Notes.

5       163.   Plaintiffs were unaware of the falsity of Defendants' misrepresentations

6  and could not discover the true information with the exercise of reasonable diligence.

7       164.   Plaintiffs actually and justifiably relied on the material

8  misrepresentations, believing the representations to be true.  In reliance upon

9  Defendants' misrepresentations, Plaintiffs purchased the Senior Notes.  Plaintiffs

10  would not have purchased the Senior Notes if they had known of the falsity of

11  Defendants' representations.

12       165.   Defendants' fraudulent conduct was a substantial factor in Plaintiffs'

13  losses.  As a direct and proximate result of Defendants' fraudulent conduct, Plaintiffs

14  have suffered substantial monetary losses, including without limitation monetary

15  losses resulting from the overpayment for the Senior Notes and the loss of profits and

16  fees, for which they are entitled to recover damages from Defendants in an amount to

17  be determined according to proof at trial.  Plaintiffs are also entitled to prejudgment

18  interest on their losses, and all other relief that law or equity provide.

19       166.   In making the intentional misrepresentations described in this Complaint,

20  Defendants, and each of them, acted fraudulently with the intention of depriving

21  investors of their property, intended to cause injury to the plaintiffs and acted

22  despicably with a willful and conscious disregard of the rights of others.  Plaintiffs are

23  therefore entitled to punitive damages in an amount to be determined at trial, which

24  are appropriate to punish or set an example of the Defendants, and each of them.

### FOURTH CLAIM FOR RELIEF

**(For Concealment by All Plaintiffs against All Defendants)**

27       167.   Plaintiffs repeat and reallege each and every allegation alleged earlier in

28  this Complaint as if fully set forth again here.

COMPLAINT

168.   Each Defendant knowingly suppressed and concealed material facts from Plaintiffs and omitted to state numerous material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

169.   By virtue of their relationship to Plaintiffs and with each other, Defendants had a duty to disclose the concealed and omitted facts to Plaintiffs. Among other things, Defendants disclosed some facts to Plaintiffs but intentionally failed to disclose other important facts, making the disclosure deceptive. Additionally, Defendants made public statements to investors and the securities laws require that such statements not omit material facts.

170.   Defendants intentionally failed to disclose important facts that were known only to them and that Plaintiffs could not have discovered.

171.   Defendants actively concealed important facts from Plaintiffs and prevented them from discovering those facts.

172.   Plaintiffs were unaware of the truth of the omitted and concealed facts and could not discover the true information with the exercise of reasonable diligence.

173.   Defendants intended to deceive Plaintiffs through their omission and concealment.  Defendants omitted and concealed material facts with the intent to defraud Plaintiffs by inducing them to consummate the purchase of the Senior Notes.

174.   Plaintiffs actually and justifiably relied on the omissions and concealment of Defendants, not knowing the omitted and concealed facts.  In reliance upon Defendants' omissions, Plaintiffs purchased the Senior Notes.  Plaintiffs would not have purchased the Senior Notes either at all or at the prices they paid and would not have incurred the resulting losses.

175.   Defendants' fraudulent conduct was a substantial factor in Plaintiffs' losses.  As a direct and proximate result of Defendants' fraudulent conduct, Plaintiffs have suffered substantial monetary losses, including without limitation monetary losses resulting from the overpayment for the Senior Notes and the loss of profits and

MCKOOL SMITH HENNIGAN, P.C.
LOS ANGELES, CA

1  fees, for which they are entitled to recover damages from Defendants in an amount to
2  be determined according to proof at trial.  Plaintiffs are also entitled to prejudgment
3  interest on their losses, and all other relief that law or equity provide.

4      176.   In carrying out the intentional concealment described in this Complaint,
5  Defendants, and each of them, acted fraudulently with the intention of depriving
6  investors of their property, intended to cause injury to the plaintiffs and acted
7  despicably with a willful and conscious disregard of the rights of others.  Plaintiffs are
8  therefore entitled to punitive damages in an amount to be determined at trial, which
9  are appropriate to punish or set an example of the Defendants, and each of them.

10               **FIFTH CLAIM FOR RELIEF**
11  **(For Fraud Based on Conspiracy by All Plaintiffs against Defendants Warburg**
12       **Pincus LLC, Warburg Pincus Private Equity X, L.P. and Carney)**

13      177.   Plaintiffs repeat and reallege each and every allegation alleged earlier in
14  this Complaint as if fully set forth again here.

15      178.   Commencing no later than the May 2012 investor call, Warburg, Carney
16  and DiMino knowingly and willfully conspired and agreed among them to perpetrate a
17  fraud on current and prospective investors in the Senior Notes, including Plaintiffs, to
18  conceal the ability of Rural/Metro to account for its revenues in an accurate and
19  reliable manner.  Intentionally and pursuant to the common plan and design, they
20  misrepresented the adequacy of Rural/Metro's revenue recognition system,
21  mischaracterized the $17.6 million write-off as a one-time event, dramatically over-
22  reported revenues and cash flow, and expressed confidence in Rural/Metro's financial
23  systems when they knew that the problems with Rural/Metro's revenue recognition
24  system had not been resolved, and that there were going to be additional write-offs in
25  future quarters.

26      179.   In furtherance of such conspiracy, Warburg, Carney and DiMino each
27  reviewed and approved the script and investor presentation for the September 2012
28  investor call which they knew included the foregoing misrepresentations and

McKOOL SMITH HENNIGAN, P.C.
LOS ANGELES, CA

47

1   omissions, and which would be relied upon by current and prospective investors in the

2   Senior Notes.

3       180.   Warburg, Carney and DiMino demonstrated their agreement to perpetrate

4   a fraud by virtue of the fact that they knew the representations made by them during

5   the September 2012 investor call were false and did not disclose what they learned

6   from E&Y shortly before the call—that the revenue recognition system was

7   antiquated and unreliable.

8       181.   Pursuant to, and in furtherance of, such conspiracy Warburg, Carney and

9   DiMino, continued to knowingly misrepresent the adequacy of Rural/Metro's revenue

10  recognition system in the November 2012 and February 2013 investor call.  The script

11  and the financial presentation for each of such calls were reviewed by Warburg,

12  Carney and DiMino, each of whom failed to disclose to current and prospective

13  investors in the Senior Notes that the issues with Rural/Metro's revenue recognition

14  system had not been remedied.  Additionally, Warburg, Carney and DiMino knew that

15  additional substantial write-offs were needed.

16      182.   In furtherance of the conspiracy, Warburg and Carney also falsely

17  represented during the May 15, 2013 investor call and thereafter that Rural/Metro's

18  Last Twelve Months adjusted EBITDA as of March 31, 2013 was $70 million, when

19  they each knew it was $64 million or less, and that Rural/Metro's liquidity was sound

20  when in fact they knew Rural/Metro was dangerously close to running short on

21  liquidity.

22      183.   Defendants misrepresented and failed to disclose these facts in order to

23  induce current and potential investors, including Plaintiffs, to purchase Senior Notes

24  and in order to continue the operations of Rural/Metro for as long as possible to buy

25  time to salvage Warburg's investment in Rural/Metro and its reputation as an expert

26  healthcare investor.

27      184.   As a direct and proximate result of the conspiracy of Warburg, Carney

28  and DiMino, Plaintiffs have suffered substantial monetary losses, including without

McKOOL SMITH HENNIGAN, P.C.
LOS ANGELES, CA

1  limitation monetary losses resulting from the overpayment for the Senior Notes and
2  the loss of profits and fees, for which they are entitled to recover damages from
3  Defendants in an amount to be determined according to proof at trial.  Plaintiffs are
4  also entitled to prejudgment interest on their losses, and all other relief that law or
5  equity provides.

6      185.   In conspiring to perpetrate the fraud described in this Complaint,
7  Defendants, and each of them, acted fraudulently with the intention of depriving
8  investors of their property, intended to cause injury to the plaintiffs and acted
9  despicably with a willful and conscious disregard of the rights of others.  Plaintiffs are
10 therefore entitled to punitive damages in an amount to be determined at trial, which
11 are appropriate to punish or set an example of the Defendants, and each of them.

**SIXTH CLAIM FOR RELIEF**

**(Negligent Misrepresentation by All Plaintiffs Against All Defendants)**

14     186.   Plaintiffs repeat and reallege each and every allegation alleged earlier in
15 this Complaint as if fully set forth again here.

16     187.   Each Defendant made material false representations to Plaintiffs.

17     188.   Each Defendant made the material false statements directly and indirectly
18 to Plaintiffs and with the intent to induce Plaintiffs and others to purchase the Senior
19 Notes.

20     189.   Each Defendant made the material misrepresentations without any
21 justifiable or reasonable basis for believing those representations to be true at the time
22 that they were made.

23     190.   Plaintiffs were unaware of the falsity of Defendants' misrepresentations
24 and could not discover that such misrepresentations were false with the exercise of
25 reasonable diligence.

26     191.   Plaintiffs actually and justifiably relied on the material
27 misrepresentations of Defendants and, based on those misrepresentations, purchased

28

McKool Smith Hennigan, P.C.
Los Angeles, CA

49
COMPLAINT

1 | the Senior Notes. Had Plaintiffs known that Defendants' representations were false,
2 | Plaintiffs would not have purchased the Senior Notes at all or at the prices they paid.

3 |       192.  As a direct and proximate result of Defendants' misrepresentations,
4 | Plaintiffs have suffered substantial pecuniary losses, including without limitation
5 | monetary losses resulting from the overpayment for Senior Notes and the loss of
6 | profits and fees, for which they are entitled to receive damages from Defendants in an
7 | amount to be determined according to proof at trial. Plaintiffs are also entitled to
8 | prejudgment interest on their losses, and all other relief that law or equity provide.

9 | **PRAYER**

10 |      WHEREFORE, Plaintiffs pray for judgment as follows:

11 |      A.    For damages against each Defendant, according to proof at trial;

12 |      B.    For punitive damages against each Defendant in an amount based on that
13 | Defendant's outrageous conduct and sufficient to punish that conduct and deter
14 | Defendant and others from engaging in such conduct in the future;

15 |      C.    An award of all costs incurred by Plaintiffs in this Action;

16 |      D.    An award of prejudgment interest as authorized by law; and,

17 |      E.    Such other and further relief as the Court deems just and proper.

19 | DATED: November 3, 2015          Respectfully submitted,

20 |                       MCKOOL SMITH HENNIGAN, P.C.

22 |                       By_____

23 |                           J. Michael Hennigan
24 |                           Michael H. Swartz

25 |                       Attorneys for Plaintiffs

26 |
27 |
28 |

MCKOOL SMITH HENNIGAN, P.C.
LOS ANGELES, CA

**JURY TRIAL DEMANDED**

Plaintiffs demand a trial by jury on all claims.

DATED: November 3, 2015                    Respectfully submitted,

                                            MCKOOL SMITH HENNIGAN, P.C.

                                            By _____
                                               J. Michael Hennigan
                                               Michael H. Swartz

                                            Attorneys for Plaintiffs

COMPLAINT

# EXHIBIT A

*Exhibit A*

**Rural/Metro Corporation**
*Transaction Data: May 15, 2012 – August 1, 2013*

| Fund | Trade Date | Settlement Date | Notional | Type | Instrument Description | Isin | Executed Price* |
|---|---|---|---|---|---|---|---|
| DG Value Partners, L.P. | 07/11/13 | 07/12/13 | 205,000 | BUY | RURL 10 1/8 07/15/19 | 781748AG3 | 70.0000 |
| DG Value Partners, L.P. | 07/11/13 | 07/12/13 | 410,000 | BUY | RURL 10 1/8 07/15/19 | 781749AA4 | 70.0000 |
| DG Value Partners, L.P. | 07/15/13 | 07/18/13 | 51,000 | BUY | RURL 10 1/8 07/15/19 | 781749AA4 | 61.0000 |
| DG Value Partners, L.P. | 07/16/13 | 07/19/13 | 405,000 | BUY | RURL 10 1/8 07/15/19 | 781748AG3 | 61.0000 |
| DG Value Partners, L.P. | 07/17/13 | 07/22/13 | 410,000 | BUY | RURL 10 1/8 07/15/19 | 781749AA4 | 61.5000 |
| DG Value Partners, L.P. | 07/24/13 | 07/29/13 | 407,000 | BUY | RURL 10 1/8 07/15/19 | 781748AG3 | 58.7500 |
| Subtotal DG Value Partners, L.P. | | | $1,888,000 | | | | |
| DG Value Partners II Master Fund, L.P. | 07/11/13 | 07/12/13 | 265,000 | BUY | RURL 10 1/8 07/15/19 | 781748AG3 | 70.0000 |
| DG Value Partners II Master Fund, L.P. | 07/11/13 | 07/12/13 | 530,000 | BUY | RURL 10 1/8 07/15/19 | 781749AA4 | 70.0000 |
| DG Value Partners II Master Fund, L.P. | 07/15/13 | 07/18/13 | 67,000 | BUY | RURL 10 1/8 07/15/19 | 781749AA4 | 61.0000 |
| DG Value Partners II Master Fund, L.P. | 07/16/13 | 07/19/13 | 530,000 | BUY | RURL 10 1/8 07/15/19 | 781748AG3 | 61.0000 |
| DG Value Partners II Master Fund, L.P. | 07/17/13 | 07/22/13 | 530,000 | BUY | RURL 10 1/8 07/15/19 | 781749AA4 | 61.5000 |
| DG Value Partners II Master Fund, L.P. | 07/24/13 | 07/29/13 | 530,000 | BUY | RURL 10 1/8 07/15/19 | 781748AG3 | 58.7500 |
| Subtotal DG Value Partners II Master Fund, L.P. | | | $2,452,000 | | | | |
| Special Situations, LLC | 07/11/13 | 07/12/13 | 270,000 | BUY | RURL 10 1/8 07/15/19 | 781748AG3 | 70.0000 |
| Special Situations, LLC | 07/11/13 | 07/12/13 | 540,000 | BUY | RURL 10 1/8 07/15/19 | 781749AA4 | 70.0000 |
| Special Situations, LLC | 07/15/13 | 07/18/13 | 68,000 | BUY | RURL 10 1/8 07/15/19 | 781749AA4 | 61.0000 |
| Special Situations, LLC | 07/16/13 | 07/19/13 | 545,000 | BUY | RURL 10 1/8 07/15/19 | 781748AG3 | 61.0000 |
| Special Situations, LLC | 07/17/13 | 07/22/13 | 540,000 | BUY | RURL 10 1/8 07/15/19 | 781749AA4 | 61.5000 |
| Special Situations, LLC | 07/24/13 | 07/29/13 | 544,000 | BUY | RURL 10 1/8 07/15/19 | 781748AG3 | 58.7500 |
| Subtotal Special Situations, LLC | | | $2,507,000 | | | | |
| Special Situations X, LLC | 07/11/13 | 07/12/13 | 260,000 | BUY | RURL 10 1/8 07/15/19 | 781748AG3 | 70.0000 |
| Special Situations X, LLC | 07/11/13 | 07/12/13 | 520,000 | BUY | RURL 10 1/8 07/15/19 | 781749AA4 | 70.0000 |
| Special Situations X, LLC | 07/15/13 | 07/18/13 | 65,000 | BUY | RURL 10 1/8 07/15/19 | 781749AA4 | 61.0000 |
| Special Situations X, LLC | 07/16/13 | 07/19/13 | 520,000 | BUY | RURL 10 1/8 07/15/19 | 781748AG3 | 61.0000 |
| Special Situations X, LLC | 07/17/13 | 07/22/13 | 520,000 | BUY | RURL 10 1/8 07/15/19 | 781749AA4 | 61.5000 |
| Special Situations X, LLC | 07/24/13 | 07/29/13 | 519,000 | BUY | RURL 10 1/8 07/15/19 | 781748AG3 | 58.7500 |
| Subtotal Special Situations X, LLC | | | $2,404,000 | | | | |
| Brevan Howard Credit Catalysts Master Fund Limited | 03/05/13 | 03/08/13 | 3,060,000 | BUY | RURL 10 1/8 07/15/19 | 781748AG3 | 99.6250 |
| Brevan Howard Credit Catalysts Master Fund Limited | 03/05/13 | 03/08/13 | 6,184,000 | BUY | RURL 10 1/8 07/15/19 | 781749AA4 | 100.1250 |
| Brevan Howard Credit Catalysts Master Fund Limited | 04/02/13 | 04/05/13 | 1,500,000 | BUY | RURL 10 1/8 07/15/19 | 781749AA4 | 103.0000 |
| Brevan Howard Credit Catalysts Master Fund Limited | 04/02/13 | 04/05/13 | 8,691,000 | BUY | RURL 10 1/8 07/15/19 | 781748AG3 | 101.8750 |
| Brevan Howard Credit Catalysts Master Fund Limited | 05/16/13 | 05/21/13 | 4,837,000 | BUY | RURL 10 1/8 07/15/19 | 781749AA4 | 83.0000 |
| Brevan Howard Credit Catalysts Master Fund Limited | 05/16/13 | 05/21/13 | 850,000 | BUY | RURL 10 1/8 07/15/19 | 781749AA4 | 86.5000 |
| Brevan Howard Credit Catalysts Master Fund Limited | 07/02/13 | 07/08/13 | (8,500,000) | SELL | RURL 10 1/8 07/15/19 | 781748AG3 | 80.0000 |
| Brevan Howard Credit Catalysts Master Fund Limited | 07/02/13 | 07/08/13 | 1,700,000 | BUY | RURL 10 1/8 07/15/19 | 781748AG3 | 79.0000 |
| Brevan Howard Credit Catalysts Master Fund Limited | 07/02/13 | 07/08/13 | (1,700,000) | SELL | RURL 10 1/8 07/15/19 | 781749AA4 | 79.5000 |
| Brevan Howard Credit Catalysts Master Fund Limited | 07/02/13 | 07/08/13 | (1,275,000) | SELL | RURL 10 1/8 07/15/19 | 781749AA4 | 79.2500 |
| Brevan Howard Credit Catalysts Master Fund Limited | 08/01/13 | 08/06/13 | 2,374,000 | BUY | RURL 10 1/8 07/15/19 | 781748AG3 | 56.0000 |
| Brevan Howard Credit Catalysts Master Fund Limited | 08/01/13 | 08/06/13 | 334,000 | BUY | RURL 10 1/8 07/15/19 | 781749AA4 | 60.0000 |
| Subtotal Brevan Howard Credit Catalysts Master Fund Limited | | | $18,055,000 | | | | |
| Brevan Howard Master Fund Limited | 03/05/13 | 03/08/13 | 765,000 | BUY | RURL 10 1/8 07/15/19 | 781748AG3 | 99.6250 |
| Brevan Howard Master Fund Limited | 03/05/13 | 03/08/13 | 1,546,000 | BUY | RURL 10 1/8 07/15/19 | 781749AA4 | 100.1250 |
| Brevan Howard Master Fund Limited | 04/02/13 | 04/05/13 | 1,309,000 | BUY | RURL 10 1/8 07/15/19 | 781748AG3 | 101.8750 |
| Brevan Howard Master Fund Limited | 05/16/13 | 05/21/13 | 663,000 | BUY | RURL 10 1/8 07/15/19 | 781749AA4 | 83.0000 |
| Brevan Howard Master Fund Limited | 05/16/13 | 05/21/13 | 150,000 | BUY | RURL 10 1/8 07/15/19 | 781749AA4 | 86.5000 |
| Brevan Howard Master Fund Limited | 07/02/13 | 07/08/13 | (1,500,000) | SELL | RURL 10 1/8 07/15/19 | 781748AG3 | 80.0000 |
| Brevan Howard Master Fund Limited | 07/02/13 | 07/08/13 | 300,000 | BUY | RURL 10 1/8 07/15/19 | 781748AG3 | 79.0000 |
| Brevan Howard Master Fund Limited | 07/02/13 | 07/08/13 | (300,000) | SELL | RURL 10 1/8 07/15/19 | 781749AA4 | 79.5000 |
| Brevan Howard Master Fund Limited | 07/02/13 | 07/08/13 | (225,000) | SELL | RURL 10 1/8 07/15/19 | 781749AA4 | 79.2500 |
| Brevan Howard Master Fund Limited | 08/01/13 | 08/06/13 | (2,374,000) | SELL | RURL 10 1/8 07/15/19 | 781748AG3 | 56.0000 |
| Brevan Howard Master Fund Limited | 08/01/13 | 08/06/13 | (334,000) | SELL | RURL 10 1/8 07/15/19 | 781749AA4 | 60.0000 |
| Subtotal Brevan Howard Master Fund Limited | | | $0 | | | | |

*Exhibit A*

**Rural/Metro Corporation**

*Transaction Data: May 15, 2012 - August 1, 2013*

| Fund | Trade Date | Settlement Date | Notional | Type | Instrument Description | Isin | Executed Price* |
|------|-----------|-----------------|----------|------|------------------------|------|-----------------|
| Oaktree Principal Fund V, L.P. | 05/20/13 | 05/23/13 | 6,591,000 | BUY | RURL 10 1/8 07/15/19 | 781748AG3 | 88.2500 |
| Oaktree Principal Fund V, L.P. | 05/23/13 | 05/29/13 | 7,579,000 | BUY | RURL 10 1/8 07/15/19 | 781748AG3 | 88.7500 |
| Oaktree Principal Fund V, L.P. | 06/05/13 | 06/12/13 | 4,614,000 | BUY | RURL 10 1/8 07/15/19 | 781749AA4 | 87.2500 |
| Oaktree Principal Fund V, L.P. | 06/11/13 | 06/14/13 | 7,312,000 | BUY | RURL 10 1/8 07/15/19 | 781748AG3 | 86.0000 |
| Oaktree Principal Fund V, L.P. | 06/12/13 | 06/17/13 | 1,737,000 | BUY | RURL 10 1/8 07/15/19 | 781749AA4 | 86.0000 |
| Oaktree Principal Fund V, L.P. | 06/20/13 | 06/25/13 | 1,317,000 | BUY | RURL 10 1/8 07/15/19 | 781749AA4 | 84.7500 |
| Oaktree Principal Fund V, L.P. | 06/28/13 | 07/09/13 | 6,587,000 | BUY | RURL 10 1/8 07/15/19 | 781749AA4 | 84.5000 |
| Oaktree Principal Fund V, L.P. | 07/01/13 | 07/05/13 | 1,646,000 | BUY | RURL 10 1/8 07/15/19 | 781749AA4 | 84.0000 |
| Oaktree Principal Fund V, L.P. | 07/01/13 | 07/19/13 | 6,587,000 | BUY | RURL 10 1/8 07/15/19 | 781749AA4 | 83.5000 |
| Oaktree Principal Fund V, L.P. | 07/02/13 | 07/08/13 | 3,293,000 | BUY | RURL 10 1/8 07/15/19 | 781749AA4 | 82.5000 |
| Oaktree Principal Fund V, L.P. | 07/02/13 | 07/08/13 | 9,880,000 | BUY | RURL 10 1/8 07/15/19 | 781749AA4 | 80.2500 |
| Oaktree Principal Fund V, L.P. | 07/02/13 | 07/10/13 | 2,964,000 | BUY | RURL 10 1/8 07/15/19 | 781749AA4 | 79.2500 |
| Oaktree Principal Fund V, L.P. | 07/03/13 | 07/11/13 | 7,360,000 | BUY | RURL 10 1/8 07/15/19 | 781749AA4 | 77.0000 |
| Oaktree Principal Fund V, L.P. | 07/09/13 | 07/12/13 | 7,743,000 | BUY | RURL 10 1/8 07/15/19 | 781749AA4 | 64.0000 |
| Oaktree Principal Fund V, L.P. | 07/10/13 | 07/12/13 | 1,185,000 | BUY | RURL 10 1/8 07/15/19 | 781749AA4 | 64.0000 |
| Subtotal Oaktree Principal Fund V, L.P. | | | $76,395,000 | | | | |
| Oaktree Principal Fund V (Parallel), L.P. | 05/20/13 | 05/23/13 | 1,776,000 | BUY | RURL 10 1/8 07/15/19 | 781748AG3 | 88.2500 |
| Oaktree Principal Fund V (Parallel), L.P. | 05/23/13 | 05/29/13 | 2,043,000 | BUY | RURL 10 1/8 07/15/19 | 781748AG3 | 88.7500 |
| Oaktree Principal Fund V (Parallel), L.P. | 06/05/13 | 06/12/13 | 1,243,000 | BUY | RURL 10 1/8 07/15/19 | 781749AA4 | 87.2500 |
| Oaktree Principal Fund V (Parallel), L.P. | 06/11/13 | 06/14/13 | 1,971,000 | BUY | RURL 10 1/8 07/15/19 | 781748AG3 | 86.0000 |
| Oaktree Principal Fund V (Parallel), L.P. | 06/12/13 | 06/17/13 | 468,000 | BUY | RURL 10 1/8 07/15/19 | 781749AA4 | 86.0000 |
| Oaktree Principal Fund V (Parallel), L.P. | 06/20/13 | 06/25/13 | 355,000 | BUY | RURL 10 1/8 07/15/19 | 781749AA4 | 84.7500 |
| Oaktree Principal Fund V (Parallel), L.P. | 06/28/13 | 07/09/13 | 1,775,000 | BUY | RURL 10 1/8 07/15/19 | 781749AA4 | 84.5000 |
| Oaktree Principal Fund V (Parallel), L.P. | 07/01/13 | 07/05/13 | 444,000 | BUY | RURL 10 1/8 07/15/19 | 781749AA4 | 84.0000 |
| Oaktree Principal Fund V (Parallel), L.P. | 07/01/13 | 07/19/13 | 1,775,000 | BUY | RURL 10 1/8 07/15/19 | 781749AA4 | 83.5000 |
| Oaktree Principal Fund V (Parallel), L.P. | 07/02/13 | 07/08/13 | 888,000 | BUY | RURL 10 1/8 07/15/19 | 781749AA4 | 82.5000 |
| Oaktree Principal Fund V (Parallel), L.P. | 07/02/13 | 07/08/13 | 2,663,000 | BUY | RURL 10 1/8 07/15/19 | 781749AA4 | 80.2500 |
| Oaktree Principal Fund V (Parallel), L.P. | 07/02/13 | 07/10/13 | 799,000 | BUY | RURL 10 1/8 07/15/19 | 781749AA4 | 79.2500 |
| Oaktree Principal Fund V (Parallel), L.P. | 07/03/13 | 07/11/13 | 1,984,000 | BUY | RURL 10 1/8 07/15/19 | 781749AA4 | 77.0000 |
| Oaktree Principal Fund V (Parallel), L.P. | 07/09/13 | 07/12/13 | 2,087,000 | BUY | RURL 10 1/8 07/15/19 | 781749AA4 | 64.0000 |
| Oaktree Principal Fund V (Parallel), L.P. | 07/10/13 | 07/12/13 | 320,000 | BUY | RURL 10 1/8 07/15/19 | 781749AA4 | 64.0000 |
| Subtotal Oaktree Principal Fund V (Parallel), L.P. | | | $20,591,000 | | | | |
| Oaktree FF Investment Fund, L.P. | 05/20/13 | 05/23/13 | 1,633,000 | BUY | RURL 10 1/8 07/15/19 | 781748AG3 | 88.2500 |
| Oaktree FF Investment Fund, L.P. | 05/23/13 | 05/29/13 | 1,878,000 | BUY | RURL 10 1/8 07/15/19 | 781748AG3 | 88.7500 |
| Oaktree FF Investment Fund, L.P. | 06/05/13 | 06/12/13 | 1,143,000 | BUY | RURL 10 1/8 07/15/19 | 781749AA4 | 87.2500 |
| Oaktree FF Investment Fund, L.P. | 06/11/13 | 06/14/13 | 1,812,000 | BUY | RURL 10 1/8 07/15/19 | 781748AG3 | 86.0000 |
| Oaktree FF Investment Fund, L.P. | 06/12/13 | 06/17/13 | 430,000 | BUY | RURL 10 1/8 07/15/19 | 781749AA4 | 86.0000 |
| Oaktree FF Investment Fund, L.P. | 06/20/13 | 06/25/13 | 328,000 | BUY | RURL 10 1/8 07/15/19 | 781749AA4 | 84.7500 |
| Oaktree FF Investment Fund, L.P. | 06/28/13 | 07/03/13 | 1,638,000 | BUY | RURL 10 1/8 07/15/19 | 781749AA4 | 84.5000 |
| Oaktree FF Investment Fund, L.P. | 07/01/13 | 07/05/13 | 410,000 | BUY | RURL 10 1/8 07/15/19 | 781749AA4 | 84.0000 |
| Oaktree FF Investment Fund, L.P. | 07/01/13 | 07/05/13 | 1,638,000 | BUY | RURL 10 1/8 07/15/19 | 781749AA4 | 83.5000 |
| Oaktree FF Investment Fund, L.P. | 07/02/13 | 07/08/13 | 819,000 | BUY | RURL 10 1/8 07/15/19 | 781749AA4 | 82.5000 |
| Oaktree FF Investment Fund, L.P. | 07/02/13 | 07/08/13 | 2,457,000 | BUY | RURL 10 1/8 07/15/19 | 781749AA4 | 80.2500 |
| Oaktree FF Investment Fund, L.P. | 07/02/13 | 07/10/13 | 737,000 | BUY | RURL 10 1/8 07/15/19 | 781749AA4 | 79.2500 |
| Oaktree FF Investment Fund, L.P. | 07/03/13 | 07/12/13 | 1,830,000 | BUY | RURL 10 1/8 07/15/19 | 781749AA4 | 77.0000 |
| Oaktree FF Investment Fund, L.P. | 07/09/13 | 07/12/13 | 1,925,000 | BUY | RURL 10 1/8 07/15/19 | 781749AA4 | 64.0000 |
| Oaktree FF Investment Fund, L.P. | 07/10/13 | 07/12/13 | 295,000 | BUY | RURL 10 1/8 07/15/19 | 781749AA4 | 64.0000 |
| Subtotal Oaktree FF Investment Fund, L.P. | | | $18,973,000 | | | | |

*Exhibit A*

*Rural/Metro Corporation*

Transaction Data: May 15, 2012 – August 1, 2013

| Fund | Trade Date | Settlement Date | Notional | Type | Instrument Description | Isin | Executed Price* |
|---|---|---|---|---|---|---|---|
| Visium Balanced Master Fund, Ltd. | 05/17/12 | 05/22/12 | 496,000 | BUY | RURL 10 1/8 07/15/19 | 781748AG3 | 95.0000 |
| Visium Balanced Master Fund, Ltd. | 05/17/12 | 05/22/12 | 228,000 | BUY | RURL 10 1/8 07/15/19 | 781749AA4 | 96.0000 |
| Visium Balanced Master Fund, Ltd. | 05/18/12 | 05/23/12 | 391,000 | BUY | RURL 10 1/8 07/15/19 | 781749AA4 | 95.7500 |
| Visium Balanced Master Fund, Ltd. | 07/10/12 | 07/13/12 | 242,000 | BUY | RURL 10 1/8 07/15/19 | 781749AA4 | 98.2500 |
| Visium Balanced Master Fund, Ltd. | 07/11/12 | 07/16/12 | 121,000 | BUY | RURL 10 1/8 07/15/19 | 781749AA4 | 98.2500 |
| Visium Balanced Master Fund, Ltd. | 07/17/12 | 07/20/12 | 363,000 | BUY | RURL 10 1/8 07/15/19 | 781749AA4 | 98.7500 |
| Visium Balanced Master Fund, Ltd. | 08/08/12 | 08/13/12 | 261,000 | BUY | RURL 10 1/8 07/15/19 | 781748AG3 | 100.0000 |
| Visium Balanced Master Fund, Ltd. | 10/12/12 | 10/17/12 | 854,000 | BUY | RURL 10 1/8 07/15/19 | 781749AA4 | 95.2500 |
| Visium Balanced Master Fund, Ltd. | 10/15/12 | 10/18/12 | 427,000 | BUY | RURL 10 1/8 07/15/19 | 781749AA4 | 94.7500 |
| Visium Balanced Master Fund, Ltd. | 10/18/12 | 10/23/12 | 641,000 | BUY | RURL 10 1/8 07/15/19 | 781748AG3 | 93.5000 |
| Visium Balanced Master Fund, Ltd. | 11/09/12 | 11/15/12 | 324,000 | BUY | RURL 10 1/8 07/15/19 | 781749AA4 | 95.8750 |
| Visium Balanced Master Fund, Ltd. | 01/04/13 | 01/09/13 | 2,000,000 | BUY | RURL 10 1/8 07/15/19 | 781749AA4 | 100.3750 |
| Visium Balanced Master Fund, Ltd. | 01/09/13 | 01/14/13 | 1,375,000 | BUY | RURL 10 1/8 07/15/19 | 781749AA4 | 100.5000 |
| Visium Balanced Master Fund, Ltd. | 01/28/13 | 01/31/13 | 1,000,000 | BUY | RURL 10 1/8 07/15/19 | 781748AG3 | 101.0000 |
| Visium Balanced Master Fund, Ltd. | 01/30/13 | 02/04/13 | 80,000 | BUY | RURL 10 1/8 07/15/19 | 781749AA4 | 101.0000 |
| Visium Balanced Master Fund, Ltd. | 02/01/13 | 02/06/13 | 2,500,000 | BUY | RURL 10 1/8 07/15/19 | 781749AA4 | 102.0000 |
| Visium Balanced Master Fund, Ltd. | 02/28/13 | 03/05/13 | 64,000 | BUY | RURL 10 1/8 07/15/19 | 781748AG3 | 102.0625 |
| Visium Balanced Master Fund, Ltd. | 04/09/13 | 04/12/13 | 2,000,000 | BUY | RURL 10 1/8 07/15/19 | 781749AA4 | 103.2500 |
| Visium Balanced Master Fund, Ltd. | 04/09/13 | 04/12/13 | 1,500,000 | BUY | RURL 10 1/8 07/15/19 | 781749AA4 | 103.2500 |
| Visium Balanced Master Fund, Ltd. | 04/18/13 | 04/23/13 | 2,000,000 | BUY | RURL 10 1/8 07/15/19 | 781749AA4 | 103.2500 |
| Visium Balanced Master Fund, Ltd. | 06/04/13 | 06/07/13 | 1,250,000 | BUY | RURL 10 1/8 07/15/19 | 781749AA4 | 94.0000 |
| Subtotal Visium Balanced Master Fund, Ltd. | | | $18,117,000 | | | | |
| Visium Credit Master Fund, Ltd. | 05/17/12 | 05/22/12 | 3,304,000 | BUY | RURL 10 1/8 07/15/19 | 781748AG3 | 95.0000 |
| Visium Credit Master Fund, Ltd. | 05/17/12 | 05/22/12 | 1,522,000 | BUY | RURL 10 1/8 07/15/19 | 781749AA4 | 96.0000 |
| Visium Credit Master Fund, Ltd. | 05/18/12 | 05/23/12 | 2,609,000 | BUY | RURL 10 1/8 07/15/19 | 781749AA4 | 95.7500 |
| Visium Credit Master Fund, Ltd. | 07/10/12 | 07/13/12 | 1,758,000 | BUY | RURL 10 1/8 07/15/19 | 781749AA4 | 98.2500 |
| Visium Credit Master Fund, Ltd. | 07/11/12 | 07/16/12 | 879,000 | BUY | RURL 10 1/8 07/15/19 | 781749AA4 | 98.2500 |
| Visium Credit Master Fund, Ltd. | 07/17/12 | 07/20/12 | 2,637,000 | BUY | RURL 10 1/8 07/15/19 | 781749AA4 | 98.7500 |
| Visium Credit Master Fund, Ltd. | 08/08/12 | 08/13/12 | 1,739,000 | BUY | RURL 10 1/8 07/15/19 | 781748AG3 | 100.0000 |
| Visium Credit Master Fund, Ltd. | 10/12/12 | 10/17/12 | 5,146,000 | BUY | RURL 10 1/8 07/15/19 | 781749AA4 | 95.2500 |
| Visium Credit Master Fund, Ltd. | 10/15/12 | 10/18/12 | 2,573,000 | BUY | RURL 10 1/8 07/15/19 | 781749AA4 | 94.7500 |
| Visium Credit Master Fund, Ltd. | 10/18/12 | 10/23/12 | 3,859,000 | BUY | RURL 10 1/8 07/15/19 | 781748AG3 | 93.5000 |
| Visium Credit Master Fund, Ltd. | 11/09/12 | 11/15/12 | 1,676,000 | BUY | RURL 10 1/8 07/15/19 | 781749AA4 | 95.8750 |
| Visium Credit Master Fund, Ltd. | 02/28/13 | 03/05/13 | 347,000 | BUY | RURL 10 1/8 07/15/19 | 781748AG3 | 102.0625 |
| Visium Credit Master Fund, Ltd. | 07/16/13 | 07/19/13 | (1,000,000) | SELL | RURL 10 1/8 07/15/19 | 781749AA4 | 60.0000 |
| Visium Credit Master Fund, Ltd. | 07/16/13 | 07/19/13 | (4,500,000) | SELL | RURL 10 1/8 07/15/19 | 781749AA4 | 60.0000 |
| Subtotal Visium Credit Master Fund, Ltd. | | | $22,549,000 | | | | |
| Total All Parties | | | $183,931,000 | | | | |

* Executed Price does not include accrued interest.