#118/119/120

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 15-8574 PSG (MRWx) | Date | January 17, 2017 |
|---|---|---|---|
| Title | Oaktree Principal Fund V, LP *et al.* v. Warburg Pincus LLC *et al.* | | |

| Present: The Honorable | Philip S. Gutierrez, United States District Judge | |
|---|---|---|
| Wendy Hernandez | | Not Reported |
| Deputy Clerk | | Court Reporter |
| Attorneys Present for Plaintiff(s): | | Attorneys Present for Defendant(s): |
| Not Present | | Not Present |

**Proceedings (In Chambers):      Order DENYING Defendants' Motion to Dismiss**

Before the Court are Defendants Warburg Pincus LLC, Warburg Pincus Private Equity X, L.P., and Sean Carney's ("Warburg Defendants") motion to dismiss, Dkts. # 119, 124, and Defendant FTI Consulting's motion to dismiss and to strike, Dkt. # 118. After considering the arguments made at the hearing, as well as those in the moving, opposing, and reply papers, the Court DENIES both motions.

I.      Background

As the parties are familiar with the facts, the Court repeats only the facts necessary to provide context for the Court's subsequent, lengthy discussion of Plaintiffs' claims and Defendants' alleged misstatements and omissions. The relevant time period for all allegations is from June 2011, when the Warburg Defendants purchased Rural/Metro, to August 2013, when Rural/Metro filed for bankruptcy.

A.      Factual Allegations

Rural/Metro Corporation ("Rural/Metro") was "one of the nation's largest providers of ambulance services, including emergency and nonemergency medical transportation services." *Second Amended Complaint* ("*SAC*") ¶ 32. Its core business was providing emergency response services under exclusive contracts with counties, municipalities, fire districts, and other governmental agencies. *Id.* It obtained its revenues from private insurance programs, government-funded healthcare programs (such as Medicare and Medicaid), and uninsured patients. *Id.*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 15-8574 PSG (MRWx) | Date | January 17, 2017 |
|---|---|---|---|
| Title | Oaktree Principal Fund V, LP *et al.* v. Warburg Pincus LLC *et al.* | | |

In June 2011, Defendant Warburg Pincus Private Equity X, L.P. and affiliate Defendant Warburg Pincus LLC purchased Rural/Metro for approximately $760 million. *Id.* ¶ 33. Warburg funded its purchase, in part, with a private placement offering of $200 million in senior notes. *Id.* ¶ 52. Shortly after Warburg's purchase of Rural/Metro, Rural/Metro purchased the ambulance companies Pacific Ambulance, Inc. and Bowers Companies, Inc. (collectively "Pacific Bowers") and Professional Medical Transport, Inc. ("PMT"). *Id.* ¶ 79. These purchases were again financed, in part, by $108 million in senior notes. *Id.* ¶ 83. As part of the issuance of the senior notes, Rural/Metro and Warburg, at the request of the senior note holders, held quarterly calls, referred to here as "Noteholder Calls," to discuss Rural/Metro's financial condition, operations, and prospects. *Id.* ¶ 95–96. Plaintiffs rely extensively on the statements in the Noteholder Calls and the accompanying written materials in their federal securities claims.

The Warburg team overseeing the Rural/Metro purchase and management included Defendant Sean Carney, a Warburg managing director; Eric Liu; and Jacob Strauss. The executive team at Rural/Metro included Michael DiMino, Rural/Metro's Chief Executive Officer, and Jorge Perez, Rural/Metro's Chief Financial Officer. *Id.* ¶ 43. Carney, Liu, and Strauss were elected to Rural/Metro's Board of Directors, and Carney became Chairman of the Board of Rural/Metro shortly after Warburg's acquisition. *Id.* ¶ 55.

Early on, both the Rural/Metro and Warburg teams understood that Rural/Metro's revenue-recognition system, the system that Rural/Metro used to bill its customers, and predict and book revenues, was essential to managing the company. *Id.* ¶ 77. In an Offering Memorandum to investors, Rural/Metro stated: "Our business depends on numerous complex information systems, and any failure to successfully maintain these systems or implement new systems could materially and adversely affect our operations." *Id.* Rural/Metro's business model makes plain exactly why the revenue-recognition system mattered so much. In the ambulatory business, ambulance companies regularly cannot collect the full amounts that they bill to customers. Actual revenues vary, depending on contractual relationships with third-parties, rates approved by Medicare and Medicaid, and the ability of the uninsured to pay their debts. *Id.* ¶ 62. "Revenue-recognition systems," accurately calibrated, are necessary to allow companies to predict "contractual allowances," or differences between billed rates and rates collected. *Id.* As the SAC plainly states, "[a]ccurate assessment of the applicable contractual allowances was *essential* to an accurate net revenue calculation" because "[u]nderestimated contractual allowance would produce overstated net revenue." *Id.* ¶ 63 (emphasis added).

As is now apparent from this litigation—and a rare point undisputed by the parties—Rural/Metro's revenue-recognition system did not perform as expected. It failed to

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 15-8574 PSG (MRWx) | Date | January 17, 2017 |
|---|---|---|---|
| Title | Oaktree Principal Fund V, LP *et al.* v. Warburg Pincus LLC *et al.* | | |

account for payer-mix changes and past collection experiences, and so, significantly overstated how much Rural/Metro could expect to collect for ambulatory transports. *Id.* The SAC alleges that Rural/Metro learned of problems with its revenue-recognition system as early as February 2012. *Id.* ¶ 86. CFO Perez received a report suggesting that Rural/Metro's revenues and its earnings before interest, tax, depreciation, and amortization ("EBITDA") figures were inflated. *Id.* EBITDA is an important figure because it is an indicator of a company's liquidity and ability to meet current obligations. *See id.* ¶¶ 48(c), 330 ("EBITDA is a proxy for cash flow that is used by investors to assess a company's historically-demonstrated ability to generate sufficient earnings to pay its obligations as they become due. EBITDA is frequently used by investors as a tool to value a company by applying an appropriate multiple to historical EBITDA"). Perez told Carney about the problematic report and Carney told Perez to "dig into" the problem because it was "important" and "critical." *Id.* ¶ 86.

In April 2012, Perez retained the accounting firm Ernst & Young ("E&Y") to audit Rural/Metro's revenue-recognition system. *Id.* ¶ 88. In an April 30 letter, E&Y reported the results of its initial assessment that the revenue-recognition system was based on "a risky methodology that is subject to a level of estimates and judgment that is not appropriate for a company of the size and scale of Rural/Metro." *Id.* ¶ 91; *see also id.* ("Without a current and historical data base for maintaining this information, it will be nearly impossible to value the month end receivable or perform accurate profitability analysis by customer/location"). After this initial assessment, Rural/Metro authorized E&Y to perform a full evaluation of the revenue-recognition system.

In May 2012, DiMino convened a Noteholder Call. On the call, DiMino stated "[O]ur financial performance is solid and trending in a positive direction. We are confident that our proactive organic and strategic growth platform provides ample opportunities for continued long-term growth," and he stated, "We are pleased to see continued growth in transport volumes from continuing operations and expect this trend to continue." *Id.* ¶¶ 100–01. Plaintiffs Visium Credit and Visium Balanced purchased $16.6 million in senior notes between May 2012 and the next Noteholder Call in September 2012. *Id.* ¶¶ 7–8, 77.

In the summer of 2012, DiMino, Perez, Carney, Strauss, and Liu continued to investigate problems with the revenue-recognition system. Carney started a "Rural Recovery Project Workplan" aimed at exploring options to resolve the revenue-recognition and collection problems. *Id.* ¶ 106. On June 25, 2012, Liu sent an email to Carney stating that he had reiterated to Perez how bad the situation was. *Id.* ¶ 105. Liu's email to Carney attached a report indicating that the "magnitude" of the issue was "+/- $20 million—this is a direct hit to EBITDA." *Id.* ¶ 119. Liu recommended that Rural/Metro announce a $14 million "write-down"

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 15-8574 PSG (MRWx) | Date | January 17, 2017 |
|---|---|---|---|
| Title | Oaktree Principal Fund V, LP *et al.* v. Warburg Pincus LLC *et al.* | | |

of accounts receivable and "bleed" the remaining balance into subsequent quarters. *Id.* A write-down is a reduction in the estimated value of an asset, and large write-downs can reduce an investors' equity in the company. Plaintiffs allege that this decision to "bleed" write-downs into subsequent periods is inherently deceptive because such a decision typically requires the company to understate the initial write-down amount and overstate revenues. *Id.* ¶ 122 ("Bleeding inflates reported results and EBITDA in one quarter, even when proper accounting methods dictate lower results.").

In September 2012, DiMino convened another Noteholder Call. On this call, DiMino announced a write-down of $17.6 million for the 2012 fiscal year. *Id.* ¶ 119. DiMino also told investors that the write-down would be a "one-time clean-up item." *Id.* ¶ 131. On the call, DiMino also assured investors that he had "high confidence" in the accuracy of Rural/Metro's revenue-recognition system, and that the system had been "enhanced" so that additional write-downs would not be necessary. *Id.* ¶¶ 131, 133. DeMino also made other statements about the "increased Average Patient Charge" and the revenue from the Pacific Bowers and PMT acquisitions. *Id.* ¶¶ 135, 140. Visium purchased $13.5 million in senior notes between this call and the next call in November 2012. *Id.* ¶ 142.

Later in September, E&Y reported the final results of its investigation into the revenue-recognition system. *Id.* ¶ 141. After confirming what it had initially predicted, E&Y told Rural/Metro and Warburg that it could only make recommendations regarding new revenue-recognition methodologies but could not assist in the actual implementation of the recommendations because E&Y was Warburg's long-time accounting firm and E&Y was concerned about independence. *Id.* ¶¶ 139, 276.

On November 6, 2012, DiMino convened another Noteholder Call. On the call, DiMino stated that Rural/Metro "remain[ed] on track to perform the plan for 2013 and look[ed] forward to reporting second quarter results in February." *Id.* ¶ 143. Visium purchased approximately $9 million in senior notes between November 2012 and February 2013. *Id.* ¶ 148.

Concerns about the revenue-recognition system escalated in late 2012 and early 2013. On November 20, 2012, Carney and DiMino exchanged emails where Carney expressed concerns about the revenue-recognition system. The emails attached an October 2012 Board report to Rural/Metro's Board where the company stated:

> While the root cause is a revenue issue, there unfortunately aren't any (or enough) near-term fixes—[a different revenue-recognition system] is too far away, and we can't control

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 15-8574 PSG (MRWx) | Date | January 17, 2017 |
|---|---|---|---|
| Title | Oaktree Principal Fund V, LP *et al.* v. Warburg Pincus LLC *et al.* | | |

the macro healthcare utilization environment. So we need to find an expense solution, even if that isn't the root cause of the problem.

*Id.* ¶ 144. Carney told DiMino that the results were "very concerning" because they "suggest[] we are missing our expense targets significantly in all the key areas." *Id.* DiMino responded, "The results are concerning agree. This miss is coming from the rate and volume issue more so than expenses." *Id.* In light of the ongoing issues, Rural/Metro retained Defendant FTI Consulting, Inc. to implement corrections to the revenue-recognition system. *Id.* ¶ 153.

On the next Noteholder Call in February 2013, DiMino announced another $4.5 million write-down related to the Pacific Bowers acquisition. Instead of disclosing the problems with the revenue-recognition system, however, DiMino attributed the write-down to "the impact of the healthcare industry trends as we are familiar with," "a continued rise in the number of self-pay accounts," and "commercial insurance . . . continuing to transition to high-deductible employer plans." *Id.* DiMino also said that this write-down would be a "one-time" event. *Id.* ¶ 158. After the call, Warburg's management exchanged emails suggesting that the revenue-recognition system was the source of the problem. In a February 22, 2013 from Liu to Carney, Liu purportedly wrote about the unreliable nature of Rural/Metro's financial information: "Have you ever heard the expression GIGO [Garbage in, Garbage out?]." *Id.* ¶ 154. In the same exchange, Liu told Carney and Strauss that he believed that additional accounts receivable write-downs might be necessary to account for the revenue-recognition problems. *Id.* ¶ 155. Visium purchased approximately $5.6 million in senior notes between the February 2013 call and the next call, and Plaintiffs DW Catalyst Master Fund, Ltd. and DW Value Master Fund, Ltd. purchased approximately $23.1 million in senior notes between March 2013 and April 2013. *Id.* ¶ 162.

In March 2013, FTI updated the Rural/Metro Board and noted many of the same deficiencies that E&Y identified in September 2012. The point person between FTI, and Rural/Metro and Warburg was Scott Bingham ("Bingham"), FTI's principal and health practice expert. *Id.* ¶ 24. Warburg was Bingham's third "most significant" client. *Id.* In March, Bingham informed the Rural/Metro Board that an additional $35 million write-down would be needed to "undo the effect of overstatements of receivables and revenue for periods in the 2011, 2012, and 2013 fiscal years." *Id.* ¶ 166. At some point before the next Noteholder Call, Bingham also estimated that EBITDA for the twelve months proceeding March 31, 2013 was $64 million. *Id.* ¶ 187. Warburg relied on Bingham, and not the revenue-recognition system, to estimate EBITDA for this period because Rural/Metro's revenue-recognition system was still overstating EBITDA; it reported an EBITDA of $90.6 million for the twelve months ending March 31, 2013. *Id.* ¶ 191. Bingham's estimate that EBITDA was $64 million should have

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 15-8574 PSG (MRWx) | Date | January 17, 2017 |
|---|---|---|---|
| Title | Oaktree Principal Fund V, LP *et al.* v. Warburg Pincus LLC *et al.* | | |

signaled to Carney, and others knowledgeable about Rural/Metro's finances, that Rural/Metro likely did not have enough cash on hand to meet obligations. The company's analysts predicted that Rural/Metro needed at least an EBITDA of $70 million to avoid serious financial distress. *See, e.g.*, *id.* ¶ 188.

In May 2013, before the next Noteholder Call, Carney fired DiMino. *Id.* ¶ 167. Carney and Bingham presented the key financial information on the call. Carney began by stating that he was "a partner at Warburg Pincus and also the Chairman of the Rural/Metro Board." *Id.* ¶ 169. Carney announced that Rural/Metro's revenues continued to be overstated and that Rural/Metro would need an additional $35 million write-down of accounts receivable. *Id.* ¶¶ 200–01. Both Carney and Bingham told investors that EBITDA for the twelve months prior to March 31, 2013 was $70.1 million, and Bingham explained, in detail, how Rural/Metro arrived at that figure. *Id.* ¶¶ 178, 183. The written materials accompanying the call confirmed the $70.1 million EBITDA. *Id.* ¶ 185. Near the end of the call, an investor asked Carney if he would comment on whether Warburg would contribute additional equity to Rural/Metro if the need arose. Carney replied, "No reason to. The company's in perfectly good liquidity position." *Id.* ¶ 212.

Although Defendants offer little to explain why the EBITDA figure changed from $64 million before the call to $70.1 million during the call, Plaintiffs point out that it was advantageous for Warburg to use the $70.1 million figure on the call. Plaintiffs assert that "it was of critical importance to Rural/Metro's ability to continue as a business and to maintain the support of the investors, and that is was critical to Warburg's attempt to salvage its investment, that Rural/Metro have and report an EBITDA number of at least $70 million." *Id.* ¶ 178. An EBITDA of $70.1 million signaled that the company could avoid bankruptcy in the near-term. Plaintiffs also point out that, in June presentations to bank lenders, not shared with senior noteholders, when it was advantageous for Rural/Metro to do so, Carney admitted EBITDA was between $50 and $64 million. *Id.* ¶¶ 217, 235.

The price of the senior notes dropped after the announcement of the $35 million write-down in May 2013. *Id.* ¶ 366. On July 15, 2013, Rural/Metro missed an interest payment. *Id.* ¶ 369. The price of the senior notes then dropped to "the low 60s and high 50s." *Id.* ¶ 370. Finally, on August 4, 2013, Rural/Metro filed for bankruptcy. *Id.* ¶ 371. That same day, Rural/Metro's new CFO, Stephen Farber, filed a declaration with the bankruptcy court stating that Rural/Metro's EBITDA was between $50 and $60 million. *Id.* After the bankruptcy announcement, the senior notes dropped from trading between the low 60s and high 50s to a new range between the mid to high 20s. *Id.* ¶ 132.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 15-8574 PSG (MRWx) | Date | January 17, 2017 |
|---|---|---|---|
| Title | Oaktree Principal Fund V, LP *et al.* v. Warburg Pincus LLC *et al.* | | |

### B.     Procedural Allegations

On November 4, 2015, Plaintiffs Oaktree Principal Fund V, LP; Oaktree Principal Fund V (Parallel), L.P.; Oaktree FF Investment Fund, L.P.; DG Value Partners, L.P.; DG Value Partners II Master Fund, L.P.; Special Situations, LLC; Special Situations X, LLC; Brevan Howard Master Fund Limited; Visium Credit Master Fund, Ltd.; and Visium Balanced Master Fund, Ltd. filed a Complaint in this Court.  Dkt. # 3.  Plaintiffs amended the Complaint on March 21, 2016, asserting federal securities violations and common law causes of action for intentional misrepresentation, concealment, fraud based on conspiracy, and negligent misrepresentation.  *See* Dkt. # 65 ("First Amended Complaint" or "FAC").  Defendants filed motions to dismiss.  Dkts. # 66, 68, 73, 78.  On August 9, 2016, the Court granted Defendants' motions to dismiss, focusing primarily on the deficiencies in Plaintiffs' Rule 10b-5 allegations.  Dkt. # 103 ("*August 9 Order*").  The Court held that Plaintiffs could not state a 10b-5 claim against Defendants because Defendants did not "make" the vast majority of the allegedly misleading statements under *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135 (2011) and *United States v. Best Foods*, 524 U.S. 51, 69 (1998), and because Plaintiffs failed to plead sufficient facts to support a claim of scienter.

Plaintiffs filed the SAC on September 28, 2016.  Dkt. # 113.  The SAC, which now totals 108 pages, re-asserts Plaintiffs' 10b-5 allegations, and revives, with additional clarity, Plaintiffs' allegations that Defendants are liable as "control persons" under section 20(a).  The SAC also adds causes of action against FTI for violations of section 20(a) and negligent misrepresentation. The Warburg Defendants and FTI now separately move to dismiss the SAC.

### II.     Legal Standard

Under Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss a cause of action if the plaintiff fails to state a claim upon which relief can be granted.  In evaluating the sufficiency of a complaint under Rule 12(b)(6), the Court should be mindful that the Federal Rules of Civil Procedure generally require only that the complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  *See* Fed. R. Civ. P. 8(a)(2). Although detailed factual allegations are not required to survive a Rule 12(b)(6) motion to dismiss, a complaint that "offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  Rather, the complaint must allege sufficient facts to support a plausible claim for relief.  *See id.*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 15-8574 PSG (MRWx) | Date | January 17, 2017 |
|---|---|---|---|
| Title | Oaktree Principal Fund V, LP *et al.* v. Warburg Pincus LLC *et al.* | | |

In evaluating a Rule 12(b)(6) motion, the Court must engage in a two-step analysis. *Id.* at 679. The Court must first accept as true all non-conclusory, factual allegations made in the complaint. *Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 164 (1993). Based on these allegations, the Court must draw all reasonable inferences in favor of the plaintiff. *Doe v. United States*, 419 F.3d 1058, 1062 (9th Cir. 2005). Then, after accepting as true all non-conclusory allegations and drawing all reasonable inferences in favor of the plaintiff, the Court must evaluate whether the complaint alleges a plausible claim for relief. *Iqbal*, 556 U.S. at 679. Despite the liberal pleading standards of Rule 8, conclusory allegations will not do. *Id.*

Through the Private Securities Litigation Reform Act of 1995 ("PSLRA"), Congress imposed heightened pleading standards on federal securities fraud actions. *See* 15 U.S.C. §§ 78u-4(b)(l)-(2). "The PSLRA significantly altered pleading requirements in private securities fraud litigation by requiring that a complaint plead with particularity both falsity and scienter." *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1084 (9th Cir. 2002), *abrogated on other grounds as recognized in South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008). "The purpose of this heightened pleading requirement was generally to eliminate abusive securities litigation and particularly to put an end to the practice of pleading fraud by hindsight." *Vantive*, 283 F.3d at 1084–85 (quoting *In re Silicon Graphics Sec. Inc. Litig.*, 183 F.3d 970, 973 (9th Cir. 1999)). To meet the exacting standards of the PSLRA, a plaintiff must "specify each statement alleged to have been misleading," and "the reason or reasons why the statement is misleading." *Id.* at 1085 (internal citation omitted).

III.    Incorporation By Reference

"Generally, the scope of review on a motion to dismiss for failure to state a claim is limited to the contents of the complaint." *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006); *accord Van Buskirk v. Cable News Network, Inc.*, 284 F.3d 977, 980 (9th Cir. 2002) ("Ordinarily, a court may look only at the face of the complaint to decide a motion to dismiss."). Courts may also, however, consider "attached exhibits, documents incorporated by reference, and matters properly subject to judicial notice." *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1051 (9th Cir. 2014), *cert. denied sub nom. Cohen v. Nvidia Corp.*, 135 S. Ct. 2349 (2015).

The incorporation by reference doctrine permits the court "to take into account documents 'whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the plaintiff's pleading.'" *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005) (alteration omitted) (quoting *Silicon Graphics*, 183 F.3d at 986). This doctrine includes "situations in which the plaintiff's claim depends on the contents of a document, the

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 15-8574 PSG (MRWx) | Date | January 17, 2017 |
|---|---|---|---|
| Title | Oaktree Principal Fund V, LP *et al.* v. Warburg Pincus LLC *et al.* | | |

defendant attaches the document to its motion to dismiss, and the parties do not dispute the authenticity of the document, even though the plaintiff does not explicitly allege the contents of that document in the complaint." *Id.* The Supreme Court has explicitly noted the importance of considering such materials in evaluating a securities complaint. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) ("[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice.").

The SAC specifically references the transcripts of the quarterly calls with senior noteholders. The SAC attaches one of these transcripts. *See SAC*, Ex. C (May 2013 Investor Call Transcript). Apart from the exhibits to the SAC, Defendants ask the Court to take judicial notice of additional documents that Defendants believe can be incorporated by reference, including transcripts of the Noteholder Calls in May 2012, September 2012, November 2012, and February 2013. *See generally Brill Declaration.* Plaintiffs filed evidentiary objections to Defendants' exhibits.

Although the Court takes judicial notice of the Noteholder Call transcripts, given their centrality to Plaintiffs' claims and their acceptance by all parties as authentic and accurate, the Court declines to take judicial notice of the other documents attached to the Brill Declaration. Given the detailed allegations in the SAC, it unnecessary and superfluous, at this stage in the litigation, to consider the other documents.

IV.   Discussion

The Court first examines Plaintiffs' federal securities causes of action and then turns to the common law causes of action.

A.   Federal Securities Violations

Plaintiffs advance two theories for why Defendants are liable for violations of federal securities laws: (1) liability as "makers" of the statements under Rule 10b-5, and (2) control person liability under section 20(a) of the Securities Exchange Act.

Plaintiffs first assert that Defendants are liable for federal securities violations as the "makers" of the statements under Rule 10b-5. The Court largely rejected these arguments in its August 9, 2016 Order granting Defendants' motions to dismiss the FAC. *See August 9 Order* 15-18. In that order, the Court, relying on *Janus Capital Group, Inc. v. First Investment*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 15-8574 PSG (MRWx) | Date | January 17, 2017 |
|---|---|---|---|
| Title | Oaktree Principal Fund V, LP *et al.* v. Warburg Pincus LLC *et al.* | | |

*Traders*, concluded that, because Carney, Bingham, and their respective corporate employers did not "make" the statements spoken by DiMino and Perez on the Noteholder Calls, Plaintiffs failed to state a 10b-5 claim against Defendants for statements in the May 2012, September 2012, November 2012, and February 2013 Noteholder Calls.

In the same order, the Court noted that the May 2013 Noteholder Call presented a trickier problem because both Carney and Bingham actually spoke on that call. *Id.* 17. Relying on *Best Foods*, which instructed the Court to presume that directors wore their "subsidiary hats" and not their "parent hats" when acting for the subsidiary, the Court held that Warburg could be liable as a "maker" of only Carney's statement that Rural/Metro had "perfectly good liquidity position." *Id.* But, as to that statement, the Court ultimately concluded that Plaintiffs had not pled scienter. *Id.* Using a similar analysis, the Court held that, although FTI could be liable as a "maker" of the statements that Bingham made on the call, FTI could not be liable for the statements in the written materials because Plaintiffs had not shown that FTI or Bingham controlled the production of those materials. *Id.* 18. As with Carney, the Court concluded that Plaintiffs had not adequately asserted falsity or scienter for Bingham's statements.

Plaintiffs give the Court no reason to reconsider its August 9 decision as to which entities are liable as "makers" under 10b-5. As the Court noted, attaching 10b-5 liability after *Janus* to a party that did not directly communicate with investors is exceedingly difficult. Even defendants who "requested, influenced, helped create, or supplied information for the relevant false statements" cannot be liable under 10b-5. *Id.* 15; *see also Janus Capital Grp.*, 131 S. Ct. at 2302 ("This rule might best be exemplified by the relationship between a speechwriter and a speaker. Even when a speechwriter drafts a speech, the content is entirely within the control of the person who delivers it. And it is the speaker who takes credit—or blame—for what is ultimately said."). The Court's prior order thus stands as is on the question of "maker" liability. Under Rule 10b-5, Carney may be liable as the "maker" of all his statements on the May 2013 call, Warburg may be liable as the "maker" of only Carney's statement that Rural/Metro had "perfectly good liquidity position," and FTI may be liable as the "maker" of Bingham's oral statements, but not his written statements, from the May 2013 call.

The Court's August 9 Order, however, largely did not reach the question of whether, under section 20(a), Defendants could be liable for DiMino's statements as well as those made by Carney and Bingham. Section 20(a) imposes liability on:

Every person who, directly or indirectly, controls any person liable under any provision . . . [making that control person] liable jointly and severally with and to the same extent . . . ,

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 15-8574 PSG (MRWx) | Date | January 17, 2017 |
|---|---|---|---|

| Title | Oaktree Principal Fund V, LP *et al.* v. Warburg Pincus LLC *et al.* |
|---|---|

unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

*See* Securities Exchange Act of 1934 § 20(a), 15 U.S.C. § 78t(a) (2016).  To state a claim under section 20(a), Plaintiffs must assert (1) a primary violation of Rule 10b-5 and (2) the defendant's direct or indirect control of the primary violator.  *Howard v. Everex Sys.*, 228 F.3d 1057, 1065 (9th Cir. 2000).  The primary violator may be anyone under Defendants' control; Defendants need not be the "primary" violators.  Courts have found that the "control" inquiry under section 20(a) is more forgiving than the "maker" inquiry under *Janus* and Rule 10b-5.  *See In re CytRx Corp. Sec. Litig.*, CV 14-1956 GHK (PJWx), 2015 WL 5031232, at *17 (C.D. Cal. July 13, 2015) ("[C]ontrol person liability claims can generally only be dismissed at the pleading stage if a plaintiff fails to adequately plead a primary violation." (citing *Loritz v. Exide Techs.*, 2014 U.S. Dist. LEXIS 111491, at *41–42 (C.D. Cal. Aug. 7, 2014)); *see also Arthur Children's Trust v. Keim*, 994 F.3d 1390, 1396 (9th Cir. 2003) ("[T]he determination of who is a controlling person . . . is an intensely factual question.").  Thus, under section 20(a), Plaintiffs correctly point out that they may state a claim based on the DiMino statements, even though Warburg and Carney did not "make" the statements under *Janus.*  DiMino's statements thus remain relevant even though the Court finds that Carney, Warburg, and Bingham did not "make" the statements.

Because the section 20(a) analysis first requires the Court to find a violation of Rule 10b-5, the Court begins with an analysis of Plaintiffs' 10b-5 allegations.  The Court then turns to whether Plaintiffs have asserted claims against Defendants as "control persons" under Rule 20(a).  Because the Court ultimately finds that Plaintiffs have pled 10b-5 claims for at least some of the statements on the Noteholder Calls and have shown that Defendants may be liable as either "control persons" or the makers of some of the statements, the Court DENIES Defendants' motion to dismiss the federal securities claims.

i.       *Rule 10b-5 Violations*

The Court starts with Rule 10b-5.  Section 10(b) of the Exchange Act forbids the "use or employ, in connection with the purchase or sale of any security . . . [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors."  15 U.S.C. § 78j(b).  SEC Rule 10b-5 implements Section 10(b) of the Exchange Act by declaring it unlawful:

(a) To employ any device, scheme, or artifice to defraud,

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 15-8574 PSG (MRWx) | Date | January 17, 2017 |
|---|---|---|---|
| Title | Oaktree Principal Fund V, LP *et al.* v. Warburg Pincus LLC *et al.* | | |

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statement made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

In a section 10b-5 private action, a plaintiff must prove: (1) a material misrepresentation or omission by the defendant; (2) scienter, *i.e.*, a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation, a causal connection between the material misrepresentation and the loss. *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341–42 (2005); *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1061 (9th Cir. 2008) (citing *In re Daou Sys. Inc.*, 411 F.3d 1006, 1014 (9th Cir. 2005)).

Plaintiffs assert that 10b-5 liability lies for several statements in the Noteholders Calls from May 2012, September 2012, November 2012, February 2013, and May 2013. Because Defendants do not contest that Plaintiffs have adequately pled the third (standing) and fifth (economic loss) elements of a 10b-5 claim, the Court focuses here on (1) material misstatement or omission, and scienter, (2) loss causation, and (3) reliance.

### a.    *Material Misstatements or Omissions, and Scienter*

The Court turns first to whether Plaintiffs have pled sufficient facts to show a material misstatement or omission, and scienter. Rule 10b-5 imposes liability for a "material misstatement or omission." 17 C.F.R. § 240.10b-5. Under the PSLRA pleading standards, the SAC must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and . . . state with particularity all facts on which that belief is formed." *Ronconi v. Larkin*, 253 F.3d 423, 429 (9th Cir. 2001) (quoting 15 U.S.C. § 78u-5(c)(1)).

A statement or omission is misleading if it "affirmatively create[s] an impression of a state of affairs that differs in a material way from one that actually exists." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002); *see also Reese v. Malone*, 747 F.3d 557, 569–70 (9th Cir. 2014). An omitted fact is material if there is a "substantial likelihood that the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 15-8574 PSG (MRWx) | Date | January 17, 2017 |
|---|---|---|---|
| Title | Oaktree Principal Fund V, LP *et al.* v. Warburg Pincus LLC *et al.* | | |

disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *McCormick v. Fund Am. Cos., Inc.*, 26 F.3d 869, 876 (9th Cir. 1994) (quoting *Basic v. Levinson*, 485 U.S. 224, 231–32 (1988)). Materiality depends on balancing the magnitude of the event and the likelihood that the event will occur. *Basic*, 485 U.S. at 238–39.

Federal securities laws impose no liability, however, when a person fails to correct a misstatement or misimpression created by another "statement maker." *See In re CytRx Corp. Sec. Litig.*, 2015 WL 5031232, at *7 ("[I]f the [] Defendants did not "make" the statements in question, they had no such duty."); *see also MGIC Inv. Corp.*, 675 F.3d at 1051–52 ("Fulton proposes to get around *Janus Capital* by asserting that MGIC had a duty to correct any errors Williams or Draghi made. But no statute or rule creates such a duty—if there were one, *Janus Capital* itself would have come out the other way."). Rather, speakers are only liable for failing to correct their own omissions. *See Garvey v. Arkoosh*, 354 F. Supp. 2d 73, 83 (D. Mass. 2005) ("[T]he burden to disclose rests on the person who *publishes* the analyst's report; by contrast, there is no duty imposed by the statute on the *issuer* who has paid for the puffery.").

The PSLRA also creates safe harbors for forward-looking statements and statements that are "mere puffing." *See* 15 U.S.C. § 78u-5(c)(1); *see also In re Cutera Sec. Litig.*, 610 F.3d 1103, 1108 (9th Cir. 2010); *In re Impac Mortg. Holdings, Inc.*, 554 F. Supp. 2d 1083, 1096 (C.D. Cal. 2008). These statements cannot be a basis for liability—even if they are untrue or deceptive when made.

A statement is forward-looking if it is "identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(c)(1)(A)(i). Forward-looking language includes statements that a company "expects," "believes," or "is confident" that certain projections will be realized in the future. *See In re Accuray, Inc. Sec. Litig.*, 757 F. Supp. 3d 936, 947 (N.D. Cal. 2010); *In re Impac Mortg. Holdings, Inc. Sec. Litig.*, 554 F. Supp. 2d at 1096; *In re Tibco Software, Inc.*, C 05-2146 SBA, 2006 WL 1469654, at *26 (N.D. Cal. May 25, 2006).

A statement is "puffing" or "puffery" if it expresses an opinion that is "not capable of objective verification" and if it is lacking in the specificity that "a reasonable investor could expect the [speaker] to be pegged." *In re Impac Mortg. Holdings*, 554 F. Supp. 2d at 1096. Puffing language includes vague statements of optimism like "business couldn't be better" and "industry-leading," as well as words like "strong," "robust," "well positioned," "solid," and "improved." *See In re Wet Seal, Inc. Sec. Litig.*, 518 F. Supp. 2d 1148, 1168 (C.D. Cal. 2007).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 15-8574 PSG (MRWx) | Date | January 17, 2017 |
|---|---|---|---|
| Title | Oaktree Principal Fund V, LP *et al.* v. Warburg Pincus LLC *et al.* | | |

As the Ninth Circuit put it in *Oregon Public Employees Retirement Fund v. Apollo Group Inc.*, "an optimistic, subjective assessment hardly amounts to a securities violation." 774 F.3d 598, 606 (9th Cir. 2014).

In addition to pleading a material misstatement or omission, Plaintiffs must plead scienter with particularity. *See Tellabs*, 551 U.S. at 323. A plaintiff can show scienter "by showing deliberate recklessness or 'some degree of intentional or conscious misconduct.'" *ESG Capital Partners, LP v. Stratos*, 828 F.3d 1023, 1035 (9th Cir. 2016) (quoting *South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 782 (9th Cir. 2008)). The PSLRA requires that the inference of scienter be "strong," and that the Court "take into account plausible opposing inferences." *See* 15 U.S.C. § 78u-4(b)(2)(A); *Tellabs*, 551 U.S. at 323. Although the inference of scienter "need not be irrefutable, *i.e.*, of the smoking-gun genre," it must be "cogent and compelling . . . . A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 323 (citation and internal quotation marks omitted); *see also Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1206 (9th Cir. 2016) (discussing the scienter requirement). "The most direct way to show both that a statement was false when made and that the party making the statement knew that is was false is via contemporaneous reports or data, available to the party, which contradict the statement." *See Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1230 (9th Cir. 2004) (allowing use of internal reports but requiring "at least some specifics from those reports"); *Reese*, 747 F.3d at 572 (same).

Because the Ninth Circuit often treats the "falsity" and scienter analysis as a single inquiry, the Court treats them together here as well. *See ScripsAmerica, Inc. v. Ironbridge Glob. LLC*, 119 F. Supp. 3d 1213, 1236 (C.D. Cal. 2015) (quoting *In re New Century*, 588 F. Supp. 2d 1206, 1227 (C.D. Cal. 2008)).

*1.    DeMino's Statements, May 2012 Noteholder Call*

Plaintiffs first point to DiMino's statements in the May 2012 Noteholder Call where he said, "[O]ur financial performance is solid and trending in a positive direction. We are confident that our proactive organic and strategic growth platform provides ample opportunities for continued long-term growth," and "We are pleased to see continued growth in transport volumes from continuing operations and expect this trend to continue." *SAC* ¶¶ 100–01. Plaintiffs assert that these statements are materially misleading because DiMino knew, at the time, that Rural/Metro could not reliably calculate revenues, and so, by implication, knew that he could not reliably say that "financial performance" or "long-term growth projections" were "trending in a positive direction." *Plaintiffs' Opposition to Warburg's Motion to Dismiss* ("*Warburg Opp.*")

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 15-8574 PSG (MRWx) | Date | January 17, 2017 |
|---|---|---|---|
| Title | Oaktree Principal Fund V, LP *et al.* v. Warburg Pincus LLC *et al.* | | |

8:7–14.  Plaintiffs fault DiMino for failing to mention what he knew about the failings of Rural/Metro's revenue-recognition system.  *Id.*

Defendants counter that the statements cannot be a basis for 10b-5 liability because they are forward-looking statements accompanied by cautionary language, or are puffery.  *Warburg Mot.* 20:13-21:7 (citing *See In re Impac Mortg. Holdings Sec. Litig.*, 554 F. Supp. 2d at 1097 ("[T]he word 'solid' . . . is such a vague expression of optimism that it would not have conveyed a misleading impression of the future on which a reasonable investor would rely.")).  Defendants point out that Rural/Metro began each of its Noteholder Calls, including the call in May 2012, with a word of caution: "During the course of this call, management may make projections or forward-looking statements . . . .  These statements may involve risks and uncertainties . . . . [Rural/Metro] can give no assurance that such expectations will prove to be correct."  *Brill Decl.*, Ex. H (May 21, 2012 Tr.).  Courts have found that this language triggers the PSLRA safe harbor for forward-looking statements.  *See City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, 880 F. Supp. 2d 1045, 1062 (N.D. Cal. 2012); *In re Musicmaker.com Sec. Litig.*, CV 00-2018 CAS (MANx), 2001 WL 34062431, at *23 (C.D. Cal. June 4, 2001).

Defendants also argue that the statements were not false when made because Rural/Metro's understanding of its revenue-recognition systems was still evolving in May 2012.  *Warburg Mot.* 19:1-11 ("For each challenged statement, the more plausible explanation is not that it was false when made, but rather was the product of Rural/Metro's evolving understanding of its financial condition.").  They point out that, although DiMino and Perez had already spoken with E&Y in April 2012, they did not sign a retention letter with the firm until May 2012, and E&Y did not formally present the results of its revenue-recognition study until September 2012.  *See SAC ¶¶* 89–92.

Defendants' arguments are persuasive.  The majority of DiMino's statements from the May 2012 call are either puffery or forward-looking statements.  The statement that "financial performance is solid and trending in a positive direction" is puffery because it is not capable of objective verification.  *See In re Impac Mortg. Holdings Sec. Litig.*, 554 F. Supp. 2d at 1097.  "Financial performance" is vague and could refer to a number of indicators, and it is thus impossible for the listener to verify the truth of the statement.  For the same reason, DiMino's statement that he is "confident" in Rural/Metro's "proactive organic and strategic growth platform" and the company's "continued long-term growth" are also puffery.  DiMino's predictions that Rural/Metro will experience "ample opportunities for long-term growth" and his statement that he "expects this trend to continue" are protected by the forward-looking safe harbor.  Because Rural/Metro began each of its Noteholder Calls with a statement of caution

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 15-8574 PSG (MRWx) | Date | January 17, 2017 |
|---|---|---|---|
| Title | Oaktree Principal Fund V, LP *et al.* v. Warburg Pincus LLC *et al.* | | |

about future predictions, a reasonable investor would have given little credence to vague, predictive statements during the call.

After stripping away the puffery and the forward-looking statements from the May 2012 call, all that is left is DeMino's statement that, "We are pleased to see continued growth in transport volumes from continuing operations." This statement is not a material misrepresentation for two reasons. First, Plaintiffs have not demonstrated that the statement is false. Transport volumes may very well have increased at the time, given Rural/Metro's recent acquisitions of Pacific Bowers and PMT. Second, Plaintiffs have not shown why this statement triggers DiMino's duty to disclose the difficulties with the revenue-recognition system. Transport volumes are only tangentially related to recorded revenues. At the time of the May 2012 phone call, DiMino and his colleagues were still gathering information about the revenue-recognition problem. Because a company does not have an obligation to disclose internal projections when they are still in flux, *see Steiner v. Tektronix, Inc.*, 817 F. Supp. 867, 882 (D. Or. 1992) (citing *In re Convergent Techs. Sec. Litig.*, 9489 F.2d 507, 516 (9th Cir. 1991), *as amended* (Dec. 6, 1991)), the Court cannot conclude that DiMino's failure to disclose the revenue-recognition system concerns during the May 2012 Noteholder Call was a material omission.

In sum, Plaintiffs do not allege sufficient facts to establish that DiMino's statements from the May 2012 call were false or misleading, and not qualified as "puffery" or forward-looking statements.

### 2.   *DiMino Statements, September 2012 Noteholder Call*

Plaintiffs point to four DeMino statements from the September 2012 Noteholder Call that they believe are materially misleading and made with requisite scienter. The four statements are: (1) DeMino's statement that the write-down would be "one-time clean-up item," (2) DeMino's statement that the revenue-recognition system was "enhanced" and that he had "high confidence" in its accuracy, (3) DeMino's representation about the "increased Average Patient Charge," and (4) DeMino's positive representations about the Pacific Bowers and PMT acquisitions. Having reviewed the statements, the Court finds that Plaintiffs adequately pled falsity and scienter as to DiMino's statement expressing confidence in the revenue-recognition system. The other statements, however, do not meet the pleading standard for either falsity or scienter.

### A.   *"One-Time Clean-Up Item"*

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 15-8574 PSG (MRWx) | Date | January 17, 2017 |
|---|---|---|---|
| Title | Oaktree Principal Fund V, LP *et al.* v. Warburg Pincus LLC *et al.* | | |

DiMino's first statement is his promise that the $17.6 million write-down that Rural/Metro had just announced would be a "one-time clean-up item." *SAC* ¶ 131. Plaintiffs allege that this statement was misleading because DiMino knew or consciously disregarded facts suggesting that additional write-downs were forthcoming. *Warburg Opp.* 12:7-14:26. To strengthen their case, Plaintiffs quote from notes that Carney created in July 2012 for his superiors at Warburg. In the notes, Carney purportedly wrote that "additional increases in accounts receivable (and therefore reductions in EBITDA) would be required." *SAC* ¶ 119. The notes also state: "From an accounting perspective, we intend to book a $[14] million A/R write-down in FY Q4 2012 with the remaining balance to be bled in to the quarters in FY 2013." *Id.* Because of these notes and because the information in the notes purportedly came from Perez, Plaintiffs ask the Court to infer that DeMino knew that the write-down would not be a one-time event. *Id.* ¶ 120. Plaintiffs point out that additional write-downs did, in fact, follow the September 2012 call.

Defendants counter that DeMino's representations were not misleading because, in September 2012, Defendants were still determining how large the write-downs would be and whether additional write-downs were necessary. *Warburg Mot.* 22:23-23:2 ("[T]he document merely presents one of a number of differing preliminary estimates."). They also argue that DiMino's "one-time" statement is protected by the forward-looking safe harbor because it implies that the speaker "expected or hoped to have fewer such difficulties in the future." *Id.* 23:10-15 (quoting *In re Musicmaker.com*, 2001 WL 34062431, at *23). They also argue that only Carney, not DiMino, knew that the "one-time" statement might be misleading; Carney's notes—not DeMino's—are the basis for Plaintiffs' inference. *Warburg Mot.* 23:1-9.

The Court agrees with Defendants on these points. The statement that the write-off was a "one-time event" is forward-looking because it predicts events that have not yet occurred. Because Rural/Metro prefaced this statement, as well as other Noteholder calls, with words of caution, the reasoning in *Musicmaker* applies. As the court concluded there, "[E]ven if this forward-looking statement was made with knowledge that it was unlikely to come true, the statement is protected by the PSLRA safe harbor and the bespeaks of caution doctrine." 2001 WL 34062431, at *23. Moreover, Plaintiffs have not made a cogent and compelling argument that DiMino knew, at the time of the September 2012 phone call, that additional write-downs would be necessary. It is plausible, given the legal separation between Warburg and Rural/Metro and Rural/Metro's subordinate status in the corporate hierarchy, that Carney shared his thoughts with his superiors alone. DiMino may have known of difficulties with the revenue-recognition system, but he may not have been privy to the decision to "bleed" revenues into future quarters. Accordingly, Plaintiffs have not satisfied either falsity or scienter for DiMino's "one-time" statement.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 15-8574 PSG (MRWx) | Date | January 17, 2017 |
|---|---|---|---|
| Title | Oaktree Principal Fund V, LP *et al.* v. Warburg Pincus LLC *et al.* | | |

> **B.** *The Revenue-Recognition System Was "Now Enhanced" and DiMino Had "High Confidence in the Reserve Estimate for Anticipated Collections"*

The second category of statements involves DiMino's representation that Rural/Metro had fixed whatever caused the $17.5 million write-down. *SAC* ¶¶ 131, 133, 135. On the call, DiMino explained the write-down by telling investors that Rural/Metro's revenue-recognition system had not had "the ability to work quickly enough through these payer mix shifts," but that the system was "now enhanced so that this won't happen going further." *Id.* ¶ 133. DiMino also told senior noteholders that the "Increased Average Patient Charge (APC) [was] due to improved revenue cycle management process" and that Rural/Metro had "high confidence in the reserve estimate for anticipated collections." *Id.* ¶ 135. Plaintiffs argue that DiMino's representations misled investors into believing that Rural/Metro had resolved its revenue-recognition problems, and DiMino knew or consciously disregarded facts suggesting otherwise.

Plaintiffs point to many facts suggesting that DiMino knew that Rural/Metro would continue to have problems with its revenue-recognition system after the September 2012 call. Before the call, E&Y told Carney, DeMino, and Perez that the revenue-recognition system was "antiquated and risky," and relied on "old software" that did not meet the standard set by "[l]eading practice healthcare organizations [which] closely monitor net payment levels for all payers." *Id.* ¶ 126. E&Y also told DeMino that it could not help Rural/Metro implement reforms because it had a conflict of interest as Warburg's former accountant. *Id.* ¶ 139 (quoting an email from E&Y to Carney where E&Y stated: "We had told [Rural/Metro] up front during our initial meetings that we could not design and execute the implementation on the AR recommendations but could advise on this case. . . . I believe that frustrated the company but we had been telling them all along we could not do the actual implementation."). Plaintiffs point out that, at the very least, DiMino should have supplemented his statements, telling investors that the company had hired outside consultants to address the uncertainties in the revenue-recognition system and that the consultants' work was ongoing.

Plaintiffs argue convincingly that the reliability of the revenue-recognition system was material to predicting the strength of Rural/Metro's financial status. As the Court earlier noted, the June 2011 Offering Memorandum to senior noteholders stated that revenue recognition was "critical to understanding" Rural/Metro's operations.

In response, the Warburg Defendants appear to argue that DiMino's statements are not misleading because DiMino disclosed negative information, including the $17.5 million write-

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 15-8574 PSG (MRWx) | Date | January 17, 2017 |
|---|---|---|---|
| Title | Oaktree Principal Fund V, LP *et al.* v. Warburg Pincus LLC *et al.* | | |

down, at the same time that DiMino announced that Rural/Metro had resolved its revenue-recognition problem. *Warburg Mot.* 22:1-11. In the alternative, the Warburg Defendants assert that DiMino's statements were not misleading because neither DiMino nor Warburg knew that the enhancements had not been made. *Id.* 23:16-22.

Both Defendants' arguments are unconvincing. DeMino's disclosure of the write-down does not negate his later statement that Rural/Metro had resolved its problems. Moreover, what Warburg knew at the time is irrelevant because DiMino, not Warburg, made the statements. For purposes of 10b-5 scienter, only DiMino's state of mind matters.

Plaintiffs' allegations as to these DiMino statements meet both the falsity and scienter requirements. The statements are misleading because they affirmatively create the impression that Rural/Metro's revenue-recognition problems had been resolved, and they are material because the revenue-recognition system was critical to the investors' ability to understand Rural/Metro's business. The inference of scienter is also cogent and compelling, given that the Warburg Defendants offer no other reason why DiMino would represent that Rural/Metro had resolved its problem when, by all indications, it had not.

### C. *Representations About the Average Patient Charge*

The third category of statements involves DiMino's representation that Rural/Metro had achieved an "increased average patient charge (APC)." *SAC* ¶ 135. This statement relates to Warburg's plan to increase Rural/Metro's revenues by increasing the set rates charged to passengers and insurance companies. Plaintiffs argue that DiMino's statement reflected an "untenable" assumption that Rural/Metro would collect 100 percent of its rate increases from customers. *Warburg Opp.* 16:6–16. For their part, the Warburg Defendants argue that the statement is not misleading because Plaintiffs present no information that the statement was false at the time it was made. *Warburg Mot.* 24:7–14. Defendants prevail here. APC could have "increased" even if Rural/Metro could not recoup 100 percent of the increased rates that it charged to customers. Because Plaintiffs have not alleged that APC declined or remained stagnant, Plaintiffs have not pled sufficient facts to show that the DiMino statement was misleading. It thus cannot be a basis for 10b-5 liability.

### D. *Representations About the PMT and Pacific Bower Acquisitions*

The fourth category of misrepresentations involves DiMino's statement that the PMT and Pacific Bower acquisitions were "doing quite nicely." *SAC* ¶ 140. DiMino stated that

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 15-8574 PSG (MRWx) | Date | January 17, 2017 |
|---|---|---|---|
| Title | Oaktree Principal Fund V, LP *et al.* v. Warburg Pincus LLC *et al.* | | |

Rural/Metro had achieved "$92 million in revenue and $23 million in EBITDA from the acquisitions." *Id.* ¶ 266. Plaintiffs argue that these statements were also misleading because, in reality, "those acquisitions were not generating any EBITDA." *Id.* As to these statements, Plaintiffs have failed to meet their burden of pleading with particularity. *See Ronconi*, 253 F.3d at 429. Plaintiffs' conclusory statement that the acquisitions did not generate EBITDA is not enough under the PSLRA; Plaintiffs must specify why they believe the EBITDA is false and must provide the Court with a cogent and compelling reason why DiMino knew the EBITDA was false. Because Plaintiffs have not done so, these statements also cannot be a basis for 10b-5 liability.

### E.    *Summary of Liability from the September 2012 Noteholder Call*

In sum, the Court concludes that only DiMino's representations that Rural/Metro had resolved the problems with its revenue-recognition system are actionable under Rule 10b-5. Plaintiffs have not demonstrated why the other statements from the September 2012 call are misleading or that DiMino acted with the requisite scienter when he made them.

### 3.    *Carney's Silence on the September 2012 Investor Call*

Plaintiffs next argue that Carney's silence on the September 2012 call was materially misleading because Carney knew that the revenue-recognition system was not fixed and that the $17.6 million write-down would be followed by additional write-downs, and he failed to correct DiMino's misstatements. *SAC* ¶¶ 119–27. Because Carney did not actually make a statement on the September 2012 phone call, however, liability for his silence is significantly curtailed. *See In re CytRx Corp. Sec. Litig.*, 2015 WL 5031232, at *7. As Judge King explained in *CytRx*, federal securities laws impose no liability on a person who fails to correct a misimpression created by another speaker. *See id.* Imposing such a duty on a non-speaker would gut the purpose of *Janus Capital*, which imposed 10b-5 liability on a non-speaker only if the plaintiff could demonstrate that the non-speaker had the "ultimate authority over the statement, including its content and whether and how to communicate it." *See MGIC Inv. Corp.*, 675 F.3d at 1051–52 (referencing *Janus Capital Grp.*, 564 U.S. at 141).

Plaintiffs attempt to distinguish *CytRx* by arguing that Carney's silence is somehow different than the silence in *CytRx* because Carney and Warburg "originated" the words that DiMino communicated on the call. *See Warburg Opp.* 7:7–12. This argument is merely a rehash of Plaintiffs' arguments that the Warburg Defendants made DiMino's statements. As the Court has already concluded, Plaintiffs cannot demonstrate that Carney or Warburg "made"

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 15-8574 PSG (MRWx) | Date | January 17, 2017 |
|---|---|---|---|
| Title | Oaktree Principal Fund V, LP *et al.* v. Warburg Pincus LLC *et al.* | | |

DiMino's statements under *Janus*, and so, they also cannot assert here that Carney is somehow liable for failing to correct DiMino's statements.  Carney's silence on the September 2012 call cannot be a basis for 10b-5 liability.

> 4.    *DiMino and Perez's Statements, November 2012 Noteholder Call*

Turning next to the November 2012 Noteholder Call, Plaintiffs argue that DiMino's statement that Rural/Metro "remain[s] on track to perform the plan for 2013 and look[s] forward to reporting second quarter results in February" is misleading.  *See SAC* ¶ 143.  To strengthen its case, Plaintiffs point to emails exchanged between Carney and DiMino on November 20, 2012, approximately two weeks after the November 2012 call.  In one of the emails, Carney purportedly told DiMino: "These results are very concerning.  It suggests we are missing our expense targets significantly in all the key areas.  We cannot let this happen."  *See id.* ¶ 144.  Responding back to Carney, DiMino purportedly wrote, "The results are concerning agree.  The miss is coming from the rate and volume issue more so than the expenses."  *See id.*  On the November 2012 Noteholder Call, Plaintiffs also allege that Perez attempted to pass off an additional $2.2 million write-down as something other than a write-down attributable to the revenue-recognition system.  *Id.* ¶ 147.

Defendants advance two arguments against Plaintiffs' allegations.  First, they contend that DiMino's November 2012 statement is not false because it was still possible for Rural/Metro to "perform to plan."  *Warburg Mot.* 25:13-20.  Second, they argue that the statements are both non-actionable puffery and forward-looking statements protected by the PSLRA safe harbor.  *See id.* 25:21–26:4 (citing *In re Impac Mortg. Holdings, Inc.*, 554 F. Supp. 2d at 1097 (concluding that the phrase "on plan" is "not actionable without specific allegations showing . . . what time frame the defendants were referring to when they made the statement")).

The Court finds Defendants' second argument convincing.  Applying the analysis in *In re Impact Mortgage Holdings, Inc.* to the phrase, "perform to plan for 2013," the Court finds the statement too vague to be actionable without additional allegations showing that investors knew what DiMino meant when he used the term "plan."  *See* 554 F. Supp. 2d at 1097.  Plaintiffs do not point to accompanying statements specifying what specific deliverables the "plan" might consist of, and whether or how they contradicted what DiMino and Carney later learned from Liu.  Moreover, the inference of scienter is neither cogent or compelling in this circumstance, given that Carney, DiMino, and Liu exchanged the emails after the November 2012 Noteholder Call.  As to DiMino's statement that Rural/Metro "look[s] forward to reporting second quarter

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 15-8574 PSG (MRWx) | Date | January 17, 2017 |
|---|---|---|---|
| Title | Oaktree Principal Fund V, LP *et al.* v. Warburg Pincus LLC *et al.* | | |

results in February," the Court concurs with Defendants that this statement is forward looking and too vague to merit consideration as a material misstatement.

As to the Perez statement, Plaintiffs have failed to plead with particularity why the statement was misleading. *See Ronconi*, 253 F.3d at 429. Apart from a footnote in the Warburg Opposition, Plaintiffs do not discuss these statements, *see Warburg Opp.* 19 n.9, and do not adequately pled that the $2.2 million in write-downs were related to the revenue-recognition system, and not other items described in Perez's remarks.

Thus, in sum, none of the statements from the November 2012 Noteholder Call form a basis for 10b-5 liability for DiMino, Perez, Carney, or Warburg.

> ### 5. *DiMino's Statements, February 2013 Noteholder Call*

In the interim between November 2012 and February 2013, the Warburg Defendants hired Defendant FTI Consulting to perform consulting services related to the revenue-recognition problem. *SAC* ¶ 153. Plaintiffs allege that Defendants also learned that additional write-downs might be necessary in the future. *Id.* ¶¶ 149, 155. Because of the new information, Plaintiffs allege that DiMino had a duty to disclose problems with the revenue-recognition system on this call. *Id.* ¶¶ 157, 160. Plaintiffs also assert that it was misleading for DiMino to announce the $4.5 million write-down and to attribute the write-down to broader industry causes and not Rural/Metro's problems generating reliable revenue figures. *Id.* ¶ 158. Specifically, DiMino attributed the write-down to: "the impact of the healthcare industry trends as we are familiar with," "a continued rise in the number of self-pay accounts," and "commercial insurance . . . continuing to transition to high-deductible employer plans." *Id.* DiMino also represented this write-down as a "one-time" event. *Id.*

Defendants argue that DiMino had no duty to disclose the problems with the revenue-recognition system in February 2013 because, as indicated by Rural-Metro's hiring of FTI Consulting, Rural/Metro was still trying to understand the scope of the revenue-recognition problem. *Warburg Mot.* 26:5-14. FTI's review did not conclude until April 2013. *SAC* ¶ 158. Defendants also assert that it was not misleading for DiMino to characterize the write-down as a "one-time" event because, at the time of the February 2013 Noteholder Call, Defendants had still not determined whether additional write-downs would be necessary. *See id.* ¶ 155 (noting that the email from Liu to Carney and Strauss said that the company "could face" another significant write-down).

The Court agrees with Defendants in part. Even the emails that Plaintiffs cite suggest

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 15-8574 PSG (MRWx) | Date | January 17, 2017 |
|---|---|---|---|
| Title | Oaktree Principal Fund V, LP *et al.* v. Warburg Pincus LLC *et al.* | | |

that Warburg had not yet determined whether additional write-downs would be necessary. Thus, accepting all facts in the Complaint as true, it is still plausible that DiMino did not know about future write-downs in early February 2013.

On the other hand, Plaintiffs have demonstrated that DiMino's attribution of the $4.5 million write-down to industry trends, and not the revenue-recognition system, was incomplete and materially misleading. By February 2013, the facts strongly suggested that DiMino knew that Rural/Metro's revenue-recognition system could not accurately predict revenue. Plaintiffs have shown that, although DiMino might not have known the exact cause of the write-down, he likely had enough information to identify the revenue-recognition system as a possible culprit. DiMino's failure to mention the ongoing investigation into the revenue-recognition system is misleading. The inference of scienter is also cogent and compelling because DiMino likely knew that disclosure of the revenue-recognition problems would cast doubt on Rural/Metro's other financial disclosures and might trigger investor backlash. Defendants offer no other plausible explanation for DiMino's failure to disclose the problems with the system at this time. The Court thus concludes that DiMino's explanation of the write-down and his failure to disclose the problems with the revenue-recognition system on the February 2013 call can form the basis of a 10b-5 claim.

> 6.    *Carney and Bingham's Statements, May 2013 Noteholder Call*

Carney fired DiMino in May 2013. *SAC* ¶ 167. Because DiMino was no longer with the company, Carney and Bingham ran the May 2013 Noteholder Call. On the call, Carney told investors that EBITDA for the twelve months preceding March 31, 2013 was $70.1 million. *Id.* ¶ 189. Bingham confirmed the $70.1 million figure and provided the calculations underlying the estimate. *Id.* The written materials accompanying the presentation also contained the $70.1 million figure. Also on the call, in response to a question from an investor, Carney stated that Rural/Metro was in "perfectly good liquidity position." *Id.* ¶ 212.

Plaintiffs allege that Carney and Bingham's statements on the May 2013 phone call and in the accompanying written materials were misleading because both Carney and Bingham knew that EBITDA for the twelve months ending March 31, 2013 was $64 million, not $70.1 million. *Id.* The difference between the $70.1 million and $64 million EBITDA is material. An EBITDA less than $70 million would have signaled to investors that Rural/Metro did not have enough cash on hand to meet current obligations, and suggested that bankruptcy was imminent. *Id.* ¶¶ 186, 188.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 15-8574 PSG (MRWx) | Date | January 17, 2017 |
|---|---|---|---|
| Title | Oaktree Principal Fund V, LP *et al.* v. Warburg Pincus LLC *et al.* | | |

To show that Carney and Bingham knew that the $70.1 million EBITDA was overstated, Plaintiffs point to Bingham's deposition testimony and to a draft version of Bingham's May 2013 presentation. *Id.* ¶¶ 223–24, 227. In his deposition, Bingham testified that he told Jacob Strauss at Warburg that his estimate of EBITDA was $64 million. *Id.* ¶ 223. In the draft presentation, dated May 9, 2013—just a few days before the May 15 Noteholder Call—Bingham included the $64 million EBITDA estimate. *Id.* ¶ 227. Although Carney and Bingham may not have "finalized" the EBITDA estimate until the final presentation to investors, Plaintiffs' allegations strongly suggest that both Carney and Bingham knew of at least the possibility that EBITDA for the twelve months preceding March 2013 was less than $70 million. Adding to the strength of Plaintiffs' facts is that, after the call, in July 2013, Carney allegedly told select market participants that the EBITDA was between $50 million and $64 million. *Id.* ¶ 240.

In its August 9, 2016 Order granting Defendants' motion to dismiss the FAC, the Court struggled to identify exactly why the $70 million estimated EBITDA on the May 2013 Noteholder Call was misleading. *August 9 Order* 20. In the FAC, Plaintiffs asked the Court to infer that Bingham and Carney colluded to present a demonstrably false number. When presented with this theory, however, the Court found Plaintiffs' arguments lacking. It concluded that there was "nothing in the transcript of the [Bingham deposition] to support that Bingham and Strauss believed that this figure was set in stone." *Id.* The Court reasoned that the "factual allegations for the May 2013 investor call established, at best, that FTI estimated one EBITDA figure prior to the call, a different EBITDA figure (that was higher) was used at the May 2013 investor call, and both figures were ultimately determined to be overstated." *Id.* It also pointed out that Plaintiffs had pled only conclusory allegations that the Warburg Defendants and FTI "agreed" to state an incorrect EBITDA figure. *Id.*

Defendants argue that not enough has changed between the FAC and the SAC to merit the Court's reconsideration of its prior holding on this point. *See Warburg Mot.* 32-34; *FTI Mot.* 4. The Court disagrees. The SAC incorporates significantly more detail about how Bingham arrived at the $64 million EBITDA and the recommendation to attribute $27 million of the write-down to the twelve months prior to March 2013. *See SAC* ¶¶ 167–234. In the SAC, Plaintiffs allege not only that Defendants reported an inaccurate EBITDA—which is a relatively malleable estimate of past revenues given the revenue-recognition problem—but also that Defendants materially misled investors into believing that the EBITDA estimate accurately reflected Rural/Metro's financial condition. Interpreting the SAC in Plaintiffs' favor, the Court understands Plaintiffs to allege that Carney and Bingham had a duty to disclose not only an accurate EBITDA, but also (1) that there were reasons to question Rural/Metro's liquidity and (2) that EBITDA might be lower than $70 million. Plaintiffs allege that Carney used Bingham's

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 15-8574 PSG (MRWx) | | Date | January 17, 2017 |
|---|---|---|---|---|
| Title | Oaktree Principal Fund V, LP *et al.* v. Warburg Pincus LLC *et al.* | | | |

expertise, or at least the appearance of expertise, to give the $70.1 million figure more weight than it likely deserved, given the earlier inconsistent estimates and the unreliability of the revenue-recognition system's predictions in May 2013. *Id.* ¶¶ 182, 191–202. Taken as true, the SAC alleges that the specificity with which Bingham made his estimation created the affirmative impression that Rural/Metro had enough cash on hand to continue operations. Because Plaintiffs have shown that the uncertainty of the EBITDA is a material fact, Plaintiffs have pled with particularity why and how the statements are misleading.

Plaintiffs' ability to cite to a draft report and to Bingham's deposition testimony suggests that this case should survive even this Circuit's more exacting standards requiring plaintiffs relying on internal report to allege "at least some specifics from those reports as well as such facts as may indicate their reliability." See *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3D 1226, 1230–31 (9th Cir. 2004). Here, Plaintiffs cite not only to the internal report but to sworn testimony, years later, that affirms the contents of the report. Although Defendants argue that Bingham communicated the EBITDA estimate to Strauss alone, and not to Carney, it is reasonable for the Court to impute knowledge of certain significant corporate events to senior management, especially when Plaintiffs explain the importance of the information and provide detailed, verifiable allegations about Strauss's exposure to the information, his proximity to Carney, and Strauss's role in managing Rural/Metro, given Strauss's status as one of three people from Warburg to sit on Rural/Metro's board. *See, e.g.*, *South Ferry LP*, 542 F.3d at 784.

Turning to scienter, the Court recognizes that Carney and Bingham had different motivations for making their statements, and so the Court analyzes scienter for each speaker separately.

As to Defendant Carney, Plaintiffs assert that he acted with scienter because Carney knew, from Bingham's draft presentation, that EBITDA could be less than $70 million, and he did not disclose this possibility to investors. Carney, in fact, suggested to investors that the exact opposite was true when he told investors that Rural/Metro had "perfectly good liquidity position." Plaintiffs point out that Carney was motivated to present the $70.1 million EBITDA because Rural/Metro needed at least $70 million to break even. *Id.* ¶ 178. Indeed, any figure less than $70 million would have indicated to investors that Rural/Metro was likely to run out of cash sometime in the coming year. *Id.* ¶ 48(c), 177.

By representing a $70.1 million EBITDA, Carney bought Rural/Metro and Warburg time to fix the revenue-recognition system and to improve Rural/Metro's financial condition. Additional time allowed for the possibility that Rural/Metro might avoid bankruptcy, and that

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 15-8574 PSG (MRWx) | Date | January 17, 2017 |
|---|---|---|---|
| Title | Oaktree Principal Fund V, LP *et al.* v. Warburg Pincus LLC *et al.* | | |

Warburg might recoup its investment. As an equity stakeholder in Rural/Metro, Carney knew that Warburg was not likely to recover its investment if Rural/Metro filed for bankruptcy. *Id.* ¶¶ 37–38, 177, 220, 232 ("In the vast majority of corporate bankruptcies and the substantial majority of out-of-court restructurings, equity holders receive no recovery. As Warburg itself stated in a filing in this matter, 'as Rural/Metro's sole shareholder, Warburg had the most to gain by trying to avoid a bankruptcy.'").

In response, the Warburg Defendants argue that the inference of scienter is not "strong" for Carney because Warburg had been actively trying to figure out what went wrong with Rural/Metro's revenue figures and released negative information as it became available. *Warburg Mot.* 36–37 *see also Reply* 7:11–17 ("The only plausible inference is that Rural/Metro openly stated the risks surrounding its A/R, diligently investigated these A/R risks by hiring several outside consultants, and timely apprised lenders and investors of what is learned as the investigation proceeded, conduct that is squarely at odds with Plaintiffs' claims of fraud."). The Warburg Defendants assert that, because Carney disclosed the $34.2 million write-down and DiMino disclosed other write downs in earlier Noteholder Calls, investors should have been on notice about Rural/Metro's declining financial condition and the unreliability of the EBITDA estimate. *Id.* Warburg also points to information that Carney purportedly received from other advisors suggesting that Rural/Metro's liquidity was "good." *Warburg Reply* 22.

Although Rural/Metro's previous disclosures stand in Defendants' favor, the Court is nonetheless concerned about Defendants' alleged half-truths—statements that appear designed to distract investors from a more severe picture of Rural/Metro's financial health. DiMino and Carney's earlier disclosures to the market do not necessarily foreclose the possibility that DiMino and Carney were less than truthful with investors. Rather, Plaintiffs paint a picture of a company that disclosed some information while withholding as much as possible. In the delicate balancing act, Plaintiffs assert that Defendants occasionally disclosed far too little or inflated malleable figures to avoid investor scrutiny. Although Defendants may ultimately succeed in proving that the "total mix" of information in the market was enough to warn investors about the company's financial health, Plaintiffs have asserted enough, at this phase in the litigation, to merit moving forward. Indeed, even if the Court accepted Warburg's representation that liquidity, EBITDA, and revenue figures were still in flux at the time of the May 2013 Noteholder Call, there remain serious questions about whether it was misleading for Carney not to disclose that EBITDA was unpredictable or trending downward. Because Plaintiffs' allegations are at least as compelling as any opposing inference that Defendants ask the Court to draw, Plaintiffs have satisfied the scienter requirement for Defendant Carney.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 15-8574 PSG (MRWx) | Date | January 17, 2017 |
|---|---|---|---|
| Title | Oaktree Principal Fund V, LP *et al.* v. Warburg Pincus LLC *et al.* | | |

Turning to non-party Bingham, Defendant FTI argues that scienter is not present because Bingham did not have a motive to distort EBITDA. FTI asserts that Bingham did not know the importance of the $70 million EBITDA, had only a limited engagement with Warburg, and, as a third-party financial consultant, would not profit at all from any misstatement. *FTI Mot.* 16–17. FTI points to cases suggesting that accountants are rarely held liable for 10b-5 violations when they identify problems and disclose negative information to the corporation. *See FTI Mot.* 16–18:6 (citing *In re A-Power Energy Gen. Sys. Ltd. Sec. Litig.*, No. MDL 11-2302 GW (CWx), 2012 WL 1983341, at \*10 (C.D. Cal. May 31, 2012) ("It is difficult to envision a scienter allegation sufficient to state a securities fraud claim against an auditor who explicitly issued negative internal control findings in connection with the same company whose financial results it is alleged to have manipulated or purposefully ignored in order to fool the investing public[.]"), *and Reiger v. Altris Software, Inc.*, No. CV 98-538 TW (JFSx), 1999 WL 540893, at \*3 (S.D. Cal. Apr. 30, 1999) ("[C]ourts have held that an independent accounting firm's desire to maintain the fees flowing from the relationship with its client, standing alone, is not a sufficient 'motive' to raise a strong inference of scienter."), among others).

Plaintiffs have the better of the argument as to Bingham and FTI as well. Although FTI is correct that auditors are generally not held accountable when they disclose negative information about the corporation to the *public*, the allegations here are factually distinguishable. In FTI's cases, the auditor either disclosed negative information to the corporation and communicated nothing to the public, or the auditor consistently disclosed negative information both to the public and to the corporation. *See In re A-Power Energy Gen. Sys. Ltd. Sec. Litig.*, 2012 WL 1983341, at \*10 (disclosing negative information in publicly available auditor forms); *Buttonwood Tree Value Partners, L.P. v. Sweeney*, 910 F. Supp. 2d 1199, 1207 (C.D. Cal. 2012) (disclosing negative information to the corporation but communicating nothing to the public). Here, Plaintiffs allege that Bingham communicated one thing to Warburg and another thing to the public. Given Bingham's deposition statements and his draft presentation, the inference of scienter is cogent and compelling, as Plaintiffs have pled that Bingham was aware that the EBITDA figure might be substantially less than $70 million and he nonetheless lent his expertise to communicating the opposite to investors.

> 7. *Conclusion re: Material Misstatements and Scienter*

In the previous sections, the Court reviewed the alleged misstatements or omissions from the quarterly Noteholder Calls in May 2012, September 2012, November 2012, February 2013, and May 2013. Plaintiffs have adequately pled falsity and scienter for a number of statements, including:

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 15-8574 PSG (MRWx) | Date | January 17, 2017 |
|---|---|---|---|
| Title | Oaktree Principal Fund V, LP *et al.* v. Warburg Pincus LLC *et al.* | | |

1. Michael DiMino's statements at the September 2012 Noteholder Call that implied that Rural/Metro had fixed the problems with its revenue-recognition system. Specifically, DiMino stated that the system was "now enhanced so that this won't happen going further," that Rural/Metro implemented an "improved revenue cycle management process," and that Rural/Metro had "high confidence in the reserve estimate for anticipated collections." *Id.* ¶¶ 133, 135. Plaintiffs advance a cogent and compelling argument that DiMino made these statements despite knowing that Rural/Metro's revenue-recognition system could not accurately predict anticipated collections.

2. Michael DiMino's omissions during the February 2013 Noteholder Call that obscured the possibility that Rural/Metro's write-downs were due to the company's revenue-recognition system. Specifically, DiMino attributed the write-down that he announced on the call to "the impact of the healthcare industry trends as we are familiar with," "a continued rise in the number of self-pay accounts," and "commercial insurance . . . continuing to transition to high-deductible employer plans." *Id.* ¶ 158. DiMino's statements are misleading because he did not tell investors that Rural/Metro had opened an investigation into its revenue-recognition system, or that the inaccuracies in the system might have led the company to overstate its revenues.

3. Sean Carney's statements and omissions during the May 2013 Noteholder Call that created the affirmative impression that Rural/Metro was in "perfectly good liquidity position." *SAC* ¶¶ 167, 189, 212. Plaintiffs have advanced a cogent and compelling argument that Carney made these statements despite either knowing or consciously disregarding facts that suggested that Rural/Metro's EBITDA for the relevant period might have been $64 million or even lower. Because a reasonable investor would have interpreted such a low EBITDA as a sign of cash flow problems at Rural/Metro, Plaintiffs have raised a "strong" inference that Carney's use of the $70.1 million EBITDA and his statement about Rural/Metro's "perfectly good liquidity position" were designed to deceive investors and to give Rural/Metro more time to alter its performance and avoid bankruptcy.

4. Scott Bingham's statements and omissions during the May 2013 Noteholder Call that Rural/Metro's EBITDA for the twelve months ending in March 2013 was $70 million and Bingham's justification for the $70 million EBITDA. Plaintiffs have advanced a cogent and compelling argument that Bingham presented and supported the $70 million figure despite knowing or consciously disregarding facts

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 15-8574 PSG (MRWx) | Date | January 17, 2017 |
|---|---|---|---|
| Title | Oaktree Principal Fund V, LP *et al.* v. Warburg Pincus LLC *et al.* | | |

that suggested that the EBITDA should be $64 million or lower.

### b. Loss Causation

The Court turns now to whether Plaintiffs have established "loss causation" for the misstatements or omissions that meet the scienter requirements. The element of loss causation requires Plaintiffs to plead a causal connection between the material misrepresentation and the loss. *Dura*, 544 U.S. at 341. The Ninth Circuit has held that the Rule 9(b) pleading standard applies to all elements of a securities fraud action, including loss causation.[1] *Oregon Pub. Emps. Ret. Fund*, 774 F.3d at 605. It has required Plaintiffs to show that "the market learned of and reacted to [the] fraud as opposed to merely reacting to reports of the defendant's poor financial health generally." *Metzler Inv.*, 540 F.3d at 1064.

Plaintiffs point to three disclosures to show how the market reacted to the announcement of the fraud. Because Plaintiffs argue that Defendants disclosed Rural/Metro's financial condition over time, Plaintiffs rely on cases showing that it is not unusual for information to seep into the marketplace over time as companies release more information about their financial position. *See In re Herbalife, Ltd. Secs. Litig.*, No. CV 14-2850 DSF (JCGx), 2015 WL 1245191, at *3 (C.D. Cal. Mar. 16, 2015) ("Either a single event or a 'series of disclosures' can establish loss causation."); *see also Dura*, 455 U.S. at 342 (recognizing that loss may occur as "relevant truth begins to leak out" or "after the truth makes its way to the marketplace").

In the first potential disclosure from May 2013, Carney told investors that Rural/Metro's had overstated accounts receivables and announced an additional write-down of $35.2 million. *SAC* ¶¶ 44–45, 48, 67, 75, 89, 93, 366. Plaintiffs allege that this partial disclosure corrected DiMino's statements in September 2012 and February 2013 that Rural/Metro had fixed the

---

[1] The Court recognizes that Ninth Circuit panels have adopted different standards for both the particularity and substantive requirements of loss causation. *Warburg Opp.* 41–42; *see also Oregon Pub. Emps. Ret. Fund*, 774 F.3d at 604–05 (discussing circuit splits as to whether a plaintiff has to plead loss causation under Rule 8(a) or 9(b)). Because one Ninth Circuit panel cannot overrule another, Plaintiffs urge the Court to adopt the more lenient standards articulated by the Ninth Circuit in *In re Gilead Sciences Securities Litigation*, 536 F.3d 1049 (2008), and *In re Dauo Sys.*, 411 F.3d 1006, 1026 (9th Cir. 2005). The Court declines to do so. The Ninth Circuit's latest pronouncements in *Oregon Public Employees Retirement Fund* and *Metzler* are not only the latest word from the Ninth Circuit but are also aligned with the goals of the PSLRA, and so are the better authority here. Moreover, the difference in the standards is of little moment because the SAC meets even the more demanding pleading requirements.

---

**CIVIL MINUTES - GENERAL**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 15-8574 PSG (MRWx) | Date | January 17, 2017 |
|---|---|---|---|
| Title | Oaktree Principal Fund V, LP *et al.* v. Warburg Pincus LLC *et al.* | | |

problems with its revenue-recognition system and could accurately predict revenues. *Id.* ¶¶ 119–23, 131–23.

The Warburg Defendants contend that Carney's statements cannot be a corrective disclosure for DiMino's statements because Warburg did not know about Rural/Metro's revenue-recognition problems at the time that DiMino made his statements. *Warburg Mot.* 30:1–8. They also argue that Carney's disclosure did not explicitly correct any of DiMino's statements, so it cannot be corrective. This argument is largely a re-hash of Defendants' previous arguments as to falsity and scienter. Warburg's timeline of events contradicts Plaintiffs' factual allegations, and as the parties are no doubt aware, such factual disputes are best reserved for summary judgment or a trial on the merits. The SAC pleads with a level of specificity that satisfies the Ninth Circuit's heightened pleading standards. Plaintiffs demonstrate that the price dropped after the May 2013 disclosure from "trading in excess of par to prices in the 80s," and they assert that this disclosure corrected all statements before the May 2013 call. *Id.* ¶¶ 366, 368.

Plaintiffs assert that Rural/Metro's missed interest payment on July 15, 2013 was the second partial disclosure that signaled to the market that the $70.1 million EBITDA and Carney's statement about Rural/Metro's liquidity were misleading. *SAC* ¶ 369. Although Defendants argue—and Plaintiffs admit—that the missed interest payment did not definitively establish that the EBITDA was less than $70 million in May 2013, Plaintiffs convincingly counter that the missed interest payment signaled to the market that Carney and Bingham had overstated EBITDA and the company's liquidity. Because the securities laws do not require an explicit correction, but only the release of information that suggests that the prior statements were false, this missed interest payment too may be a "corrective disclosure."

Defendants also assert that this second disclosure cannot be a basis for loss causation because the price of senior notes had already dropped into the 60s before the disclosure. *Mot.* 38. This argument misstates the allegations in the SAC. Although Plaintiffs admit that Plaintiff Oaktree bought senior notes for as low as $64 in the days before the missed interest payment, Plaintiffs assert that the price dropped to a new low of $61 after the disclosure. *SAC*, Exs. 1–3; *Warburg Opp.* 45:5–13. The Court notes that Plaintiffs' loss causation theory is not based on a single disclosure, but a series of disclosures over time. The proximity between the May 2013 misstatements and the July missed interest payment, and the close link between EBITDA and cash flow, as well as the other facts discussed here, are sufficient to allege that the missed interest payment is a partial disclosure. *See Dura*, 544 U.S. at 342–43 ("Other things being equal, the longer the time between purchase and sale, the more likely that this is so, *i.e.*, the more likely that other factors caused the loss").

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 15-8574 PSG (MRWx) | Date | January 17, 2017 |
|---|---|---|---|
| Title | Oaktree Principal Fund V, LP *et al.* v. Warburg Pincus LLC *et al.* | | |

Plaintiffs assert that Rural/Metro's bankruptcy filing on August 4, 2013 was the third and final disclosure that told investors that the EBITDA for the relevant period was $55 million, and not $70.1 million as reported, and that Rural/Metro did not have enough cash on hand to continue operating. *Id.* ¶¶ 371–72. The biggest losses for noteholders came after the bankruptcy filing, when the stock price fell from the 50s to the high 20s. *Id.* ¶ 372. Defendants contend that the bankruptcy filing cannot be a corrective disclosure because bankruptcy was "the far more probable cause" of the decline than the revelation of the accurate EBITDA. *Warburg Mot.* 40. Plaintiffs convincingly argue, however, that the declaration of an accurate EBITDA and the bankruptcy filing "went hand in glove." *Warburg Opp.* 46:6–12. They point out that Carney and Bingham's representation that EBITDA exceeded $70.1 million misled investors into believing that Rural/Metro did not need bankruptcy. The disclosure that EBITDA was actually $55 million and that Rural/Metro needed bankruptcy both corrected the earlier EBITDA estimate and the perceptions of financial health that it was designed to generate. As with the missed interest payment, the proximity in time between the bankruptcy filing and the May 2013 misstatements is substantial support of a causal link between the misrepresentation and the loss.

In light of the above, the Court concludes that Plaintiffs have asserted sufficient facts to state a plausible claim of causal connection between the statements on the September 2012, February 2013, and May 2013 Noteholder Calls and subsequent market activity.

        *c.*    *Reliance*

Defendants levy two reliance arguments against Plaintiffs. The first is specifically targeted at the purchases made by Plaintiffs DG Value Partners, L.P. and DG Value Partners II ("DG Plaintiffs"). The second is levied against all Plaintiffs.

As to the DG Plaintiffs, Defendants argue that they cannot plausibly plead reliance because all of the DG Plaintiffs' purchases took place on or after July 11, 2013—after the missed interest payment on July 9, 2013. *Warburg Mot.* 41:2–12. Plaintiffs counter that the missed interest payment was a partial disclosure and that the complete information about Rural/Metro's financial condition was not available until after Rural/Metro filed for bankruptcy. *Warburg Opp.* 47:4–16. The Court agrees with Plaintiffs. Courts have recognized that "[i]nvestors who purchased after such a [partial] disclosure may well have done so at a price still inflated by the same fraud (even if less so) and may suffer losses when the <u>full</u> details of the fraud are exposed." *In re LDK Solar Sec. Litig.*, 255 F.R.D. 519, 528–29 (N.D. Cal. 2009) (emphasis in original). The law encourages defendants to come forward swiftly and all at once with disclosures once defendants realize that they have communicated a material

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 15-8574 PSG (MRWx) | Date | January 17, 2017 |
|---|---|---|---|
| Title | Oaktree Principal Fund V, LP *et al.* v. Warburg Pincus LLC *et al.* | | |

misrepresentation. If defendants delay and allow information to leak out over time, they may still be liable to those that purchased after disclosures began to leak into the market.

The Warburg Defendants' second reliance argument attempts to refute Plaintiffs' assertion that they relied on "all prior calls" at the time that they made their purchases. The Warburg Defendants claim that these assertions are implausible and contradict what Plaintiffs asserted in the FAC. *See Warburg Mot.* 41. Again, the Court disagrees. Except in those cases where companies make a statement indicating that their prior statements are systematically unreliable, investors are entitled to look at the "total mix" of information, not just the latest news. The law here too encourages swift and complete disclosure because defendants' liability expands the longer they wait to correct misstatements and the more time they leave for investors to purchase stock relying on inaccurate information.

The Court thus concludes that Plaintiffs have pled sufficient facts to support a plausible claim of reliance.

> ### d. *Conclusion as to Plaintiffs' 10b-5 Claims*

In sum, Plaintiffs have adequately pled four 10b-5 violations. If Plaintiffs are able to prove their case at trial, Defendant Carney might be liable under 10b-5 for his communication of a $70 million EBITDA estimation, his failure to disclose that EBITDA might be lower or that the $70.1 million EBITDA was unreliable, and his statement that Rural/Metro was in "perfectly good liquidity position." Defendants Warburg Pincus LLC and Warburg Pincus Private Equity X, L.P. might be indirectly liable under 10b-5 as "makers" of Carney's statement that Rural/Metro was in "perfectly good liquidity position." And, finally, Defendant FTI Consulting, Inc. might be indirectly liable under Rule 10b-5 as the "maker" of Bingham's statements describing the $70.1 million EBITDA on the May 2013 call.

As the Court concluded in its August 9 Order, however, Defendants cannot be liable under Rule 10b-5 as the "makers" of DiMino's statements. DiMino was the primary violator and the "maker" of his statements. Nonetheless, as the Court explained earlier, this does not mean that Defendants cannot be liable as "control persons" under section 20(a) for DiMino's statements, or for the statements of their employees, Carney and Bingham. The Court turns now to that section 20(a) analysis.

> ### ii. *Section 20(a) Control Person Liability Claim*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 15-8574 PSG (MRWx) | Date | January 17, 2017 |
|---|---|---|---|
| Title | Oaktree Principal Fund V, LP *et al.* v. Warburg Pincus LLC *et al.* | | |

To state a claim under the control-person liability provision of the Securities Exchange Act, a plaintiff must show a primary violation by the controlled person, and control of the primary violator by the targeted defendant, and must show that the controlling person was in some meaningful sense a culpable participant in the fraud perpetrated by the controlled person. *See Fila v. Pingtan Marine Enterprise Ltd.*, No. CV 15-267 (AJN), 2016 WL 3962015 (S.D.N.Y. 2016). Plaintiffs need not assert scienter for the control person. *Paracor Finance, Inc. v. General Elec. Capital Corp.*, 96 F.3d 1151 **(9th Cir. 1996). The section 20(a) requirements are to be construed liberally, requiring only some indirect means of discipline or influence short of actual direction.** *See Harrison v. Dean Witter Reynolds, Inc.*, 974 F.2d 873 **(7th Cir. 1992). The "traditional indicia of control" are "having a prior lending relationship, owning stock in the target company, or having a seat on the board."** *No. 84 Emp'r-Teamster Joint Council Pension T. Fund v. Am. W. Holding Corp.*, **320 F.3d 920, 945 (9th Cir. 2003). Control also is sufficiently pled where the complaint alleges defendant's "high level position[] and the fact that the false statements alleged could be found in company press releases or financial statements."[1]** *In re CytRx Corp.*, **2015 WL 5031232, at \*17.**

> **Plaintiffs allege that all Defendants are control persons under 20(a) because of:**
>
> **their high-level positions, their ownership and contractual rights, participation in and awareness of Rural/Metro's operations and intimate knowledge of aspects of Rural/Metro's financial issues and dissemination of information to existing and potential investors in Senior Notes . . . [their] power to influence and control and did influence and control, directly or indirectly, the decision making of Rural/Metro and DiMino himself, including the content and dissemination of various statements and omissions in the investor presentations and otherwise which Plaintiffs contend are false and misleading.**

*SAC* **¶ 382. Given that Warburg owned and controlled 100 percent of the common stock of Rural/Metro, that Carney was Chairman of the Board of Directors of Rural/Metro and**

---

[1]     Rule 20(a) allows control persons an escape hatch from liability if they can show that "the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." *See* 15 U.S.C. § 78t(a). Although Defendants raise these arguments here, the focus of the Warburg Defendants' motion remains elsewhere. In any event, given the allegations of scienter levied against Carney and Bingham, the Court cannot conclude, at this phase in the litigation, that the Warburg Defendants are entitled to the "good faith" or "failure to induce" defenses.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 15-8574 PSG (MRWx) | Date | January 17, 2017 |
|---|---|---|---|
| Title | Oaktree Principal Fund V, LP *et al.* v. Warburg Pincus LLC *et al.* | | |

was primarily responsible for Warburg's investment in Rural/Metro, that Carney was fully engaged in the failed efforts to quantify Rural/Metro's revenue-recognition problems through, at least, the "Rural Recovery Project Workplan," and that Carney ultimately fired DiMino and took over all communications to investors, it is certainly plausible that the Warburg Defendants had the requisite "control" over DiMino. This is especially true given that Plaintiffs have successfully alleged primary liability against Carney, as it would be illogical for the Court to conclude that Carney was not in control of his own potential Exchange Act violations, or that the corporate employers are not liable for the conduct of their high-level employees. For the same reasons, it is plausible that FTI, as Bingham's employer, had the requisite control over Bingham. Thus, Plaintiffs' control allegations are sufficient, and Defendants' motions as to the section 20(a) claim are DENIED.

### B.      Common Law Claims

In addition to the federal securities claims, Plaintiffs bring causes of action for intentional misrepresentation, concealment, fraud based on conspiracy, and negligent misrepresentation. *See generally SAC.* In challenging the merits of these common law claims, Defendants either broadly state that the claims fail for the same reasons as the federal securities claims or they make conclusory statements about Plaintiffs' inability to state a claim. *See Warburg Mot.* 2, 45; *FTI Mot.* 24. Because Defendants' merit-based arguments are undeveloped, the Court need not consider them further here. They are DENIED.

FTI separately asserts a procedural argument concerning leave to amend. It contends that Plaintiffs added two new claims in the SAC against FTI without first seeking leave to amend from the Court. *FTI Mot.* 22–24. Although the Court granted Plaintiffs leave to amend when it dismissed the FAC, FTI argues that the Court only granted leave to amend the federal security claims, and not to add new claims against defendants. FTI's arguments overlook the many opinions from district courts in this Circuit that routinely allow plaintiffs to add new claims or parties to an amended complaint where a prior order of dismissal granted the plaintiff leave to amend without limitation. *See Jameson Beach Prop. Owners Ass'n v. United States*, No. CV 13-1025 MCE (ACx), 2014 WL 4925253, at *3–4 (E.D. Cal. Sept. 29, 2014); *Forest Ambulatory Surgical Assocs., L.P. v. Ingenix, Inc.*, No. CV 12-2916 PSG (FFMx), 2013 WL 11323601, at *3 (C.D. Cal. Dec. 13, 2013), *on reconsideration in part sub nom. Forest Ambulatory Surgical Assocs., L.P. v. United Healthcare*, 2014 WL 11395929 (C.D. Cal. Feb. 12, 2014) (declining to strike new claims where court granted leave without limitation). Because the federal rules counsel in favor

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 15-8574 PSG (MRWx) | Date | January 17, 2017 |
|---|---|---|---|
| Title | Oaktree Principal Fund V, LP *et al.* v. Warburg Pincus LLC *et al.* | | |

of a liberal amendment policy and such a policy serves the goals of judicial efficiency, the Court DENIES FTI's motion to strike these claims.

In sum, Defendants have not demonstrated why the Court should dismiss Plaintiffs' common law claims, and thus all common law claims survive the motion to dismiss.

**IV.   Conclusion**

The Court DENIES Defendants' motions to dismiss and to strike.  Although many of Plaintiffs' allegations about the Noteholder Calls do not survive the motion to dismiss, Plaintiffs' five causes of action all survive intact.  Specifically, the Court concludes:

1. Defendants have adequately pled 10b-5 violations for all Defendants.  Defendant Carney may be liable under 10b-5 for his estimation of a $70 million EBITDA calculation, his failure to disclose that EBITDA might be lower, and his statement that Rural/Metro was in "perfectly good liquidity position."  Defendants Warburg Pincus LLC and Warburg Pincus Private Equity X, L.P. may be indirectly liable under 10b-5 as "makers" of Carney's statement that Rural/Metro was in "perfectly good liquidity position."  And, finally, Defendant FTI Consulting, Inc. may be indirectly liable under Rule 10b-5 as the "maker" of Bingham's statements describing and justifying the $70.1 million EBITDA on the May 2013 call, and his failure to disclose that EBITDA might be lower.

2. Defendants have adequately pled section 20(a) violations for all Defendants.  The Warburg Defendants may be liable for the DiMino statements from the September 2012 and February 2013 Noteholder Calls, and they may be liable for Carney's statements on the May 2013 call.  Defendant FTI may be liable under section 20(a) for Bingham's statements on the May 2013 call.

3. Plaintiffs' common law claims may proceed past this motion to dismiss.  The Court finds Defendants' conclusory allegations about why they should be dismissed lacking in merit, as are Defendant FTI's procedural arguments regarding jurisdiction and leave to amend.

IT IS SO ORDERED.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 15-8574 PSG (MRWx) | Date | January 17, 2017 |
|---|---|---|---|
| Title | Oaktree Principal Fund V, LP *et al.* v. Warburg Pincus LLC *et al.* | | |